# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
### GREEN BAY DIVISION

| | |
|---|---|
| OLIVIA KREIE, | CASE NO.: |
| Plaintiff, | 26-CV-738 |
| v. | |
| THE KRAFT HEINZ COMPANY, MONDELEZ INTERNATIONAL, INC.. POST HOLDINGS, INC., THE COCA-COLA COMPANY, PEPSICO, INC., GENERAL MILLS, INC., NESTLE USA, INC., KELLANOVA, WK KELLOGG CO., MARS INCORPORATED, INC., CONAGRA BRANDS, INC., and UNILEVER UNITED STATES, INC., | |
| Defendants. | |

## COMPLAINT AND JURY DEMAND

1

Plaintiff, by her attorneys, **KRAVIT, HOVEL & KRAWCZYK, S.C** and **DOUGLAS & LONDON, P.C.**, upon information and belief, at all times hereinafter mentioned, alleges as follows:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because Defendants are citizens of states other than the state in which the named Plaintiff is a citizen.

2. This Court has personal jurisdiction over each Defendant, consistent with the United States Constitution and Wisconsin's "long arm" statute, because Plaintiff's claims arise out of each Defendant's transactions of business and tortious acts within the State of Wisconsin, and by virtue of each Defendant's substantial, continuous, systematic and not-isolated activity within the State of Wisconsin.

3. Venue is proper in this District under 28 U.S.C. §1391, as a substantial part of the events and omissions giving rise to this action occurred in this District. Each Defendant regularly conducts business in this District, are responsible for the sale and distribution of their respective UPF in this District, and/or Plaintiff was exposed, diagnosed and treated in this District.

## NATURE OF THE CASE

4. This action is brought by Plaintiff OLIVIA KREIE who was injured as a result of her ingestion of ultra-processed foods ("UPF"), which at all relevant times were designed, research, manufactured, tested, advertised, labeled, promoted, marketed, sold, and/or distributed by each Defendant.

2

5. In the United States of America, one of the greatest threats to health, and the health of children, are the substances that dominate the shelves of grocery stores: UPF.

6. UPF are industrially produced edible substances that are imitations of food.[1] They consist of former foods that have been fractioned into substances, chemically modified, combined with additives, and then reassembled using industrial techniques such as molding, extrusion and pressurization.[2]

7. UPF are alien to prior human experience. They are inventions of modern industrial technology and contain little to no whole food.[3] However, the prevalence of these foods exploded in the 1980s, and have come to dominate the American food environment and the American diet. The issue is particularly pronounced in children, who now derive over 2/3 of their energy from UPF on average.[4]

8. The explosion and ensuing rise in UPF in the 1980s was accompanied by an explosion in obesity, diabetes, and other life-changing chronic illnesses.[5]

9. During this timeframe, diseases that had been largely confined to older adults, such as Type 2 Diabetes and Fatty Liver Disease, emerged in children.[6] Although such diseases were

---

[1] Carlos A. Monterio et al., *Ultra-processed foods, diet quality, and health using the NOVA classification system*, Food and Agriculture Organization of the United Nations, 2019; Carlos A. Monterio et al., *Ultra-processed foods: what they are and how to identify them*, Public Health Nutr., Apr. 2019; Dr. Jean-Claude Moubarac, *Ultra Processed Food and Drink Products in Latin America: Trends, impact on obesity, policy implications*, Pan American Health Organization, at 6-8, 2015; Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 33, 155, (2023).
[2] Id.
[3] Id.
[4] Lu Wang et al., *Trends in Consumption of Ultraprocessed Foods Among US Youths Aged 2-19 Years, 1999-2018*, JAMA, Aug. 2021.
[5] Regina M. Benjamin, *United States Surgeon General's Vision for a Healthy and Fit Nation*, Public Health Rep., Jul. 2010.
[6] Heather J. Dean & Elizabeth Sellers, Children have Type 2 Diabetes too, a historical perspective, Biochem Cell Biol, Oct. 2015; Ariana Eunjung Cha, *Fatty liver disease rising in U.S. kids as Ultra-Processed Diets Surge*, Washington Post, Oct. 3, 2023.

unheard of in children 40 years ago, they are now common, and treating them constitutes a large fraction of pediatric medical practice.

10. The human genome did not experience a catastrophic failure or paradigmatic shift during this timeframe. Similarly, the explosion of these diseases cannot be explained by a massive nationwide failure of personal responsibility that began in the 1980s. Instead, something else happened in the 1980s.

11. In the 1980s, two major tobacco companies ("Tobacco Companies") took over the American food environment. Phillip Morris bought major US food companies, including General Foods and Kraft.[7] RJ Reynolds purchased Nabisco, Del Monte, Kentucky Fried Chicken, and others.[8]

12. Collectively, Phillip Morris and RJ Reynolds dominated the US food system for decades.[9] During this time, they used their cigarette playbook to fill our food environment with addictive substances that they aggressively marketed to children and minorities.

13. UPF formulation strategies were guided by the same tobacco company scientists and the same type of brain research on sensory perceptions, physiological psychology, and chemical senses that were used to increase the addictiveness of cigarettes.

14. Studies of how electrical messages are transmitted throughout the central nervous system are used to formulate UPF. For example, scientists who supervised human electrode tests on

---

[7] Terra L. Fazzino, US Tobacco Companies Selectively Disseminated Hyper-Palatable Foods into the US Food System: Empirical evidence and current implications, Addiction, Sept. 2023; Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, at 122-123, (2013).
[8] Terra L. Fazzino, US Tobacco Companies Selectively Disseminated Hyper-Palatable Foods into the US Food System, Addiction, Sept. 2023.
[9] Id.

nicotine's addictiveness at a secret Phillip Morris laboratory in Germany regularly consulted with Kraft and General Foods on the development of UPF.[10]

15. In doing so, these Tobacco Companies intentionally designed UPF to hack the physiological structures of our brains.[11]

16. These formulation strategies were quickly adopted throughout the UPF industry, with the goal of driving consumption, and Defendants' profits, at all costs. The same MRI machines used by scientific researchers to study potential cures for addiction are used by UPF companies to engineer their products to be ever more addictive.[12]

17. At the same time, these Tobacco Companies repurposed marketing strategies designed to sell cigarettes to children and minorities, and aggressively marketed UPF to these groups.[13] As a Phillip Morris executive boasted at a UPF industry conference, "We've decided to focus our marketing on kids where we know our strength is the greatest".[14]

18. The rest of the UPF industry quickly followed suit, taking a very well-evolved marketing strategy to sell things that make people sick and applying it from one substance, cigarettes,

---

[10] Patricia Callahan, *Where there's smoke, there might be food research, too*, Chicago Tribune, Jan. 29, 2006; Interoffice Memo, F. P Gullotta, R. D. Kisner, (Oct. 22, 1991); Interoffice Memo, F. P Gullotta, Dr. R. A Carchman, (Mar. 22, 1991); Interoffice Memo, C. S. Hayes, R. D. Kisner, (Mar. 26, 1991); Interoffice Memo, F. P. Gullota et al., C. K. Ellis, (Nov. 8, 1990).

[11] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).

[12] Laura Schmidt, *Why we can't stop eating unhealthy foods*, Nov. 2015. https://www.youtube.com/watch?v=wTNlHyjip94.

[13] Kim H. Nguyen et al., *Tobacco Industry Involvement in Children's Sugary Drinks Market*, BMJ, Mar. 2019.

[14] Andrew Jacobs, *How Big Tobacco Hooked Children on Sugary Drinks*, New York Times, Mar. 14, 2019

to another: UPF.[15] The UPF industry now spends about $2 billion each year marketing UPF to children.[16]

19.     These strategies have had their intended effect. UPF meet all the scientific criteria that were used to determine that tobacco products are addictive.[17] Like industrial tobacco products, UPF trigger compulsive use, have psychoactive effects, are highly reinforcing, and trigger strong urges and cravings.[18]

20.     Meanwhile, UPF sales have surged. UPF have displaced traditional foods and now constitute the vast majority of children's diets.

21.     While the multinational UPF companies get richer, Americans get sicker.

22.     We are all living with the devastating consequences of each Defendant's actions. The United States is beset by concurrent epidemics of obesity, diabetes, heart disease, and other conditions.[19] Obesity has doubled among adults and tripled among children.[20] The number of Americans with Type 2 Diabetes has tripled since 1980.[21] Rates of colorectal cancer have doubled in younger adults.[22]

---

[15] Sarah Berry, *More of us are turning away from our 'vices'. But will it make a difference*?, The Sydney Morning Herald, Nov. 11, 2023.
[16] Center for Science in the Public Interest, *Food Marketing to Children*, (2013), https://www.foodmarketing.org/wp-content/uploads/2013/10/food_marketing_to_children_factsheet_2013.pdf.
[17] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Apr. 2023.
[18] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Nov. 2022.
[19] Regina M. Benjamin, *United States Surgeon General's Vision for a Healthy and Fit Nation*, Public Health Rep., Jul. 2010.
[20] Id.
[21] Id.
[22] Rebecca L. Siegel et al., *Colorectal Cancer Statistics*, CA Cancer J Clin., May 2023.

6

23. For the first time ever, Type 2 Diabetes and Non-Alcoholic Fatty Liver Disease emerged in adolescents around the turn of the millennium.[23] The rates of these diseases in children are now surging, with rates of both doubling in recent years.[24] Non-Alcoholic Fatty Liver Disease is now as common in children as asthma.[25]

24. Scores of high-quality human studies have demonstrated that UPF significantly increase the risks of obesity, Type 2 Diabetes, non-alcoholic Fatty Liver Disease, cancers, cardiovascular disease, cerebrovascular disease, irritable bowel disease, dementia, mental health outcomes, mortality, and other serious chronic illnesses.

25. However, these same studies demonstrate that UPF increase these risks independently of their nutritional profiles. Even after adjustment for the fat, sugar, salt, carbohydrates, and other nutrient profiles, UPF still cause significant health risks.

26. In other words, UPF are dangerous not only because they are designed to hack our physiological nervous system and are aggressively marketed to children. The risks caused by UPF cannot be avoided simply by choosing healthier UPF with less fat, sugar, salt, carbohydrates, or different nutrient profiles. Likewise, UPF does not increase the risks of other conditions simply because it causes obesity.

27. Instead, UPF increase the risks of disease ***because*** they are ultra-processed, not because of how many grams of certain nutrients they contain or how much weight gain they cause.

---

[23] Heather J. Dean & Elizabeth Sellers, *Children have Type 2 Diabetes too, a historical perspective*, Biochem Cell Biol, Oct. 2015; Ariana Eunjung Cha, *Fatty liver disease rising in U.S. kids as Ultra-Processed Diets Surge*, Washington Post, Oct. 3, 2023.
[24] Jean M. Lawrence, *Trends in Prevalence of Type 1 and Type 2 Diabetes in Children and Adolescents in the US, 2001-2017*, JAMA, Aug. 2021; Children's Health, *Fatty liver disease in children is on the rise*, (Last updated 2024), https://www.childrens.com/health-wellness/fatty-liver-disease-in-children-on-the-rise; Ariana Eunjung Cha, *Fatty liver disease rising in U.S. kids as Ultra-Processed Diets Surge*, Washington Post, Oct. 3, 2023.
[25] Ariana Eunjung Cha, *Fatty liver disease rising in U.S. kids as Ultra-Processed Diets Surge*, Washington Post, Oct. 3, 2023.

7

Therefore, even attempts to eat healthfully are undermined by the ultra-processed nature of UPF. One cannot evade the risks caused by UPF simply by selecting UPF with lower calories, fat, salt, sugar, carbohydrates, or other nutrients.

28.     The UPF industry is well aware of the harms they are causing and has known it for decades. But they continue to inflict massive harm on society in a reckless pursuit of profits.

29.     In April 1999, the CEOs of the largest UPF companies attended a secret meeting in Minneapolis to discuss the devastating public health consequences of UPF and their conduct.[26] At that meeting, a Kraft executive told the other CEOs in attendance that obesity was reaching epidemic proportions, especially among children, who were "at a higher risk of developing chronic diseases such as diabetes, heart disease, hypertension and cancer".[27]

30.     This same executive informed the others that their companies were collectively driving this, costing the U.S. upwards of $100 billion a year, and inflicting a toll on public health rivaling that of tobacco.[28]

31.     He then implored the attendees to change their ways before this became a crisis for the UPF industry, asking rhetorically, "With all this, can the trial lawyers be far behind?"[29]

32.     But nothing changed as a result of that meeting, and the UPF industry has carried on inflicting massive social harm on our health and our children for the last 25 years.

33.     In November of 2025, the Lancet Journal published a three-paper series reviewing the evidence confirming the increase in UPF in diets globally and the association with many health

---

[26] Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, (2013); Michael Mudd, Remarks for ILSI CEO Dinner, (Draft April 2, 1999).
[27] Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, (2013); Michael Mudd, Remarks for ILSI CEO Dinner, (Draft April 2, 1999).
[28] Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, (2013); Michael Mudd, Remarks for ILSI CEO Dinner, (Draft April 2, 1999).
[29] Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, (2013); Michael Mudd, Remarks for ILSI CEO Dinner, (Draft April 2, 1999)

risks, including Type 2 Diabetes. Among the many topics addressed in the series were: (1) the power and control of the UPF industry, which includes each Defendant named herein, and how the UPF industry is the key driver of the harm to global health, including Type 2 Diabetes; and (2) how the main barrier to advancing policy responses is the corporate political activities of the UPF industry, which includes each Defendant named herein, coordinated through a network of front groups, multi-stakeholder initiatives, and research partners, to counter and block regulation.[30]

34.     Each Defendant targeted Plaintiff with marketing campaigns intended to increase her consumption of their respective UPF, which each Defendant engineered to have addictive qualities.

35.     Due to each Defendant's conduct, Plaintiff was and still is caused to suffer serious and dangerous side effects including, inter alia, Type 2 Diabetes and all of its sequelae, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing other injuries associated with UPF.

36.     Plaintiff has sustained the above health consequences due to her ingestion of each Defendant's UPF, and each Defendant's actions or omissions as set forth herein were a direct and proximate cause of her health consequences.

37.     Plaintiff brings this action to recover the damages Defendants have inflicted upon her, as well as all additional damages available under applicable law.

---

[30] Baker, et al, *Towards unified global action on ultra-processed foods: understanding commercial determinants, countering corporate power, and mobilising a public health response*, Lancet, Vol. 4, pp. 2703-2726 (Dec. 6. 2025).

9

## PARTY PLAINTIFF

38. Plaintiff OLIVIA KREIE is a citizen of the United States of America, and is a citizen and resident of the State of Wisconsin.

39. Plaintiff OLIVIA KREIE was born in 2006 and turned 18 in 2024.

40. Plaintiff OLIVIA KREIE has ingested each Defendant's UPF throughout her entire life.

41. Plaintiff OLIVIA KREIE was exposed to each Defendant's wrongful conduct in the state of Wisconsin.

42. Plaintiff OLIVIA KREIE was diagnosed and treated for her injuries, which she alleges were caused by use of and exposure to each Defendant's respective UPF, in Wisconsin.

43. As result of her ingestion and exposure to each Defendant's harmful UPF, Plaintiff OLIVIA KREIE has been caused to suffer from Type 2 Diabetes which was first diagnosed on March 19, 2016, and which has caused her to sustain severe and permanent personal injuries, pain, suffering, and emotional distress related thereto.

## PARTY DEFENDANTS

44. Defendant The Kraft Heinz Company ("KRAFT HEINZ") is a Delaware corporation with its principal place of business and headquarters located in Chicago, Illinois. Thus, for diversity of citizenship purposes, KRAFT HEINZ is a citizen of Delaware and Illinois.

45. KRAFT HEINZ is a successor to Philip Morris Companies, Inc., Altria Group, Inc., Kraft General Foods Inc., Kraft Foods Group, Inc., Kraft Foods, Inc. and H.J. Heinz Company.

46. As part of its business, Defendant KRAFT HEINZ is involved in the creation, research, development, design, testing, marketing, promotion, labeling, advertising, sale and/or distribution of UPF.

10

47. Defendant KRAFT HEINZ has transacted and conducted business in the State of Wisconsin.

48. Defendant KRAFT HEINZ has derived substantial revenue from goods and products sold and/or used in the State of Wisconsin.

49. Defendant KRAFT HEINZ expected or should have expected its acts to have consequence within the State of Wisconsin, and derived substantial revenue from interstate commerce within the United States, and Wisconsin, more particularly.

50. Defendant Mondelez International, Inc. ("MONDELEZ") is a Virginia corporation with its principal place of business and headquarters located in Chicago, Illinois. Thus, for diversity of citizenship purposes, MONDELEZ is a citizen of Virginia and Illinois.

51. MONDELEZ is a successor to R.J. Reynolds Industries Inc., RJR Nabisco Holdings Corp., Nabisco Holdings Corp., Philip Morris Companies, Inc., Altria Group, Inc., Kraft General Foods Inc., Kraft Foods Group, Inc., and Kraft Foods, Inc.

52. As part of its business, Defendant MONDELEZ is involved in the creation, research, development, design, testing, marketing, promotion, labeling, advertising, sale and/or distribution of UPF.

53. Defendant MONDELEZ has transacted and conducted business in the State of Wisconsin.

54. Defendant MONDELEZ has derived substantial revenue from goods and products sold and/or used in the State of Wisconsin.

55. Defendant MONDELEZ expected or should have expected its acts to have consequence within the State of Wisconsin, and derived substantial revenue from interstate commerce within the United States, and Wisconsin, more particularly.

11

56. Defendant Post Holdings, Inc. ("POST HOLDINGS") is a Missouri corporation with its principal place of business and headquarters located in St. Louis, Missouri 63144. Thus, for diversity of citizenship purposes, POST HOLDINGS is a citizen of Missouri.

57. POST HOLDINGS is a successor to Philip Morris Companies, Inc., Altria Group, Inc., Kraft General Foods Inc., Kraft Foods Group, Inc., and Kraft Foods, Inc.

58. As part of its business, Defendant POST HOLDINGS is involved in the creation, research, development, design, testing, marketing, promotion, labeling, advertising, sale and/or distribution of UPF.

59. Defendant POST HOLDINGS has transacted and conducted business in the State of Wisconsin.

60. Defendant POST HOLDINGS has derived substantial revenue from goods and products sold and/or used in the State of Wisconsin.

61. Defendant POST HOLDINGS expected or should have expected its acts to have consequence within the State of Wisconsin, and derived substantial revenue from interstate commerce within the United States, and Wisconsin, more particularly.

62. Defendant The Coca-Cola Company ("COCA-COLA") is a Delaware corporation with its principal place of business and headquarters located in Atlanta, Georgia. Thus, for diversity of citizenship purposes, COCA-COLA is a citizen of Delaware and Georgia.

63. As part of its business, Defendant COCA-COLA is involved in the creation, research, development, design, testing, marketing, promotion, labeling, advertising, sale and/or distribution of UPF.

64. Defendant COCA-COLA has transacted and conducted business in the State of Wisconsin.

12

65. Defendant COCA-COLA has derived substantial revenue from goods and products sold and/or used in the State of Wisconsin.

66. Defendant COCA-COLA expected or should have expected its acts to have consequence within the State of Wisconsin, and derived substantial revenue from interstate commerce within the United States, and Wisconsin, more particularly.

67. Defendant PepsiCo, Inc. ("PEPSICO") is a North Carolina corporation with its principal place of business and headquarters located in Purchase, New York 10577. Thus, for diversity of citizenship purposes, PEPSICO is a citizen of North Carolina and New York.

68. As part of its business, Defendant PEPSICO is involved in the creation, research, development, design, testing, marketing, promotion, labeling, advertising, sale and/or distribution of UPF.

69. Defendant PEPSICO has transacted and conducted business in the State of Wisconsin.

70. Defendant PEPSICO has derived substantial revenue from goods and products sold and/or used in the State of Wisconsin.

71. Defendant PEPSICO expected or should have expected its acts to have consequence within the State of Wisconsin, and derived substantial revenue from interstate commerce within the United States, and Wisconsin, more particularly.

72. Defendant General Mills, Inc. ("GENERAL MILLS") is a Delaware corporation with its principal place of business and headquarters located in Minneapolis, Minnesota. Thus, for diversity of citizenship purposes, GENERAL MILLS is a citizen of Delaware and Minnesota.

73. As part of its business, Defendant GENERAL MILLS is involved in the creation, research, development, design, testing, marketing, promotion, labeling, advertising, sale and/or

13

distribution of UPF.

74.     Defendant GENERAL MILLS has transacted and conducted business in the State of Wisconsin.

75.     Defendant GENERAL MILLS has derived substantial revenue from goods and products sold and/or used in the State of Wisconsin.

76.     Defendant GENERAL MILLS expected or should have expected its acts to have consequence within the State of Wisconsin, and derived substantial revenue from interstate commerce within the United States, and Wisconsin, more particularly.

77.     Defendant Nestle USA, Inc. ("NESTLE") is a Delaware corporation with its principal place of business and headquarters located in Arlington, Virginia, 22209. Thus, for diversity of citizenship purposes, NESTLE is a citizen of Delaware and Virginia.

78.     As part of its business, Defendant NESTLE is involved in the creation, research, development, design, testing, marketing, promotion, labeling, advertising, sale and/or distribution of UPF.

79.     Defendant NESTLE has transacted and conducted business in the State of Wisconsin.

80.     Defendant NESTLE has derived substantial revenue from goods and products sold and/or used in the State of Wisconsin.

81.     Defendant NESTLE expected or should have expected its acts to have consequence within the State of Wisconsin, and derived substantial revenue from interstate commerce within the United States, and Wisconsin, more particularly.

82. Defendant KELLANOVA is a Delaware corporation with its principal place of business and headquarters located in Chicago, Illinois. Thus, for diversity of citizenship purposes, KELLANOVA is a citizen of Delaware and Illinois.

83. As part of its business, Defendant KELLANOVA is involved in the creation, research, development, design, testing, marketing, promotion, labeling, advertising, sale and/or distribution of UPF.

84. Defendant KELLANOVA has transacted and conducted business in the State of Wisconsin.

85. Defendant KELLANOVA has derived substantial revenue from goods and products sold and/or used in the State of Wisconsin.

86. Defendant KELLANOVA expected or should have expected its acts to have consequence within the State of Wisconsin, and derived substantial revenue from interstate commerce within the United States, and Wisconsin, more particularly.

87. Defendant WK KELLOGG CO. is a Delaware corporation with its principal place of business and headquarters located in Battle Creek, Michigan. Thus, for diversity of citizenship purposes, WK KELLOGG CO. is a citizen of Delaware and Michigan.

88. As part of its business, Defendant WK KELLOGG CO is involved in the creation, research, development, design, testing, marketing, promotion, labeling, advertising, sale and/or distribution of UPF.

89. Defendant WK KELLOGG CO has transacted and conducted business in the State of Wisconsin.

90. Defendant WK KELLOGG CO has derived substantial revenue from goods and products sold and/or used in the State of Wisconsin.

15

91. Defendant WK KELLOGG CO expected or should have expected its acts to have consequence within the State of Wisconsin, and derived substantial revenue from interstate commerce within the United States, and Wisconsin, more particularly.

92. At all relevant times to this action, Defendants KELLANOVA and WK KELLOGG CO. collectively operated as "Kellogg Company". Defendants KELLANOVA and WK KELLOGG CO. are successors to Kellogg Company ("KELLOGG'S"), and were each formed on October 2, 2023 through a corporate split of the predecessor Kellogg Company. Thus, Defendants KELLANOVA and WK KELLOGG CO. are collectively referred to herein as "KELLOGG'S".

93. Defendant Mars Incorporated, Inc. ("MARS") is a Delaware corporation with its principal place of business and headquarters located in McLean, Virginia. Thus, for diversity of citizenship purposes, MARS is a citizen of Delaware and Virginia.

94. As part of its business, Defendant MARS is involved in the creation, research, development, design, testing, marketing, promotion, labeling, advertising, sale and/or distribution of UPF.

95. Defendant MARS has transacted and conducted business in the State of Wisconsin.

96. Defendant MARS has derived substantial revenue from goods and products sold and/or used in the State of Wisconsin.

97. Defendant MARS expected or should have expected its acts to have consequence within the State of Wisconsin, and derived substantial revenue from interstate commerce within the United States, and Wisconsin, more particularly.

98. Defendant ConAgra Brands, Inc. ("CONAGRA") is a Delaware corporation with its principal place of business and headquarters located in Chicago, Illinois. Thus, for diversity of citizenship purposes, ConAgra is a citizen of Delaware and Illinois.

99. As part of its business, Defendant CONAGRA is involved in the creation, research, development, design, testing, marketing, promotion, labeling, advertising, sale and/or distribution of UPF.

100. Defendant CONAGRA has transacted and conducted business in the State of Wisconsin.

101. Defendant CONAGRA has derived substantial revenue from goods and products sold and/or used in the State of Wisconsin.

102. Defendant CONAGRA expected or should have expected its acts to have consequence within the State of Wisconsin, and derived substantial revenue from interstate commerce within the United States, and Wisconsin, more particularly.

103. Defendant UNILEVER UNITED STATES, INC. ("UNILEVER") is a Delaware corporation with its principal place of business and headquarters located in Hoboken, New Jersey. Thus, for diversity of citizenship purposes, UNILEVER is a citizen of Delaware and New Jersey.

104. As part of its business, Defendant UNILEVER is involved in the creation, research, development, design, testing, marketing, promotion, labeling, advertising, sale and/or distribution of UPF.

105. Defendant UNILEVER has transacted and conducted business in the State of Wisconsin.

106. Defendant UNILEVER has derived substantial revenue from goods and products sold and/or used in the State of Wisconsin.

107. Defendant UNILEVER expected or should have expected its acts to have consequence within the State of Wisconsin, and derived substantial revenue from interstate commerce within the United States, and Wisconsin, more particularly.

17

I.    **Ultra-Processed Foods**

    A.    *What are UPF?*

108.    UPF is a categorization of food defined by the NOVA System, a scientific framework. The NOVA System is widely used in the international scientific community, and categorizes food based on the extensiveness of processing, without regard to nutrient composition.

109.    The key insight underlying NOVA is that food is more than just the sum of its macronutrients, and that food, not nutrients, is the fundamental unit in nutrition.

110.    Traditional diets throughout the world are healthful, even though they diverge widely in their nutrient content. For example, traditional Asian diets are high in salt, traditional Latin American diets are high in carbohydrates, and traditional Mediterranean diets are high in fat. Nevertheless, all promote healthful lives and positive health outcomes.

111.    UPF are fundamentally different than the foods that make up traditional diets.

112.    Unlike traditional foods that have dominated diets for all of human history, UPF are industrially produced edible substances that are imitations of food.[31] UPF are formulations of, typically, cheap industrial ingredients using a series of industrial processes.[32] These ultra-processed products are not modified foods, but formulations made mostly or entirely of fractionated substances that have undergone hydrolysis, hydrogenation, or other chemical modifications, and contain ingredients that have no or rare culinary use—such as fructose, high-

---

[31] Dr. Jean-Claude Moubarac et al., *Ultra-Processed Food and Drink Products in Latin America: Sales, Sources, Nutrient Profiles, and Policy Implications*, Pan American Health Organization of the World Health Organization, 2019.

[32] Carlos A. Monteiro et al., *Ultra-processed foods, diet quality and human health*, Food and Agriculture Organization of the United Nations, 2019; Carlos A. Monteiro et al., *UN Decade of Nutrition, the NOVA food classification and the trouble with ultra-processing*, Public Health Nutr. Jan. 2018.

fructose corn syrup, 'fruit juice concentrates', invert sugar, matlodextrin, dextrose, lactose, hydrogenated or interesterfied oils, hydrolysed proteins, soya protein isolate, gluten, casein, whey protein, 'mechanically separated meat'—and additives such as colors, flavors, flavor enhancers, emulsifiers, emulsifying salts, artificial sweeteners, thickeners, and foaming, anti-foaming, bulking, carbonating, gelling, and glazing agents.[33]

113. Additives are used either to disguise unpleasant sensory properties created by ingredients, processes, or packaging used in the manufacture of ultra-processed products, or give the final product intense sensory properties especially attractive to see, taste, smell, and/or touch, or both.[34]

114. These substances are then assembled into end products using industrial processes such as extrusion, moulding, and pre-frying.[35] Sophisticated and attractive packaging is used, usually made of synthetic materials.[36]

115. The practical way to identify UPF is to see if its list of ingredients contains substances that are never or rarely used in kitchens.[37] If so, the product is UPF.

116. Processes and ingredients used for the manufacture of UPF are designed to create highly profitable products (low-cost ingredients, long shelf-life, branded products) that are hyper-palatable and owned by transnational corporations.[38]

117. UPF are engineered to be overconsumed, addictive and irresistible.[39]

---

[33] Id.
[34] Id.
[35] Id.
[36] Id.
[37] Id.
[38] Id.
[39] Carlos A. Monteiro et al., *Ultra-processed foods, diet quality and human health*, Food and Agriculture Organization of the United Nations, 2019; Food, Diet and Obesity Committee, *Corrected Oral Evidence: Food Diet and Obesity, Evidence Session 11, Question 147*, House of

118.    These features, along with aggressive marketing—including vivid packaging, health claims, establishment of franchised outlets, campaigns using social, electronic, broadcast and print media, including to children and in schools—has caused UPF to displace real food.[40]

### B.    *UPF are Dangerous & Cause Human Harm*

119.    The nature of the processes and ingredients used in their manufacture make UPF intrinsically unhealthy.[41]

120.    UPF have been extensively studied in epidemiological research. Large, rigorous, high-quality scientific studies have found that consuming UPF significantly increases risks of numerous non-communicable diseases, including but not limited to Type 2 Diabetes[42] and non-alcoholic Fatty Liver Disease[43].

---

Lords, Mar. 2024; Tara Parker-Pope, *How the Food Makers Captured Our Brains*, N.Y. Times, June 22, 2009.

[40] Carlos A. Monteiro et al., *Ultra-processed foods, diet quality and human health*, Food and Agriculture Organization of the United Nations, 2019; Carlos A. Monteiro et al., *UN Decade of Nutrition, the NOVA food classification and the trouble with ultra-processing*, Public Health Nutr., Jan. 2018.

[41] Carlos A. Monteiro et al., *Ultra-processed foods, diet quality and human health*, Food and Agriculture Organization of the United Nations, 2019.

[42] Sajjad Moradi et al., *Ultra Processed Food Consumption and Adult Diabetes Risk: A Systematic Review and Dose-Response Meta Analysis*, Nutrients, Dec. 2021; Felipe M. Delpino et al., *Ultra-processed food and risk of type 2 diabetes: a systematic review and meta-analysis of longitudinal studies*, Int J Epidemiol., Aug. 2022; Zhangling Chen et al., *Ultra-Processed Food Consumption and Risk of Type 2 Diabetes: Three Large Prospective U.S. Cohort Studies*, Diabetes Care., Jul. 2023; María Llavero-Valero et al., *Ultra-processed foods and type 2 diabetes risk in the SUN project: A Prospective Cohort Study* , Clin Nutr., May 2021; Claudia Gutierrez-Ortiz et al., *Impact of Ultra-Processed Foods Consumption on the Burden of Obesity and Type 2 Diabetes in Belgium*, BMC Public Health, Mar. 2025.

[43] Longgang Zhao et al., *Higher Ultra-Processed Food Intake was Positively Associated with odds of NAFLD in both US Adolescents and Adults*: *A National Study*, Heptaol Commun., Aug. 2023; Longgang Zhao et al., *Higher ultra-processed food intake is associated with adverse liver outcomes a prospective cohort study of UK Biobank participants*, Am J Clin Nutr., Oct. 2023. Yi-Fend Zhang et al., *Association of Ultra-Processed Food Intake with Severe NAFLD*, J. Nurt., Health and Aging, Aug. 2024

20

121. Importantly, these scientific studies control for nutrient composition of UPF. In other words, the risks caused by UPF are not solely a function of the amount of calories, fat, sugar, salt, carbohydrates, protein or other macronutrients consumed.

122. Instead, UPF ***cause unique health risks***, separate and apart from the nutrient quality of a diet. These risks are further compounded by the poor dietary quality of UPF.

123. The unique health risks of UPF are also exacerbated by the fact that UPF are engineered to be overconsumed.

124. A randomized-controlled trial conducted by the National Institutes of Health meticulously matched the diets of inpatient subjects by nutritional composition, with one group receiving a UPF diet and the other group receiving a nutritionally identical diet of real food.[44] The group receiving the UPF diet consumed over 500 calories more each day and gained approximately a pound each week.[45] By contrast, the group receiving real food lost weight.[46]

125. A second randomized-controlled trial with a similar design confirmed these results, finding that individuals fed an UPF diet consumed 813.5 calories a day and gained an average of 1.2 pounds each week compared to those fed a non-UPF diet.[47]

126. A third randomized-controlled trial found that UPF increased body weight and altered cholesterol ratios independently of caloric intake.[48] This randomized-controlled trial also found that UPF independently affected hormones involved in energy metabolism.[49]

---

[44] Kevin D. Hall et al., *Ultra Processed Diets Cause Excess Calorie Intake and Weigh Gain: An Inpatient Randomized Controlled Trial of Ad Libitum Food Intake*, Cell Metab., Jul. 2019.
[45] Id.
[46] Id.
[47] Shoko Hamano et al., *Ultra-processed foods cause weight gain and increased enerdy intake associated with reduced chewing frequency: a randomized, open-label, crossover study*, Diabetes Obes. Metab., Aug. 2024
[48] Jessica Preston et al., *Effect of Ultra-Processed Food Consumption on Male Reproductive and Metabolic Health*, Cell Metab., Oct. 7, 2025
[49] Id.

21

127. The authors, considering the accumulated evidence from multiple RCTs found that "calories from unprocessed or UPFs are not equally stored or metabolized even when controlled for macronutrient load".[50] They concluded that "the processed nature of food itself, independent of the caloric and macronutrient intake, impacts numerous health markers" and that "our results demonstrate that consumption of UPF itself, irrespective of excess caloric intake, is detrimental to human health".[51]

128. Despite this fact, the health harms caused by UPF are not solely a function of the weight gain they cause either. Like nutrient content, the studies of UPF control for obesity and other confounders, and demonstrate that UPF causes unique risks of serious disease—independent of the weight gain they cause.

129. The risk of Type 2 Diabetes is one of the most robustly studied effects of UPF. Independent researchers throughout the world have determined that the scientific evidence that UPF increase the risk of Type 2 Diabetes is "convincing" and that there is a clear link between UPF and a higher risk of Type 2 Diabetes.[52]

130. There are multiple plausible mechanisms by which UPF cause childhood Type 2 Diabetes. These mechanisms are largely common across all UPF, as will be demonstrated in greater detail below.

---

[50] Id.
[51] Id.
[52] Melissa M. Lane et al., *Ultra-Processed Food Exposure and Adverse Health Outcomes, Umbrella Review of Epidemiological Meta-Analyses*, BMJ, Feb. 2024.

131. For example, UPF consumption is associated with oxidative stress, chronic inflammation, alterations of immune signaling, intestinal dysbiosis, and mitochondrial metabolism alterations.[53]

132. Additives can directly modulate the composition and function of intestinal microbiota, driving microbioata encroachment and chronic intestinal inflammation, thus exacerbating metabolic dysfunction.[54]

---

[53] Edwin E. Martínez Leo, *Ultra-Processed Diet, Systemic Oxidative Stress, and Breach of Immunologic Tolerance*, Nutrition., July 2021; Carmine Stolfi et al., *Impact of Western Diet and Ultra-Processed Food on the Intestinal Mucus Barrier*, Biomedicines, Jul. 2023; Marta Asensi et al., *Low-Grade Inflammation and Ultra-Processed Foods Consumption: A Review*, Nutrients., Mar. 2023; Akihito Harusato et al., *Dietary Emulsifiers Exacerbate Food Allergy and Colonic Type 2 Immune Response through Microbiota Modulation*, Nutrients., Nov. 2022; Sabrine Naimi et al., *Direct Impact of Commonly Used Dietary Emulsifiers on Human Gut Microbiota,* Microbiome., Mar. 2021; Corbin S C Johnson et al., *Contrasting Effects of Western v. Meditarranean Diets on Monocyte Inflammatory Gene Expression and Social Behavior in a Primate Model*, eLife., Aug. 2021; Amanda Cuevas-Sierra et al., *Gut Microbiota Differences According to Ultra-Processed Food Consumption in a Spanish Population*, Nutrients., Aug. 2021; Emilie Viennois et al., *Dietary Emulsifiers Directly Impact Adherent-Invasive E. Coli Gene Expression to Drive Chronic Intestinal inflammation*, Cell Rep., Oct. 2020; Eloi Chazelas et al., *Food Additives: Distribution and Co-Occurrence in 126,00 food products of the French Market*, Sci Rep., Mar. 2020; Emilie Viennois et al., *Dietary Emulsifier-Induced Low-Grade Inflammation Promotes Colon Carcinogenesis*, Cancer Res., Jan. 2017; Sareh Edalti et al., *Higher Ultra Processed Food Intake is Associated with Higher DNA Damage in Healthy Adolescents*, Br J Nutr., Mar. 2021; Maria Magdalena Quetglas-Llabres et al., *Oxidative Stress and Inflammatory Biomarkers are related to High Intake of Ultra-Processed Food in Old Adults with Metabolic Syndrome*, Antioxidants (Basel), Jul. 2023; Lisaura Maldonados-Pereira et al., *Oxidative Status of Ultra Processed Foods in the Western Diet*, Nutrients., Nov 2023; Bernard Srour et al., *Ultra Processed Foods and Human Health, from epidemiological evidence to mechanistic insights*, Lancet Gastroenterol Hepatol., Dec. 2022; Oren Contreras-Rodriguez et al., *Consumption of Ultra-Processed Foods is associated with depression, mesocorticolimbic volume, and inflammation*, J Affect Disord., Aug. 2023; Eva Vissers et al., *Ultra Proceed Foods as a possible culprit for the rising prevalence of inflammatory bowel diseases*, Front Med (Luasanne), Nov. 2022; Filippa Juul et al., *Ultra Processed Foods and Cardiovascular Diseases: Potential Mechanisms of Action*, Adv Nutr., Oct. 2021; Serena Coppola et al., *Increased Dietary Intake of Ultraprocessed Foods and Mitochondrial Metabolism Alteration in Pediatric Obesity*, Sci Rep., Aug. 2023.

[54] Clara Salame et al., *Food Additive Emulsifiers and the Risk of Type 2 Diabetes: Analysis of data from the NutriNet-Sante prospective cohort study*, Lancet Diabetes Endocrinol., May 2024.

23

133. Additives induce intestinal microbiota dysbiosis, which stimulates pro-inflammatory signaling, and can predispose people to several diseases such as hypertension, obesity, diabetes and other cardiometabolic disorders.[55]

134. Inflammatory signaling can induce metabolic diseases such as Type 2 Diabetes by desensitizing insulin receptor signaling.[56]

135. Dysbiosis induced by chronic exposure to additives can drive chronic intestinal as well as systemic inflammation, which can affect other organs.[57]

136. The presence of chronic inflammation disrupts the homeostatic balance, altering the crosstalk between immune and metabolic responses and promoting chronic metabolic inflammation.[58]

137. The resulting immune cell infiltration and secretion of inflammatory cytokines into the tissue environment can inhibit glucose uptake and alter lipid metabolism.[59] This increases the risk of noncommunicable diseases such as cancer, diabetes, and cardiovascular disease.[60]

138. Research has also suggested that nutrient concentrations in natural foods share universal structures rooted in the nature of biochemical processes governing nutrient synthesis and regulation.[61]

139. Ultra-processing disrupts this nutrient balance that humans are genetically adapted to, and the human metabolism may not be able to properly process nutrient distributions that

---

[55] Id.
[56] Id.
[57] Id.
[58] Marta Asensi et al., *Low-Grade Inflammation and Ultra-Processed Foods Consumption: A Review*, Nutrients., Mar. 2023.
[59] Id.
[60] Id.
[61] Guilia Menichetti & Albert-László Barabási, *Nutrient Concentrations in Food Display Universal Behavior*, Nature Food, May 2022.

24

substantially deviate from the natural range and structure observed in natural foods.[62] Research has indicated that the destruction of natural food structures, also known as the "food matrix", affects satiety and glycemic response.[63]

140.    All of these harmful effects occur as a result of ultra-processing itself, and do not rely on nutrient content to cause harm. The poor nutrient balance common in UPF further exacerbates these ill effects, but does not cause them.

### C.    UPF is Inextricably Intertwined with the Tobacco Companies

141.    Early attempts at ultra-processing arose around the World Wars of the early 20th Century, in efforts to respond to war-time shortages. These projects included efforts to create artificial sweeteners from coal tar and Nazi German efforts to create butter substitutes from coal wastes.[64]

142.    While a small amount of novel UPF entered the domestic food market in the 1950's, 1960's, and 1970's, the US food environment was dominated by traditional food during that timeframe. As an indicator of this, in 1980, only 13% of U.S. homes had microwave ovens.[65]

---

[62] Id.

[63] Anthony Fardet, *Minimally processed foods are more satiating and less hyperglycemic than ultra-processed foods: a preliminary study with 98 ready-to-eat foods*, Food Funct., May 2016; Anthony Fardet & Edmond Rock, *Reductionist Nutrition Research has Meaning Only within the Framework of Holistic and Ethical Thinking*, Adv Nutr., Nov. 2018; Anthony Fardet et al., *Beyond nutrient-based food indices: a data mining approach to search for a quantitative holistic index reflecting the degree of food processing and including physicochemical properties*, Food Funct., Jan. 2018.

[64] Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 69-73, 90-92, (2023); *Butter is Made by Germans from Coal*, Eagle Valley Enterprise, September 6, 1946; *Made Butter from Coal in Germany*, Brisbane Courier-Mail, August 8, 1946; Elke Maier, *Coal—in Liquid Form*, MaxPlanckResearch, Apr. 2016.

[65] James E. Fay & Lana Douglas, *R.J. Reynolds Tobacco Non-Industry Marketing Learning, New Brand Task Force, Project INFINITY*, Delta Research, Jan. 1991.

143. Before the 1970's, the food environment in the USA was largely supplied by smaller, local food producers and regional companies.[66] However, in the 1970's and 1980's, larger food companies began controlling the food environment by absorbing smaller food producers and centralizing and increasing the amount of food processing and distribution efforts.[67]

144. Two of largest players in "Big Tobacco", RJ Reynolds and Philip Morris, were leaders in this market shift.[68]

145. RJ Reynolds first entered the food market in the early 1960's with its acquisition of Hawaiian Punch. In a 1962 internal memo, RJ Reynold's Head of Biochemical Research encouraged the company to enter the field of artificial foods, flavors and fragrances, writing:

> "It is easy to characterize R.J. Reynolds merely as a tobacco company. In a broader and much less restricting sense however, R.J. Reynolds is in the flavor business. This flavor business will be greatly expanded by the addition of the soft drink line presently in an advanced development stage…
>
> Meanwhile our interests in non-tobacco areas are developing. It is probable that many flavorants for tobacco will be useful in food, beverage and other products. If we become a basic producer of tobacco flavorants, we will have started to become a basic producer in the general flavor industry…
>
> The market for synthetic flavoring agents will greatly expand during the next 20-25 years. If R.J. Reynolds were to establish a position in this field now, it would realize large financial returns from these developments."[69]

146. Over the ensuing 15 years, RJ Reynolds acquired a number of food companies, and by 1979 was boasting of being a "major force in worldwide consumer packaged goods with strong positions in tobacco and foods".[70]

---

[66] Tena L. Fazzino, *The Reinforcing Natures of Hyper Palatable Foods: Behavioral Evidence for Their Reinforcing Properties and the Role of the US Food Industry in Promoting Their Availability*, Current Addiction Rprts., May 2022.
[67] Id.
[68] Id.
[69] Interoffice Memo, Eldon D. Nielson, Kenneth H. Hoover et al., (Oct. 4, 1962).
[70] RJR Foods, Inc. *Fact Sheet*, Mar. 1978; *R.J Reynolds Industry 1979 Annual Report*, R.J. Reynolds Tobacco Company, 1979.

26

147.     In 1985, RJ Reynolds purchased Nabisco for $4.9 billion and merged it with Del Monte and the other food and beverage brands it had previously acquired throughout the 1960's and 1970's.[71] In order to help finance the acquisition of Nabisco, R.J Reynolds sold Kentucky Fried Chicken to PepsiCo for $850 million.[72]

148.     This acquisition cemented RJ Reynolds as a tobacco-food behemoth. A 1988 interoffice memorandum boasted:

> "We process over 243,000 metric tons of tobacco leaf in the production and licensing of almost 300 billion cigarettes annually throughout the world…
>
> Our domination of the cookie and cracker business is even more obvious…in snack crackers, we are the market."[73]

149.     A Philip Morris market intelligence report at the time noted that R.J. Reynolds had achieved "critical mass in the dry grocery business" and that "R.J. Reynolds' presence in virtually all aisles of the grocery store permits cross merchandising of brands in different sections of the store and different packaging forms".[74]

150.     In 1985, Philip Morris joined the food market as well—purchasing General Foods for $5.6 Billion.[75] Philip Morris then purchased Kraft Inc. for $12.9 billion in 1988, making the combined tobacco-food company the world's largest food business and the world's largest consumer products company.[76]

---

[71] Terra L. Fazzino, US Tobacco Companies Selectively Disseminated Hyper-Palatable Foods into the US Food System: Empirical evidence and current implications, Addiction, Sept. 2023; Todd Purdum, *R.J. Reynolds Set to Pay $4.9 Billion in Bid for Nabisco*, N.Y. Times, June 3, 1985.
[72] Richard Stevenson, *PepsiCo to Acquire Kentucky Fried*, N.Y. Times, July 25, 1986. https://www.nytimes.com/1986/07/25/business/pepsico-to-acquire-kentucky-fried.html
[73] Interoffice Memo, Huntley R. Whitacre, Edward A. Horrigan Jr. et al., (Aug. 9, 1988).
[74] R. D. Sherrod, *Marketing Intelligence Report*, Mar. 1985.
[75] *Philip Morris Agrees to Buy General Foods*, Chicago Tribune, Sept. 28, 1985.
[76] *It's All Over: Philip Morris is New Owner of Kraft*, Chicago Tribune, Dec. 9, 1988.

27

151. Shortly after the acquisition and merger of Kraft, a Philip Morris executive explained:

> In the U.S. home market, Kraft General Foods is the largest food company overall and is #1 in all of the major retail grocery channels—dry grocery, refrigerated and frozen. It is also the second largest player in foodservice distribution.
>
> Both companies bring strong brand franchises to the combination, and KGF will, we think, account for something like 18 of the top 50 grocery store brands.[77]

152. Philip Morris' CEO stated that "Today, with the acquisition of Kraft, we manufacture and market more than 3000 food, beverage and tobacco products".[78] Around the same time, another Philip Morris executive boasted "You can now have a complete meal of Philip Morris foods and beverages, followed, of course, by one of our cigarettes".[79]

153. The combined company dominated the market in 20 food categories, had 32 food brands that exceeded $100 million in sales.[80]

154. Philip Morris conquered even more of the U.S. food market in 2000, when it acquired R.J. Reynolds' former food business for $18.9 billion.[81] It integrated and merged the R.J. Reynolds food companies with its own, creating a company with 73 brands exceeding $100 million in sales.[82]

---

[77] Hans G. Storr & Michael A. Miles, *Consumer Analysts Presentation*, Philip Morris Companies Inc., Feb.1989.

[78] Hamish Maxwell, *Keynote Remarks by Hamish Maxwell to Philip Morris Legal Conference*, Apr. 1989.

[79] Dr. K.S. Houghton, *State of the Union Speech*, Mar. 1989

[80] Marc Cohen & Nomi Ghez, *Philip Morris Companies An In-Depth Analysis of Kraft*, Goldman Sachs U.S. Research, Apr. 1995.

[81] *Philip Morris to Acquire Nabisco*, South Wisconsin Sun Sentinel, Jun. 26, 2000.

[82] *Philip Morris Acquires Nabisco for $55 per Share in Cash and Plans for IPO of Kraft*, Newsbreak Extra!, Jun. 25, 2000.

155. Collectively, the Tobacco Companies dominated the U.S. food environment for decades. Defendants KRAFT HEINZ, MONDELEZ, and POST HOLDINGS are direct descendants of Philip Morris and/or R.J. Reynolds.

## II. Fruits of the Poisonous Tree—The Tobacco Companies Infect our Food Environment

### A. *Turning our Food into Cigarettes: The Tobacco Companies Used Cigarette Addiction Science to Develop UPF, and Hack the Human Brain*

156. The Tobacco Companies' conquest of the U.S. food environment was much more than a coincidental by-product of diversification. Instead, as explained by Philip Morris' Director of Applied Research, the purpose of these acquisitions was for the Tobacco Companies "to control all of the pleasure drugs that are not regulated".[83]

157. RJ Reynolds and Philip Morris did not operate their respective food companies as wholly independent entities, but instead rapidly integrated them into their existing businesses, bringing techniques developed on the tobacco side over to the food side.

158. As a result, there was a systematic transfer of people, knowledge, information and technologies from the Tobacco Companies to the Food & Beverage Industry in the 1980's, 1990's and 2000's.[84]

159. RJ Reynolds' Biochemical & Biobehavioral R&D Group coordinated design of new cigarette and food formulations, including analyses of flavors and additives that could be used in tobacco and food products, and biological activity resulting from consuming such products.[85]

---

[83] Patricia Callahan et al., Patricia Callahan et al., *Where there's smoke, there might be food research, too,* Chicago Tribune, Jan. 29, 2006.
[84] Virginia Gewin, *New Archive Reveals How the Food Industry Mimics Big Tobacco to Suppress Science, Shape Public Opinion*, Nov. 28, 2018.
[85] *1987 Second Quarter Project Status*, Secret Biochemical/Biobehavioral R&D Report, Jun. 1987

160. Although this group became involved in the design and assessment of UPF, the original purpose of RJ Reynolds' Biochemical & Biobehavioral Group was to generate "information on the biochemical and biobehavioral aspects of tobacco use. This information creates a corporate advantage through usage in product design".[86]

161. Stated otherwise, the goal of RJ Reynolds' Biochemical & Biobehavioral group was to understand the addictive qualities of its cigarettes, and use this knowledge to design more addictive products.

162. RJ Reynolds spent hundreds of millions of dollars a year on research and development "opportunities affecting cigarettes and food".[87] These included biobehavioral research into electrical responses of the trigeminal nerve in rats, the "biological bases of the responses of humans to inhaled chemicals", the "structural requirements for the perception of both bitter and sweet", and "detailed analysis of the effects of partial removal of salivary glands on eating and drinking behavior".[88]

163. Philip Morris organized the Philip Morris Companies Technical Synergy Group to disseminate formulation and marketing research to its food companies.[89]

164. Research and technology was coordinated through Philip Morris' "Worldwide Operations and Technology" organization to ensure "that world class research and development, quality assurance and science are available and applied globally to Phillip Morris USA ("PM USA"), the tobacco operations of Phillip Morris International ("PMI") and the domestic and international food operations of Kraft Foods, Inc."[90]

---

[86] F.H. Christopher Jr., *Secret Research and Development 1988-1990 Strategic Plan*, R.J. Reynolds Tobaco Company, Oct. 1987.
[87] Interoffice Memo, Huntley R. Whitacre, Edward A. Horrigan Jr. et al., (Aug. 9, 1988).
[88] *Research and Development 1988 Year-End Status Report*, RJR Confidential, 1988.
[89] *Appendix A R&D 1991 Accomplishments*, PM USA, 1991.
[90] Philip Morris 5 Year Plan, 1996.

165. Philip Morris held formal synergy meetings to coordinate formulation and marketing research across subsidiaries, including brain-research on sensory perceptions and artificial intelligence models designed to drive consumer behavior.[91]

166. Philip Morris scientists studying nicotine's impact on the brain regularly collaborated with Kraft and General Foods.[92]

167. For example, Dr. Frank Gullotta was a Philip Morris brain scientist who supervised a secret Philip Morris addiction laboratory in Germany.[93] Gullotta's research included using electrodes on human scalps to understand the impact of nicotine consumption on the human brain.[94] He became integrated in the company's food operations after the acquisition of General Foods and Kraft.[95]

 

[91] Kim H. Nguyen, *Tobacco Industry Involvement in Children's Sugary Drinks Market*, BMJ, March 2019; Delroy Alexander et al, *Craving the cookie,* Chicago Tribune, Aug. 21, 2005; *Appendix A R&D 1991 Accomplishments*, PM USA, 1991; *The Role of Technology in Understanding the Consumer*, Philip Morris Product Development Symposium, Dec. 1990.

[92] Delroy Alexander et al, *Craving the cookie,* Chicago Tribune, Aug. 21, 2005.

[93] Patricia Callahan et al., *Where there's smoke, there might be food research, too,* Chicago Tribune, Jan. 29, 2006.

[94] Delroy Alexander et al., *Craving the cookie*, Chicago Tribune, Aug. 21, 2005.

[95] *Appendix A R&D 1991 Accomplishments*, PM USA, 1991; Patricia Callahan et al., *Where there's smoke, there might be food research, too,* Chicago Tribune, Jan. 29, 2006.

 

168. Gullotta noted in 1990 that "an understanding of the chemical senses is critical in developing new products. Recently, interest in our studies has been expressed by Kraft USA and G.F. USA".[96]

169. Gullotta collaborated with Dr. Pamela Scott-Johnson, a physiological psychologist and Senior Research Scientist in the Taste Fundamentals program.[97] She studied the fundamental mechanisms involved in the perception of taste, and included using "Brain Wave computer system" on live rats to see how nerves transmit messages relating to various fats and fat substitutes.[98]

 

---

[96] Interoffice Memo, F. P. Gullota et al., C. K. Ellis, (Nov. 8, 1990); Patricia Callahan et al., *Where there's smoke, there might be food research, too,* Chicago Tribune, Jan. 29, 2006.
[97] Interoffice Memo, C. S. Hayes, R. D. Kisner, (Mar. 26, 1991).
[98] Id.

32

 

170. While this research initially focused on the electrophysiological responses of the chorda tympani nerve to various fats, Gullotta recommended this "be extended to also investigate the vagus, glossopharyngeal and trigeminal nerve responses to tastants that would be of mutual benefit to" Philip Morris and Kraft General Foods.[99]

171. Philip Morris and Kraft's chemical senses program collaborated on "gustatory electrophysiology" and designed collaborative studies of mutual interest to the cigarette and food operations.[100] Gullotta also educated company food scientists on "The Use of Nasal Event-Related Potentials in Flavor Evaluation".[101]

172. Dr. James Andrade was a physiological psychologist who would rise to become one of Kraft's top research executives.[102] He conducted research into human perception of tastes, smells, cognitive and behavioral factors, as well as how opiate receptors in the brain mediate the hunger drive.[103]

173. Philip Morris and Kraft General Foods collaborated on research into the "molecular basis for odor/flavor recognition" and "molecular, cellular and organ-related signal transduction".

---

[99] Id.
[100] Interoffice Memo, F. P. Gullotta, Dr. R. A Carchman, (Mar. 22, 1991).
[101] Interoffice Memo, F. P Gullotta, R. D. Kisner, (Oct. 22, 1991).
[102] Delroy Alexander et al, *Craving the cookie*, Chicago Tribune, Aug. 21, 2005.
[103] Delroy Alexander et al, *Craving the cookie*, Chicago Tribune, Aug. 21, 2005; Interoffice Memo, C. S. Hayes, R. D. Kisner, (Mar. 26, 1991).

Case 1:26-cv-00738    Filed 04/27/26    Page 33 of 185    Document 1

174. A confidential internal memo explained the rationale: "Many consumer attributes of our products manifest themselves via response to the chemical stimuli (flavors, odors, textural components, etc.) in these products. The biological interpretation (i.e. modulation/transduction) of these stimuli (i.e. signals) share common pathways critical for normal human performance".[104]

175. The reason for these collaborations was clear. In a meeting discussing chemosensory and electrophysiology research collaborations between cigarettes and UPF divisions, Philip Morris' Director of Consumer Research explained:

> "When we talk in terms of what we are selling the consumer we don't talk in terms of cigarettes. We talk in terms of benefits. We talk in terms of effects. What does somebody get when he smokes a cigarette? A tube that's white on one end and cork on the other in a lot of cases you set fire to. Well nobody is going to pay money for that. What they pay money for is what they get out of it. They need some satisfaction and whatever else that they do. Now that certainly doesn't limit it to cigarettes. But in order to figure out intelligently what products could be offered that may appeal to a larger group than just smokers, i.e. products that don't offer the perceived negatives to a nonsmoker of a cigarette but still provide some of the benefits that smokers can enjoy. I think we have to understand just how this works"[105]

176. Philip Morris understood that "Since consumer products represent an extracellular 'stimulus' to the consumer and the objective of this research endeavor is to optimize the 'response' of our products on the consumer, the stimulus-response mechanism is an obvious area of focus. The stimulus-response area, also called signal transduction, relates to the mechanism by which extracellular stimuli elicit both transitory and lasting responses or effects".[106]

177. But Philip Morris also understood that conscious perceptions of human senses were not the key to maximum profits for Philip Morris products.

---

[104] *Philip Morris Institute Proposal*, Philip Morris Technical Synergy Group, Apr. 1993.
[105] *Appendix A Chemical Senses Symposium, Meeting Minutes*, Apr. 1990.
[106] *Philip Morris Institute Proposal*, Philip Morris Technical Synergy Group, Apr. 1993.

178. As Frank Gullotta explained about the senses of taste, smell and touch, "none of these matter a didley if you don't have the effects in the brain. These are only pleasurable because of the consequences" in the brain.[107]

179. In other words, the purpose of all this research on brain waves and nerve conduction was not to determine how to make UPF more flavorful. The Tobacco Companies conducted this research to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[108]

180. As a clear example of this, Philip Morris & Kraft conducted joint research into "drivers of acceptance, mood or satiety/drinkability" that "are usually not consciously perceived…but are perceived at the receptor level (ex. Pheromones)".[109] This research was identified as "of common interest to beer, food and tobacco".[110]

181. Kraft and Philip Morris scientists applied their combined expertise in brain science and sensory transduction to develop UPF products.[111] Their research was used to shape people's perception of hunger and fullness, known as satiety, in order to promote overconsumption of their UPF products.[112]

182. Kraft and Philip Morris jointly used "neuroimaging (understanding how olfaction and gustatory information is coded—identify receptor subtypes)" and technologies relating to chemoreception and transduction, genetics and molecular biology, and molecular imprinting

---

[107] *Appendix A Chemical Senses Symposium, Meeting Minutes*, Apr. 1990.
[108] Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023); Robert Lustig, The Hacking of the American Mind, (2017).
[109] Interoffice Memo, Chemoreception Research, (Feb. 12, 1998).
[110] Id.
[111] Delroy Alexander et al, *Craving the cookie*, Chicago Tribune, Aug. 21, 2005.
[112] Id.

polymers.[113] This research was used in UPF product formulation and in the creation of "designer odors and flavors" and the "production of novel aroma compounds".[114]

183. These and similar technologies and research were broadly applied to product formulation in Philip Morris' UPF division, which later became Defendants KRAFT HEINZ, MONDELEZ and POST HOLDINGS. Knowledge of the brain's physiological functions was used to hack the human brain, and to formulate UPF products that could evade people's bodily mechanisms for controlling intake.

184. UPF products also directly incorporated tobacco additives in their formulations. For example, RJ Reynolds used the company's tobacco flavour library to create beverage formulas "starting from our knowledge of flavours we already produce or have in our flavour library".[115] The stated goal "is to leave people wanting more".[116]

185. On information and belief, Defendants KRAFT HEINZ, MONDELEZ and POST HOLDINGS continue to engage in these formulation strategies.

### B. *The Tobacco Companies' Addiction Science Permeates the Rest of the UPF Industry*

186. As market leaders, the Tobacco Companies quickly spread this research and formulation strategy throughout the UPF industry, and such strategies are now prevalent.

187. For example, since at least the early 2000's, Defendant NESTLE has spent millions of dollars a year on research to understand sensory perception, i.e. "How do we smell, taste and

---

[113] Interoffice Memo, Arthur Anderson, Phillip Morris Technology Synergy Team, (Oct. 2, 1997).
[114] Id.
[115] Kim H. Nguyen et al., *Tobacco Industry Involvement in Children's Sugary Drinks Market*, BMJ, Mar. 2019; Charles Milton, Monthly Research Report: Technical Development Division RJ Reynolds, 1962 No. 5
[116] Kim H. Nguyen et al., *Tobacco Industry Involvement in Children's Sugary Drinks Market*, BMJ, Mar. 2019.

36

see food".[117] In 2007, NESTLE identified "sensory evaluation" as "an increasingly important field of study" and conducted research into this with both external partners and internal research divisions such as the "Sensory Science Group".[118]

188.     NESTLE currently employs numerous sensory psychologists to study issues relating to brain activity, including the use of electroencephalography, and "taste development, perception and food preference in young children".[119] Nestle has even begun using consumer DNA and artificial intelligence to formulate new products.[120]

189.     Defendant PEPSICO operates one global R&D organization to develop new product formulations and conducts extensive research into human biology, sensory chemoreception and physiological responses in the brain.[121] For example, PEPSICO utilizes functional magnetic resonance imaging (fMRI), a neuroimaging technique that measures human brain activity by detecting changes in blood flow, to guide product formulation design.[122] PEPSICO also uses robots fitted with human taste buds that are hardwired into a computer to simulate human neurochemical responses to product formulations.[123]

190.     Defendant COCA-COLA employs "subject matter experts in the area of taste biology" and scientists studying "taste and odor perception, from detection by receptors in the oral and retronasal cavities, to signal transduction to the taste cortex in the brain where signals are

---

[117] Stephen Daniells, *Nestlé teams up with EPFL for food-brain research*, Bakery & Snacks, (Last updated Jul. 2008).
[118] Albert Pfiffer & Hans-Jörg Renk, *Transformational Challenge 1990-2005*, 2007.
[119] Nestlé, *Consumers find an unfamiliar taste more enjoyable after looking at food that appeals to them*, Mar. 2012; Catherine Forestell, *Video Teaser: Taste development, Perception and Food preference in Young Children*, Nestlé Nutrition Institute, Nov. 2021.
[120] Gill Hyslop, *Pizza to ward off Alzheimer's? Nestle uses DNA to create personalized diets*, Bakery & Snacks, Sep. 4, 2018.
[121] Austin Kzoman, PepsiCo Global R&D; Stephen A. Gravina et al., *Human Biology of Taste*, ASM, May 2013.
[122] John Seabrook, "Snacks for a Fat Planet". The New Yorker, May 9, 2011.
[123] Id.

processed…to ultimately contribute to the building flavor knowledge and capability for The Company".[124]

191.    Similarly, Defendant CONAGRA is "using brain science…to grow and expand brand and portfolio offerings".[125]

192.    Defendant GENERAL MILLS maintains a large technical center with numerous sensory labs, and employs sensory scientists "to guide the optimization of new products, product improvements" and product design.[126]

193.    Defendant KELLOGG'S utilizes "the cognitive neuroscience approach to the multisensory design (and modification) of their food products, and maintains numerous laboratories focusing on "sensory science".[127]

194.    Defendant MARS maintains an Advanced Research Institute focusing on the "combination of chemistry, biology and psychology…to understand the complex interplay between the chemical composition of food and the sensory perceptions it generates".[128]

195.    These few examples demonstrate how widespread the Tobacco Companies' brain hacking strategies have become in the UPF industry, but do not constitute the entirety of the UPF industry's efforts in this area. Additional details will be uncovered through discovery and presented at trial.

---

[124] *Taste and Olfaction Research Senior Scientist-R&D*, Coca Cola, (Visited Apr. 2024).
[125] Jacobson/Rost, *Bringing Classic Brands into the New Economy*, (Last updated 2022), https://www.jacobsonrost.com/work/conagra#:~:text=Bringing%20classic%20brands%20into%20 0the,expand%20brand%20and%20portfolio%20offerings.
[126] *Sensory Scientist--R&D*, General Mills, (Visited Apr. 2024); Bill Zalud, *Managing in Tough Times*, Security Magazine, March 1, 2009.
[127] Charles Spence, *Eating with Our Ears: Assessing the Importance of the Sounds of Consumption on our Perception and Enjoyment of Multisensory Flavour Experiences*, Flavour, Dec. 2015; Joanne O'Dea, *Kellogg's Food Science Lab Opens at Leuven Facility*, Science Business, Sep. 13, 2013.
[128] Mars, *The Science of Deliciousness: Dr. John Didzbalis creates flavor for a…*, May 3, 2023.

196.    In addition to each Defendant's internal capacities, as demonstrated by the examples above, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – has engaged third party research firms to conduct brain research to guide the development of new products.

197.    For example, the Monell Chemical Senses Center, which employs chemists, biochemists, physiologists and psychologists conducting stimuli/response research on human senses and "the essential mechanisms and functions of…taste and smell", has counted Defendants COCA-COLA, KRAFT HEINZ, MARS, NESTLE, and PEPSICO, as corporate partners.[129]

198.    On information and belief, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – has utilized both internal scientists and third-party research partners to assess physiological mechanisms of food reward activity.

199.    The purpose of KRAFT HEINZ's brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[130]

200.    The purpose of MONDELEZ's brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[131]

---

[129] *Corporate Partnership Program*, Monell Chemical Senses Center, (Visited Oct. 2023).
[130] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).
[131] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).

201. The purpose of POST HOLDINGS' brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[132]

202. The purpose of COCA-COLA's brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[133]

203. The purpose of PEPSICO's brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[134]

204. The purpose of GENERAL MILLS' brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[135]

205. The purpose of NESTLE's brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[136]

---

[132] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).
[133] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).
[134] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).
[135] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).
[136] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).

206. The purpose of KELLOGG'S' brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[137]

207. The purpose of MARS' brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[138]

208. The purpose of CONAGRA's brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[139]

209. The purpose of UNILEVER's brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[140]

210. The goal of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – is to make UPF more profitable by driving consumption increasing volumes.

211. The knowledge of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – of the brain's physiological functions was used to hack the human brain, and formulate UPF products that could evade people's mechanisms for controlling intake.

---

[137] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).
[138] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).
[139] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).
[140] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).

212. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – utilized sophisticated scientific methodologies to ensure that their respective UPF was consumed in ever increasing speeds and volumes.

213. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – utilized sophisticated scientific methodologies to ensure that reinforcing features of their respective UPF were fine-tuned to trigger addictive responses.

### III. UPF are Addictive Substances

#### A. *UPF Change Brain Chemistry and Neurocircuitry in the Same Ways as other Addictive Products*

214. The UPF industry has spent millions of dollars to figure out how to hack the human brain and the physiological hardware used to transmit messages throughout the human body.

215. The efforts of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – have had predictable and intended consequences: UPF are addictive substances.

216. The control of food intake over long periods of time is ***not*** a matter of willpower or conscious control. Instead, our food choices are driven by signals from within our body interacting with signals from our environment. Like with breathing, one can exert temporary control overeating, but the majority of it is subconsciously controlled by human biology.

217. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and

42

UNILEVER – is aware of this fact, and has exploited it through their respective research, design, and marketing efforts to drive excess consumption.

218. Recent studies provide compelling evidence that UPF drive neurobiological and behavioral changes in the same ways as addictive drugs.[141]

219. Strong biological evidence for the addictiveness of UPF comes from neuroimaging studies that show UPF trigger similar reward-related neural responses as other addictive substances such as cocaine and cigarettes.[142] UPF, cigarettes and cocaine all trigger dopaminergic reward signaling dysfunction, emotion dysregulation and impulsivity.[143]

220. UPF have consistently been widely associated with elevated responses in brain regions related to desire and reward, such as the dorsal striatum, nucleus accumbens ("NAc"), and orbitofrontal cortex.[144]

221. These patterns of neural activation occur in drug abusers and are associated with elevated cravings and overconsumption of UPF, cocaine and cigarettes.[145]

222. UPF triggers rapid upregulation in calcium permeable AMPA receptors in the NAc, which is characteristic of addictive substances and associated with increased cue-induced craving and drug-seeking behavior.[146]

---

[141] Erica M. Schulte et al., *Advances in the Neurobiology of Food Addiction*, Curr. Behav. Neurosci. Rep., Dec. 2021.
[142] Erica M. LaFata, *Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., June 2024.
[143] Erica M. Schulte et al., *Advances in the Neurobiology of Food Addiction*, Curr. Behav. Neurosci. Rep., Dec. 2021.
[144] Id.
[145] Id.
[146] Erica M. LaFata, *Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., June 2024.

43

223. Prolonged exposure to UPF causes reduced excitability of NAc core neurons, which is indicative of altered dopaminergic reward responses and similarly occurs with chronic cocaine exposure.[147]

224. Similarly, naltrexone, which is used to treat opioid use disorder, and pexacerfont, which is used to treat heroin addiction and methamphetamine addiction, are effective in reducing addiction to UPF.[148] This suggests that UPF cravings are mediated through endogenous opioid peptide tone and the prefrontal cortex.[149]

225. High levels of UPF intake are associated with disrupted dopaminergic signaling (increased hedonic drive for UPFs), dysregulated hunger/satiety hormones (increased hunger, reduced satiety) and other alterations to the gut microbiome.[150]

226. Less processed foods are not addictive, and do not trigger these brain and physiological responses.[151]

227. This research provides "convincing support for the direct and unique role" that UPFs have in promoting overconsumption through their ability to alter the brain-gut microbiome axis in a manner that increases craving and motivating continued UPF intake.[152]

---

[147] Id.
[148] Id.
[149] Robert H. Lustig, *Ultraprocessed Food: Addictive, Toxic, and Ready for Regulation*, Nutrients., November 2020.
[150] Erica M. LaFata, *Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., Jun. 2024.
[151] Erica M. Schulte et al., *Advances in the Neurobiology of Food Addiction*, Curr. Behav. Neurosci. Rep., December 2021.
[152] Erica M. LaFata, *Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., Jun, 2024.

44

**B.      *UPF are Addictive Based on the U.S. Surgeon General's Criteria for Addictiveness***

228.      UPF are also addictive based on the criteria used by the U.S. Surgeon General to determine tobacco products are addictive.[153]

229.      Historically, the addiction label was mostly applied to substances such as alcohol and heroin that clearly caused mind-altering intoxication and adverse physical symptoms with withdrawal.[154]

230.      Tobacco presented a challenge to this conceptualization of addiction, because it results in no apparent intoxication syndrome and only mild physical withdrawal symptoms.[155] People can effectively go about their day fulfilling necessary obligations while having nicotine delivered rapidly to the brain through cigarettes.[156] Because of this, the notion that tobacco could be considered an addictive substance remained highly controversial for decades.[157]

231.      Despite the differences between tobacco and other addictive drugs, there is now scientific consensus that tobacco is a highly addictive substance, based in large part on the U.S. Surgeon General's findings.[158]

232.      In 1988, the U.S. Surgeon General issued a report identifying tobacco products as addictive based on three primary scientific criteria: their ability to (1) cause highly controlled or compulsive use; (2) cause psychoactive (i.e. mood-altering) effects via their effect on the brain; and (3) reinforce behavior.[159] Scientific advances have since identified the ability of tobacco

---

[153] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Nov. 2022.
[154] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.
[155] Id.
[156] Id.
[157] Id.
[158] Id.
[159] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Nov. 2022.

products to (4) trigger strong urges or craving as another important indicator of addictive potential.[160]

233. Like tobacco, UPF do not trigger intoxication and do not cause life-threatening physical withdrawal symptoms, but people are prone to compulsively consume them even in the face of significant negative consequences.[161] Thus, the reconceptualization of addiction triggered by tobacco is appropriate for evaluating the addictiveness of UPF.[162]

234. UPF meet the same criteria used by the Surgeon General, and can be labeled as addictive substances using the standards set for tobacco products.[163]

### 1. *UPF Cause Compulsive Use*

235. The ability of a substance to trigger compulsive use, including "drug-seeking and drug-taking behavior that is driven by strong, often irresistible urges" that can persist despite a desire or even repeated attempts to quit, is a hallmark of addictive substances.[164]

236. Compulsive use for tobacco in the U.S. Surgeon General's Report was demonstrated by evidence that most smokers would like to quit, but most were unable to do so.[165] The report notes that the compulsive nature of tobacco is most clearly demonstrated in extreme cases where individuals experiencing significant smoking-related disease (e.g. cancer and cardiovascular disease) continue smoking.[166]

---

[160] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Nov. 2022.
[161] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.
[162] Id.
[163] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Nov. 2022.
[164] Id.
[165] Id.
[166] Id.

237. UPFs are capable of triggering the same kind of compulsive use. Even in the face of significant diet-related health consequences (e.g. diabetes and cardiovascular disease), the majority of patients are unable to adhere to medically recommended dietary plans that require a reduction of UPF intake.[167] One of the most commonly cited obstacles for low dietary adherence is cravings for UPF.[168]

238. Failure in response to gastric bypass provides an extreme case of compulsive UPF intake.[169] Approximately 20-50% of individuals who undergo this surgery will "eat through" it, and continue to excessively ingest UPF.[170] This intake persists despite UPFs triggering immediate aversive physical symptoms (e.g. cramping, vomiting, and diarrhea) when consumed after gastric bypass.[171]

239. Binge eating is inversely associated with minimally processed foods, whereas UPF is positively associated with binge eating.[172] A review of food diaries of individuals with eating disorders found that 100% of the foods consumed in binge episodes were UPF.[173]

240. Similarly, rodents will risk aversive experiences (e.g. electric shock) to consume industrially produced sweets when other calorie sources are easily available to them.[174] Rats even show greater resistance to electric shock when working for industrially produced sweetener than when methamphetamine is used as the reinforcer.[175]

---

[167] Id.
[168] Id.
[169] Id.
[170] Id.
[171] Id.
[172] Id.
[173] Erica M. LaFata & Ashley N. Gearhardt, *Ultra-Processed Food Addiction: An Epidemic?*, Psychother Psychosom., Nov. 2022.
[174] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Nov. 2022.
[175] Id.

47

241. Minimally processed foods do not elicit these responses in humans or rodents.[176] Therefore, UPFs, but not other foods, meet the criterion of triggering compulsive intake consistent with addictive substances.[177]

### 2. *UPF are Psychoactive Substances*

242. Psychoactivity was defined in the U.S. Surgeon General's Report as a product that "produces transient alterations in mood that are primarily mediated by effects in the brain".[178]

243. The ability of tobacco to alter mood is more subtle than intoxicating substances, such as opioids and alcohol.[179] However, tobacco products can cause detectable subjective increases in pleasure and reductions in negative affect.[180] These mood-altering effects are related to the ability of tobacco products to deliver high doses of nicotine rapidly to the brain.[181]

244. The medial habenula and ventral tegmental area are key mediators of nicotine self-administration and use.[182] Relative to dopamine agonists such as amphetamine, which can increase stratial dopamine release by 1000%, nicotine administration causes more modest increases in dopamine efflux (150-250%), which is similar to other addictive drugs such as alcohol (also 150-200% over baseline).[183] However, despite this lower magnitude, nicotine is still capable of triggering compulsive intake and changing mood.[184]

245. There is sufficient evidence to label UPFs as psychoactive substances based on the criteria from the U.S. Surgeon General's Report.[185]

---

[176] Id.
[177] Id.
[178] Id.
[179] Id.
[180] Id.
[181] Id.
[182] Id.
[183] Id.
[184] Id.
[185] Id.

246. UPF are capable of increasing positive affect and reducing negative affect.[186] For example, ultra-processed sweets are associated with similar measures of psychoactive drug effects as the administration of 1.5 mg of intravenous nicotine.[187] Further, UPF intake is often motivated by a desire to alter mood rather than to address homeostatic needs.[188]

247. Regarding the brain, UPFs and their components increase dopamine in the striatum at a similar magnitude as nicotine when delivered orally (150-200%).[189]

248. These substances increase striatal dopamine (~150%) and dopaminergic firing rates even when oral somatosensation is bypassed and UPF is delivered directly to the gut.[190]

249. In other words, the addictive response is not dependent on tasting, smelling or touching UPF. It is a chemical reaction that occurs inside the body when it is exposed to UPFs—even when UPF is not eaten but is instead surgically inserted into the stomach.

250. As with tobacco, the experience of subjective liking of UPF is less central to their tendency to maintain compulsive intake.[191] Instead, UPF's ability to trigger strong urges and cravings through dopamine receptors in the brain is more central to their addictive potential.[192]

### 3. *UPF are Reinforcing Substances*

251. The U.S. Surgeon General's Report defines reinforcing substances as those "being sufficiently rewarding to maintain self-administration".[193] Clearly, humans will self-administer tobacco products, although not all humans find tobacco products reinforcing.[194]

---

[186] Id.
[187] Id.
[188] Id.
[189] Id.
[190] Id.
[191] Id.
[192] Id.
[193] Id.
[194] Id.

49

252. Nicotine was identified as a key factor in the reinforcing nature of tobacco products, as animals would self-administer nicotine, work to gain access to nicotine, and prefer places where nicotine was administered.[195] Research also demonstrated that conditioned cues paired with nicotine become secondary reinforcers.[196]

253. Compared to other addictive drugs (such as cocaine), nicotine was a relatively weak reinforcer and was only self-administered under a narrow range of conditions.[197] However, this level of evidence was sufficient for the U.S. Surgeon General's Report to conclude that tobacco products were reinforcing due to their ability to deliver nicotine.[198]

254. The reinforcing nature of UPFs is high—both adults and children will self-administer UPF even when satiated.[199] In contrast, the tendency to consume other foods when satiated is much lower.[200]

255. Daily exposure to UPF appears to sensitize the reinforcing value of these foods (as indicated by an increasing willingness to work to gain access to UPF over time) and larger portions of UPF lead to greater sensitization.[201] In contrast, daily exposure to other foods does not sensitize reinforcement and may even reduce it.[202]

256. Thus, UPFs have a high reinforcement value.[203]

---

[195] Id.
[196] Id.
[197] Id.
[198] Id.
[199] Id.
[200] Id.
[201] Id.
[202] Id.
[203] Id.

257.    In animal models, the strength of reinforcement for UPF relative to nicotine is very clear.[204] Animals will self-administer UPF in a much wider range of conditions than nicotine.[205]

258.    The ability of UPFs to rapidly deliver refined carbohydrates, fat and sweet tastes appears to play a role in their reinforcing nature, as these factors are all highly reinforcing even when studied in isolation.[206] Animals will self-administer sweet tastes over cocaine more than 80% of the time.[207] In contrast, animals choose to self-administer nicotine over cocaine less than 20% of the time.[208]

### 4.    *UPF Cause Strong Urges & Cravings*

259.    Cravings in response to tobacco-associated cues are a major driver of use in humans and is a diagnostic indicator of tobacco use disorder.[209]

260.    Similarly, cravings in response to UPF cues—including marketing and promotion—drive UPF consumption and addiction.[210] Craving for UPF commonly occurs even when individuals are satiated.[211]

261.    The neural substrates underpinning cravings for UPF and other addictive substances largely overlap.[212] As with tobacco, stimuli paired with UPF become salient motivational cues and cue-inducing craving for UPF is implicated in more frequent UPF intake, loss of control over UPF intake (e.g. binge episodes), difficulty losing weight and a failure to reduce UPF intake in the face of serious health conditions.[213]

---

[204] Id.
[205] Id.
[206] Id.
[207] Id.
[208] Id.
[209] Id.
[210] Id.
[211] Id.
[212] Id.
[213] Id.

262. Thus, UPF, but not other foods, meet the criterion of triggering strong urges or cravings in a manner consistent with an addictive substance.[214]

**C. A Profit-Driven Epidemic: UPF are Engineered to Max Out Consumption, and Profits**

263. There is sufficient evidence that UPF are addictive substances, based on the physiological changes UPF cause to brain chemistry and neurocircuitry, and the criteria used to establish the addictive nature of tobacco.[215]

264. It has been the status quo to treat UPF as food, and not the highly refined substances that they are.[216] But "every addictive substance is something we take from nature and we alter it, and refine it in a way that makes it more rewarding—and that is very clearly what happened with these hyper-palatable food substances. We treat these foods like they come from nature. Instead, they come from big tobacco".[217]

265. Humans create addictive substances by processing naturally occurring substances into products with unnaturally high doses of reinforcing ingredients.[218] These products are typically combined with other additives that further enhance their rewarding effects (e.g. menthol in cigarettes) and addictive potential.[219]

266. Cocaine is the extracted and ultra-processed modification of a South American shrub.[220] Crack is an even more ultra-processed and further addictive modification.

---

[214] Id.

[215] Erica M. LaFata, *Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., Jun. 2024; Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Nov. 2022.

[216] Id.

[217] Anahad O'Connor, *Many of Today's Unhealthy Foods were Brought to you by Big Tobacco*, The Washington Post, Sep. 19, 2023.

[218] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.

[219] Id.

[220] Amy Sue Biondich & Jeremy David Joslin, *Coca: The History and Medical Significance of an Ancient Andean Tradition*, Emerg Med Int., Apr. 2016.

52

267. Methamphetamine is the extracted and ultra-processed modification of a Chinese shrub, that can also be synthesized in laboratories.[221]

268. UPF is the extracted and ultra-processed modification of naturally occurring components as well, stitched together with laboratory chemicals and colors and flavors developed for cigarettes. Like cocaine and methamphetamine, UPF are addictive in ways that their unrefined predecessors are not.

269. In the case of industrial tobacco products, their complexity and inclusion of thousands of chemicals made identifying a single addictive agent challenging.[222] A dose and rate profile of a single addictive chemical was not used to identify tobacco products as addictive.[223] Instead, the U.S. Surgeon General determined the addictiveness of tobacco products using criteria that also demonstrate UPF are addictive.

270. Like industrial tobacco products, UPF are complex substances that are psychoactive, highly reinforcing, strongly craved, and consumed compulsively.[224] UPF meet the actual scientific criteria used to determine that tobacco products are addictive.[225]

271. Neuroimaging studies have demonstrated similar patterns of reward dysfunction and inhibitory control deficits for those with symptoms of food addiction and substance-use disorders.[226]

---

[221] Sanctuary Lodge Halstead, *Origins of Methamphetamine*, (Last updated Jan. 2024), https://www.sanctuarylodge.com/blog/society/origins-of-methamphetamine/.
[222] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Nov. 2022.
[223] Id.
[224] Id.
[225] Id.
[226] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.

272. It is clear that not all foods trigger an addictive response.[227] The scientific literature specifically points to ultra-processed foods as being uniquely implicated in the biological (e.g. downregulation of dopamine receptors with prolonged consumption) and behavioral (e.g. binge eating, withdrawal) addictive-like responses, whereas minimally processed foods do not cause these responses.[228]

273. Additionally, the consumption of UPF has been associated with subjective experiences of reward that have predicted the abuse liability of addictive substances, such as elevated craving, enjoyment and satisfaction.[229]

274. As Philip Morris scientists Frank Gullotta explained to the predecessor of Defendants KRAFT HEINZ, MONDELEZ, and POST HOLDING in 1990, the senses of taste, smell and touch don't "matter a didley if you don't have the effects in the brain. [UPF] are only pleasurable because of the consequences" in the brain.[230]

275. UPF engage brain regions related to reward/motivation (e.g., dorsal striatum) in a similar manner as drugs of abuse, and are commonly linked to behavioral features of addiction, such as increased loss of control eating and binging.[231]

276. UPF are designed with combinations of ingredients that create an artificially rewarding eating experience.[232] The high levels of refined ingredients in UPF trigger metabolic signals which send reinforcing signals to the brain that this item is highly rewarding.[233] This

---

[227] Id.

[228] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021; Erica M. LaFata, *Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., Jun. 2024.

[229] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.

[230] *Appendix A Chemical Senses Symposium, Meeting Minutes*, Apr. 1990.

[231] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.

[232] Terra L. Fazzino, US Tobacco Companies Selectively Disseminated Hyper-Palatable Foods into the US Food System: Empirical evidence and current implications, Addiction, Sept. 2023.

[233] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.

potent combination is further amplified by the addition of unnaturally high levels of sodium and other flavor enhancers and preservatives.[234]

277.   UPF are designed to optimize not only the magnitude of the reward signal in the brain through high doses of ingredients and additives, but also the speed with which that reward is delivered.[235]

278.   One of the most important factors in determining addictive potential is the speed with which a substance is absorbed by the body.[236] Delivery mechanisms that lead to rapid absorption of the addictive ingredient, like smoking a cigarette or snorting cocaine, all increase addictive potential.[237]

279.   In contrast, slowing the absorption rate of an addictive substance can transform an addictive drug into a therapeutic medication, as is the case for slow-release nicotine patches that aid attempts to quit smoking and slow-release stimulant medication used to treat ADHD.[238]

280.   In parallel, the creation of UPF often includes the removal of ingredients such as fiber, water, or protein that slow the rate of absorption of rewarding ingredients and the addition of ingredients (like texturizers) that increase how quickly the food can be consumed.[239]

281.   This allows ultra-processed foods to be consumed more rapidly and increases the speed with which highly rewarding ingredients are absorbed into the system.[240]

282.   Thus, as with other addictive substances, the speed with which rewarding ingredients are delivered and impact the body is increased in UPF.[241]

---

[234] Id.
[235] Id.
[236] Id.
[237] Id.
[238] Id.
[239] Id.
[240] Id.
[241] Id.

283. The combinations found in UPF do not occur in nature; as a result, UPF excessively activate brain reward neurocircuitry, evade systems designed to signal sufficient or excess caloric intake, and thereby facilitate excess caloric intake.[242]

284. Repeated consumption of UPF over time can result in dysregulation of food reinforcement processes, leaving individuals highly motivated to seek out and consume UPF.[243] These consequences are similar to other substances of abuse, including nicotine.[244]

285. Consuming addictive drugs is not essential for survival—if one never consumes an addictive drug, survival would be possible.[245] The reinforcing and compulsive nature of addictive drugs comes from their ability to activate to an unnaturally high degree the reward/motivation, memory, and habit systems that were optimized to enhance human survival.[246]

286. Like other addictive substances, UPF do not exist in nature and are not necessary for survival.[247] Humans survived and thrived for thousands of years prior to the invention of UPF. Prior to the last few generations, all of human existence occurred without the presence of these substances. Every human civilization was built without UPF.

287. UPF are created by combining processed ingredients and additives into novel products with unnaturally high levels or rewarding ingredients.[248]

---

[242] Terra L. Fazzino, US Tobacco Companies Selectively Disseminated Hyper-Palatable Foods into the US Food System: Empirical evidence and current implications, Addiction, Sept. 2023; Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.

[243] Terra L. Fazzino, US Tobacco Companies Selectively Disseminated Hyper-Palatable Foods into the US Food System: Empirical evidence and current implications, Addiction, Sept. 2023.

[244] Id.

[245] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.

[246] Id.

[247] Id.

[248] Id.

288. The ability of addictive drugs to potently activate neurocircuitry can shift attention away from life-sustaining behaviors and instead drive forward compulsive drug-seeking and drug-taking behavior that is detrimental to health and survival.[249]

289. As with addictive drugs, excess consumption can be marked by compulsive UPF-seeking and taking behavior that results in poor health and preventable death.[250]

290. And like other addictive substances, UPF are evolutionarily novel products made possible through modern technology that provide refined and rapidly delivered primary reinforcers that tap into reward and motivation systems.[251]

291. Individual risk factors interact with the addictive potential of a substance to determine the likelihood that a specific individual will become addicted.[252]

292. Individual risk factors that increase a propensity for addiction include a family history of addiction, cognitive control difficulties, trauma exposure, and depression.[253]

293. These same risk factors also increase the likelihood of excessive UPF intake.[254]

294. Given that the individual risk profile for addiction does not change quickly on a population level, increases in substance use disorders are primarily attributable to the addictive potency of the substance and accessibility within the surrounding environment.[255]

295. For the same reasons, addiction epidemics are driven not by drastic changes in individual risk factors but by changes in the environment.[256]

---

[249] Id.
[250] Id.
[251] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Nov. 2022.
[252] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.
[253] Id.
[254] Id.
[255] Erica M. LaFata & Ashley N. Gearhardt, *Ultra-Processed Food Addiction: An Epidemic?*, Psychother Psychosom., Nov. 2022.
[256] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.

296. Addiction epidemics occur because a novel and potent addictive substance is created, but its addictive potential is undetected or underestimated.[257] The environment changes in a manner that makes the addictive substance more accessible.[258]

297. When addictive substances become cheap, easily accessible, heavily marketed and socially acceptable to use, the prevalence of addictive responses to that substance will increase.[259]

298. It is clear that the same environmental factors that drive addictive drug epidemics are also contributing to excessive intake of ultra-processed foods, including low cost, high availability, and frequent marketing.[260]

299. There was not a massive, population-level failure of personal responsibility beginning in the 1980s.

300. Similarly, the human genome did not undergo a radical transformation beginning in the 1980s.

301. Instead, beginning in the 1980's, the Tobacco Companies and each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – took over the U.S. food environment and filled it with UPF.

302. Recent systematic reviews estimate that 14-20% of adults and 12-15% of children are addicted to UPF.[261]

---

[257] Erica M. LaFata & Ashley N. Gearhardt, *Ultra-Processed Food Addiction: An Epidemic?*, Psychother Psychosom., Nov. 2022.
[258] Id.
[259] Id.
[260] Id.
[261] Erica M. LaFata & Ashley N. Gearhardt, *Ultra-Processed Food Addiction: An Epidemic?*, Psychother Psychosom., Nov. 2022.

303. The rate of UPF addiction in adults is highly similar to the rate of addiction in users of other addictive substances.[262] For example, while 90% of people consume alcohol over their lifetime, only 14% develop an alcohol use disorder.[263] Similarly only 18% of tobacco users develop a tobacco-use disorder, and only 20.9% of cocaine users become addicted.[264]

304. However, the prevalence of UPF addiction in children is "striking and unprecedented".[265] Never in American history have so many children been hooked on an addictive substance.

305. And there is a clear reason why: each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – targeted and continues to target children with their harmful UPF.

**IV.  Preying on the Vulnerable: Each Defendant Targets Children with Marketing for Dangerous UPF**

306. The Tobacco Companies injected one of their most ominous, and successful tactics, from the cigarette industry and brought it over to the UPF industry to increase their profits – targeting children.

---

[262] Erica M. LaFata, *Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., Jun. 2024.
[263] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.
[264] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021; Erica M. LaFata, *Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., Jun. 2024.
[265] Erica M. LaFata, *Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., Jun. 2024.

307. The Tobacco Companies promoted their UPF using integrated marketing strategies that had been originally designed to sell cigarettes, surrounding children with consistent product messages in the home, store, school, sports stadium and theme park.[266]

308. Both RJ Reynolds and Phillip Morris used the techniques they developed in tobacco product development, sales and marketing to develop and market unhealthy UPF products to vulnerable populations in the USA, specifically children and racial and ethnic minority groups.[267]

309. Much as they did with cigarettes, the Tobacco Companies used cartoon mascots, child sized packaging technologies, and advertising messages found to appeal to children's desire for autonomy, play and novelty to sell their UPF.[268]

310. Tobacco executives transferred their knowledge of marketing to young people to the UPF industry, and expanded product lines using colors and flavors, and marketing strategies originally designed to market cigarettes.[269]

311. Through centralized marketing initiatives, Philip Morris directly transferred knowledge, expertise, personnel, resources and infrastructure from its tobacco to its UPF companies.[270]

312. Phillip Morris' "Corporate Synergy Project" set up committees to identify shared activities across tobacco, alcohol and food subsidiaries to increase sales, consolidate media

---

[266] Kim H. Nguyen et al., *Tobacco Industry Involvement in Children's Sugary Drinks Market*, BMJ, Mar. 2019.
[267] Tena L. Fazzino, *The Reinforcing Natures of Hyper Palatable Foods: Behavioral Evidence for Their Reinforcing Properties and the Role of the US Food Industry in Promoting Their Availability*, Current Addiction Rprts., May 2022.
[268] Kim H. Nguyen et al., *Tobacco Industry Involvement in Children's Sugary Drinks Market*, BMJ, Mar. 2019.
[269] Id.
[270] Kim H. Nguyen at al., *Transferring Racial, Ethnic Marketing Strategies from Tobacco to Food Corporations: Phillip Morris and Kraft General Foods*, Am J Public Health, Mar. 2020.

purchases, and increase advertising budgets.[271] Marketing and brand management were centralized at the Phillip Morris corporate level.[272]

313.    The combined Philip Morris companies used grocery scanners to collect consumer data, including demographics, lifestyle characteristics and purchasing patterns on 199 million people.[273] Demographics, including children's ages and household purchasing patterns, were compiled into a comprehensive consumer database used by all subsidiaries.[274]

314.    The Tobacco Companies' approach to UPF marketing was to maximize sales to children, who are vulnerable and not fully capable of making informed decisions. As Philip Morris' CFO bragged in 1987, "We've decided to focus our marketing on kids, where we know our strength is greatest".[275]

315.    After acquiring General Foods and Kraft, Philip Morris slashed UPF ad spending directed at mothers and increased ad spending directed to children by many multiples.[276]

316.    For example, in the manner of a few years after acquiring General Foods, Philip Morris boosted children's marketing budget for Kool Aid from $2.8 million to over $45 million, while cutting advertising directed to mothers in half.[277]

317.    Likewise, RJ Reynolds transformed Hawaiian Punch from an at-home cocktail mixer for adults to a children's beverage through reformulation, repackaging and kid-targeted marketing.[278]

---

[271] Id.
[272] Id.
[273] Id.
[274] Kim H. Nguyen, *Tobacco Industry Involvement in Children's Sugary Drinks Market*, BMJ, Mar. 2019.
[275] Hans Storr, Remarks to First Boston Beverage Tobacco Conference, (April 1, 1987).
[276] Kim H. Nguyen, *Tobacco Industry Involvement in Children's Sugary Drinks Market*, BMJ, Mar. 2019.
[277] Id.
[278] Id.

318. Numerous campaigns were aimed at 6-12 year olds.[279] Kraft maintained a "Kids Task Force" that used integrated marketing campaigns, Disney and Nickelodeon's cartoons, toys, and games to promote UPF.[280]

319. The head of Kraft's "Kids Task Force" bragged in the late 1990s that these promotions "will reach about 95% of the kids in the target 6 to 12 age group in the U.S."[281] Philip Morris collaborated with Mattel and Nintendo to issue UPF branded toys, including Barbie and Hot Wheels.[282] Philip Morris collaborated with Marvel to issue UPF branded comic book series.[283]

320. Philip Morris created kid-focused UPF loyalty programs, such as the Kool-Aid "Wacky Warehouse", which the director of Philip Morris' beverage division described as "our version of the Marlboro Country Store".[284] A Philip Morris analysis called the Kool Aid Wacky Warehouse "the most effective kid's marketing vehicle known".[285]

321. Philip Morris directed integrated UPF marketing campaigns to children to create a "fully integrated event across all the touch-points in a kid's world".[286]

322. Philip Morris' Kraft and Burger King united in multi-million dollar integrated co-promotions on Nickelodeon in joint efforts "ratcheting up" promotion of UPF to children through TV ads, toys and cartoons.[287]

---

[279] Id.

[280] Duncan Hood, *Kraft to untwist toons on ABC Disney block*, Kidscreen, Jan. 1, 1999.

[281] Id.

[282] Kim H. Nguyen, *Tobacco Industry Involvement in Children's Sugary Drinks Market*, BMJ, Mar. 2019.

[283] Id.

[284] Id.

[285] Id.

[286] Id.

[287]Corporate Affairs, *Today's Topics*, Philip Morris Companies, Inc., Jun. 1998.

323.    Included in these efforts were racial/ethnic minority-targeted UPF marketing programs modeled on successful cigarette programs.[288] These programs specifically targeted children in Black and Hispanic communities.[289]

324.    By 1989, KGF had been integrated with Phillip Morris Tobacco's contracts with Black and Hispanic television, print and other media.[290] In 1990, KGF pledged $7 million to Hispanic media and $2 million to Black media.[291] Kraft maintained a database of millions of Black consumers and another database of Hispanic-dominant stores serving 1 million households.[292]

325.    The Tobacco Companies' marketing tactics targeting children and minorities were broadly applied in Philip Morris' UPF division, which later became Defendants KRAFT HEINZ, MONDELEZ and POST HOLDINGS.

326.    In a highly confidential 1999 memo, Kraft admitted that its foods were being attacked as a major cause of disease, and that "critics are calling for remedies focusing entirely on food, including taxes on 'bad' foods to control consumption and regulations to control marketing to kids".[293]

327.    Despite this, and in the very same memo, Kraft committed to "expand KFNA's One Company multi-brand scale events, such as this year's partnerships with Nickelodeon and Disney's ABC network to promote Kraft's portfolio of Kids products" and that "Post will strengthen its established Kids portfolio…via an integrated Post Kids scale initiative including dedicated advertising, logos and packaging graphics".[294]

---

[288] Kim H. Nguyen at al., *Transferring Racial, Ethnic Marketing Strategies from Tobacco to Food Corporations: Phillip Morris and Kraft General Foods*, Am J Public Health, Mar. 2020.
[289] Id.
[290] Id.
[291] Id.
[292] Id.
[293] *Confidential Strategic Plan*, Kraft, 1999.
[294] Id.

328. The direct descendants of Philip Morris, Defendants KRAFT HEINZ, MONDELEZ and POST HOLDINGS, continue to engage in these marketing strategies directing unhealthy UPF at children and minorities. These companies continue to spend millions of dollars every year marketing UPF to children and minorities.[295]

329. For example, Defendant KRAFT HEINZ targets children with UPF marketing including PAW Patrol games, television ads, integrated campaigns with popular children's television and movie characters, and co-branding on children's media such as Nick Jr.[296]

 



[295]Jennifer L. Harris et al., *Rudd Report: Targeted Food and Beverage Advertising to Black and Hispanic Consumers: 2022 Update*, Rudd Center for Food Policy, Nov. 2022.
[296] See e.g., Nick Jr., *PAW Patrol: Mission Mac & Cheese Shapes #1 w/ Kraft! | Nick Jr.*, (Youtube Dec. 5, 2020), https://www.youtube.com/watch?v=x8E58eLWr6Q; Nick Jr., *PAW Patrol: Mission Mac & Cheese Shapes #2 w/ Kraft! | Nick Jr.*, (Youtube Dec. 12, 2020), https://www.youtube.com/watch?v=LqhFcFuUHFA; Nick Jr., *PAW Patrol: Mission Mac & Cheese Shapes #3 w/ Kraft! | Nick Jr.*, (Youtube Dec. 19, 2020), https://www.youtube.com/watch?v=FFYsf2T5e0U; Lunchables, *Lunchables TV Spot, 'Mixed Up Alert: Minions'*, (iSpot Jan. 28, 2019), https://www.ispot.tv/ad/ITcX/lunchables-mixed-up-alert-minions.



330.    Defendant MONDELEZ targets children with UPF using Super Mario characters, television ads, interactive websites, and co-branding with children's movie characters.[297]



---

[297] See e.g., OREO Cookie, *Super Mario x OREO Limited Edition Cookies*, (Youtube Jun. 26, 2023), https://www.youtube.com/watch?v=VJrFh8rZ9pU; OREO Cookie, *Unlock your Imagination with OREO x #ifmovie*, (Youtube May 9, 2024), https://www.youtube.com/watch?v=n_Pdpeq5qvA.



331. POST HOLDINGS airs television ads encouraging children to eat its UPF, use its UPF packaging as toys, and incorporate UPF into their science projects, as well as integrated campaigns with popular children's television and movie characters, and co-branding on children's media.[298]



---

[298] See e.g., Pebbles Cereal, *Let's Do This!*, (Youtube Nov. 30, 2021), https://www.youtube.com/watch?v=5rXzi7LHYwY; Honey-Comb, *Honey-Comb TV Spot, 'Made With Nickelodeon: Spongebob'*, (iSpot Jun. 5, 2019), https://www.ispot.tv/ad/ooOe/honey-comb-made-with-nickelodeon-spongebob; Honey-Comb, *Honey-Comb TV Spot, 'Cannonball'*, (iSpot Oct. 2, 2017), https://www.ispot.tv/ad/wKMv/honey-comb-cannonball.

66





332. These are but examples of the intensive and integrated strategies KRAFT, MONDELEZ, and POST HOLDINGS use to target children with UPF marketing and promotions. Additional details will be uncovered through discovery and presented at trial.

333. The remaining Defendants, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER each aggressively targeted and continue to target children with UPF marketing as well. As discussed above, smaller companies

within an industry observe and model themselves on the larger ones.[299] The UPF Industry is no exception.

334. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – uses an integrated marketing campaigns to pervasively target children with UPF marketing.

335. By 2006, UPF companies spent over $1.6 billion a year on advertising directed towards children.[300] Of this, approximately $870 million was spent on marketing directed to children under 12.[301]

336. To this day, the UPF industry continues to spend over $2 billion on advertising UPF to children each year.[302] In addition to TV ads, the industry annually puts more than 3 billion ads on popular children's websites promoting UPF.[303]

---

[299] Kim H. Nguyen at al., *Transferring Racial, Ethnic Marketing Strategies from Tobacco to Food Corporations: Phillip Morris and Kraft General Foods*, Am J Public Health, Mar. 2020; Neil Fligstein, *The Transformation of Corporate Control*, Theory and Society, Feb. 1993; Heather A. Haveman, *Follow the leader: mimetic isomorphism and entry into new markets*, Adm. Sci. Q., Dec. 1993.

[300] Sarah Botha et al., *Marketing Food To Children and Adolescents: A Review of Industry Expenditures, Activities, and Self-Regulation*, U.S Federal Trade Commission Report To Congress, Jul. 2008.

[301] Id.

[302] Brett Wilkins, *NEWS: Sanders and Booker Take on Food and Beverage Industry with Legislation to Address Childhood Diabetes and Obesity Epidemics*, U.S. Senate Committee on Health, Education, Labor & Pensions, April 19, 2024; *Blumenthal, DeLauro & Booker Introduce Bicameral Bill to Curb Unhealthy Food & Beverage Marketing Targeting Kids*, U.S. Senate Office of Richard Blumenthal, Nov. 15, 2022.

[303] A E Ustjanauskas et al., *Food and Beverage Advertising on Children's Web Sites*, Pediatr Obes., Jan. 2013.

337. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – also pervasively market UPF to children through social media.[304]

338. This advertising disproportionately targets Black and Hispanic children, who are targeted with 70% more UPF ads than their White counterparts.[305]

339. Much of this marketing intentionally plays on the addictive nature of UPF. For example, numerous cartoon mascots and spokes-characters used to target children have an addictive and unhealthy relationship with the UPF they are promoting.

340. Defendant COCA-COLA specifically set out to grow individual consumption of their products, and aimed to drive individual consumption of Coca-Cola higher than individual consumption of milk and water.[306] As described by Todd Putman, COCA-COLA's former head of US Marketing, the goal was "How can we drive more ounces into more bodies more often?"[307]

341. Kids were a major target of Defendant COCA-COLA's efforts.[308] According to Putman, "when they would turn twelve, we'd suddenly attack them like a bunch of wolves" with marketing campaigns.[309]

342. Defendant COCA-COLA's rationale was to prey on the vulnerable. As COCA-COLA acknowledged in a 2005 internal report on targeting children, "Teens are at a crucial stage

---

[304] Frances Fleming-Milici & Jennifer L. Harris, *Adolescents' engagement with unhealthy food and beverage brands through social media*, Appetite., Mar. 2020.

[305] Daniel P. Jones, *Food Advertising Targeted to Hispanic and Black Youth: Contributing to Health Disparities*, University of Connecticut, Rudd Center for Food Policy & Obesity. Aug. 2015.

[306] Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, at 99, 108-110, (2013).

[307] Id. at 110.

[308] Id. at 110-116.

[309] Id. at 111.

69

on the learning curve of 'how to be me'".[310] As such, teens are a critical focus of COCA-COLA's child marketing efforts.

343. When Jeffrey Dunn, COCA-COLA President & COO of North & South America, suggested that Coke should stop marketing in public schools, he was called "an embarrassment to the company", and fired shortly thereafter.[311]

344. Defendant Pepsico also aggressively markets UPF to children, and has increased such advertising since 2010.[312]

345. PEPSICO marketing prominently features young children in its advertisements, includes integrated promotions with popular cartoon characters such as the Minions, contests with prizes including free trips to amusement parks, and spokes-characters such as Chester Cheetah.[313]



[310] Clinkin Reasearch, *Convenience Teens Building Loyalty with the Next Generation*, Coca Cola Leadership Council, 2005.
[311] Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, at 116-118, (2013).
[312] *Sugary Drink Targeted Marketing*, Wall Street Journal, https://www.wsj.com/public/resources/documents/Targeted-marketing-sheets-Children-Teens.pdf
[313] See e.g., Nelson Tabolt, *When Pigs Fly - Doritos Crash the Super Bowl 2015 WINNER OFFICAL*, (Youtube Nov. 9, 2014), https://www.youtube.com/watch?v=YQo0TfuueaY; Filmpop, *The New Kid | Doritos Commercial*, (Youtube Nov. 15, 2015), https://www.youtube.com/watch?v=fvyBCesuxMM; Dans Ta Pub, Cheetos Mix Ups and Despicable Me 2, (Youtube Jul. 8, 2013), https://www.youtube.com/watch?v=AhmTMN6WaKQ; Commercials Funny, *Cheetos Commercial 2018 Beluga Whale*, (Youtube Sept. 5, 2018), https://www.youtube.com/watch?v=QwBg9mSe_IY.

 

 

346. As of 2013, despite pledges to reduce advertising to children, PEPSICO was increasing its advertising to children, and COCA-COLA had placed 38 million ads for products or promotions on children's websites.[314]

347. Collectively, Defendants COCA-COLA and PEPSICO spent more than $1 billion annually marketing UPF to kids.[315] These ads disproportionally target Black and Hispanic children.[316]

---

[314] *Sugary Drink Targeted Marketing*, Wall Street Journal, https://www.wsj.com/public/resources/documents/Targeted-marketing-sheets-Children-Teens.pdf
[315] Aurora Meadows et al., Study: *Big Soda's Ads Target Young People of Color*, EWG, August 4, 2020.
[316] Id.

348. Defendant NESTLE markets to children using cartoon spokes-characters, marketing prominently featuring children, and integrated campaigns across multiple media platforms to target children with UPF marketing.[317]






[317] See e.g. Amazon Fresh, *Nesquik Bunny Ears*, (Youtube Jul. 12, 2013), https://www.youtube.com/watch?v=xmsglZvEBLY; SN ®, *Hot Pockets Commercial 2022 - (USA) • DeliWich | Commercial Break*, (Youtube Aug. 23, 2022), https://www.youtube.com/watch?v=aNVxBTOwIXs; Sar Spary, *Nestle Causes Outrage Over Ads Promoting Unhealthy Eating To Kids*, Buzzfeed News, Dec. 2015, https://www.buzzfeed.com/saraspary/nestle-blasted-for-promoting-unhealthy-eating-to-children; Elizabeth S. Moore, *It's Child's Play: Advergaming and the Online Marketing of Food to Children — Report*, Kaiser Family Foundation 2006, Jul. 2006.

349. Defendant CONAGRA aired cartoon movies on Nickelodeon to promote children-focused product lines such as "Kid's Cuisine".[318] CONAGRA's General Manager explained that "integrated promotions are critical for Kid Cuisine to drive kid requests for our meals and strengthen brand equity among children. When Kid Cuisine partners with strong licensed properties, we've seen measurable sales increases".[319] CONAGRA also uses cartoons, super-hero spokes-characters, and ads prominently featuring young children.[320]

 

350. Defendant GENERAL MILLS uses marketing featuring young children, cross promotions with popular children's movie characters, giveaways including free movie tickets to Disney cartoons, multimedia games, online quizzes and cell phone apps to market UPF to children.[321]

---

[318] Conagra News Release, *Conagra Foods' Kid Cuisine® Brand Launches Integrated Marketing Promotion with 'Planet 51(TM') Animated Movie*, Conagra Brands, Nov. 19, 2009
[319] Id.
[320] See e.g. Kid Cuisine, *Kid Cuisine Earth's Mightiest Popcorn Chicken TV Spot, 'Avengers Assemble'*, (iSpot Feb. 5, 2018), https://www.ispot.tv/ad/walC/kid-cuisine-earths-mightiest-popcorn-chicken-avengers-assemble; Kid Cuisine, *Kid Cuisine Galactic Chicken Breast Nuggets TV Spot, 'Junior Jedi'*, (iSpot Sept. 13, 2016), https://www.ispot.tv/ad/ACef/kid-cuisine-galactic-chicken-breast-nuggets-junior-jedi;
[321] Matt Richtel, *In Online Games, a Path to Young Consumers*, New York Times, Apr. 20, 2011; Anneliese STREBEL, *GoGurt Commercial 2017 Guardians of the Galaxy Vol. 2*, (Youtube Jan. 12, 2018), https://www.youtube.com/watch?v=mcyncuQfFdU; Cheerios, X, (Nov. 16, 2022),

73

 

 

351. Defendant KELLOGG'S uses marketing featuring cartoons, spokes-characters, young children, and cross promotions with popular Disney movies to target children with UPF marketing.[322]

---

https://x.com/cheerios/status/1725222885399130220; Lucky Charms, *Lucky Charms TV Spot, 'Rainbow Unicorn Marshmallows'*, (iSpot Jul. 29, 2019), https://www.ispot.tv/ad/oD5I/lucky-charms-rainbow-unicorn-marshmallows;Go-Gurt, *GoGurt TV Spot, 'Minion Jokes'*, (iSpot Jun. 15, 2015), https://www.ispot.tv/ad/7cQJ/gogurt-minion-jokes.

[322] See e.g. KelloggsUS, *Disney Frozen 2 - Kellogg's Commercial*, (Youtube Nov. 6, 2019), https://www.youtube.com/watch?v=rB4hIYwJuiY; Rice Krispies, *Rice Krispies Christmas message*, (Mar. 11, 2013), https://www.youtube.com/watch?v=drInTjUw48w&list=PLGP6FBvf5tT6DHLv5NtvXXLTTfeY97ke2&index=145; Froot Loops, *Froot Loops® | Wild Dance*, (Youtube Dec. 5, 2022) https://www.youtube.com/watch?v=6EMTMeumq_4; Rice Krispies, *Rice Krispies Vibin' - Official Lyric Video*, (Youtube Jun. 30, 2021). https://www.youtube.com/watch?v=P-mYetXky_Y&list=PLGP6FBvf5tT6DHLv5NtvXXLTTfeY97ke2&index=162.







352. Defendant MARS uses marketing featuring cartoons, children, popular video game characters, and internet promotions to target children with UPF marketing.[323]





353. Defendant UNILEVER markets to children using marketing prominently featuring children, cartoon spokes-characters, and integrated campaigns across multiple media platforms to target children with UPF marketing.

---

[323] See e.g., Commercial Ads, *Skittles Commercials Compilation Taste The Rainbow Ads*, (Youtube Sept. 30, 2018), https://www.youtube.com/watch?v=GUVkO6ts2pA; Funny Commercials, *All Funniest Starburst Fruit Flavored Juicy Candy Commercials EVER!*, (Youtube Oct. 1, 2020), https://www.youtube.com/watch?v=wqeNn0sQAI4; Juicy Fruit, *Juicy Fruit Starburst TV Spot, 'Teens Use Zippers to Communicate'*, (iSpot Jan 12. 2015), https://www.ispot.tv/ad/7HjH/juicy-fruit-starburst-teens-use-zippers-to-communicate.

76





354. These are but examples of the intensive and integrated strategies each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA AND UNILEVER – uses to inundate

children with UPF marketing. Additional details will be uncovered through discovery and presented at trial.

355. Despite repeated promises to reduce advertising targeting children, Defendants KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER collectively target kids with billions of website advertisements every year.[324]

356. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – continue to target children with intensive, integrated marketing campaigns designed to infiltrate multiple touchpoints of children's lives.

357. And while some UPF companies claim that they restrict their child targeting to adolescents, adolescents may be even more vulnerable to UPF's harmful marketing appeals than younger children.[325]

358. Scientists have determined that UPF promotions "continue to present a risk to young people's heath and raise ethical concerns".[326] UPF companies have "never had so much access to [children] and never been able to bypass parents so successfully".[327]

359. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and

---

[324] A E Ustjanauskas et al., *Food and Beverage Advertising on Children's Web Sites*, Pediatr Obes., Jan. 2013.
[325] Jennifer L. Harris et al., *Hooked on Junk: Emerging Evidence on How Food Marketing Affects Adolescents' Diets and Long-Term Health*, Curr. Addict. Rep., Nov. 2020.
[326] James W. Elsey & Jennifer L. Harris, *Trends in Food and Beverage Television Brand Appearances by Children and Adolescents from 2009 to 2014 in the USA*, Public Health Nutr., Nov. 2015.
[327] Matt Richtel, *In Online Games, a Path to Young Consumers*, New York Times, Apr. 20, 2011.

UNILEVER – has weaponized this unfettered access to engage in unfair and deceptive marketing targeting children.

## V. A Banquet of Consequences—UPF Companies have Unleashed Immense Harm on American Children

360. Collectively, the Tobacco Companies dominated the U.S. food industry from 1985 through 2007. During this time, the Tobacco Companies' food companies, including Defendants KRAFT HEINZ, MONDELEZ, and POST HOLDINGS, selectively disseminated addictive UPF into the U.S. food environment. The other Defendants, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER, followed the lead of the Tobacco Companies, and our food supply has become dominated by UPF.

361. Currently about 73% of the food in our food supply is ultra-processed and potentially addictive.[328] Unsurprisingly, these foods compose 67% of children's diets on average.[329]

362. With Americans' food options so dominated by UPF, the notion of "personal responsibility" is thoroughly undermined. People consume unhealthy UPF because it is addictive and has crowded out other options. This is not a lack of personal responsibility but a deprivation of real choice— unhealthy UPF manufactured by Defendants KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER is ubiquitous.

---

[328] Jessica Taylor Price, *Has your food been chemically altered? New database of 50,000 products provides answers,* Northeastern Global News, May 25, 2022.
[329] Lu Wang et al., *Trends in Consumption of Ultraprocessed Foods Among US Youths Aged 2-19 Years, 1999-2018*, JAMA, Aug. 2021.

363. UPF is engineered to hack the physiological structures of our brains.[330] Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER purposefully sought to introduce addictive qualities into their UPF, using the same experimental psychology research pioneered by the tobacco industry to make cigarettes more addictive.

364. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – incorporated colorings, flavorants, and other additives initially created for cigarettes into their products. They selectively manufactured and sold foods that have addictive qualities. And they aggressively marketed their products to children, especially to Black and Hispanic children, using marketing tactics pioneered by the tobacco industry to sell cigarettes to children and these communities.

365. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – used sophisticated brain science to develop products that would be overconsumed, in order to generate excess profits.

366. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER –targeted children with marketing for their dangerous and addictive UPF.

367. In terms of profits, the efforts of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – have been highly successful. Real food has been displaced

---

[330] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).

by UPF in the American food environment, and Defendants collectively have generated billions of dollars in profits.

368. However, in more important terms—in human terms—the actions of each Defendant– KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – have been disastrous. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – got rich by robbing the health of American children.

369. The exponential increase of UPF in our food system, beginning in the 1980s, ushered in a multitude of epidemics. The conduct of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – separate and/or collectively has caused the displacement of real food by UPF and has caused social, cultural, economic, political and environmental disruption and crises.[331]

370. Since the Tobacco Companies spread their knowledge of addiction science and child targeting through the U.S. and global food environment, 14-20% of adults and 12-15% of children are addicted to UPF.[332] This rate in adults is highly similar to prior addiction epidemics, including tobacco.[333] However, the prevalence of UPF addiction in children is "striking and

---

[331] Carlos A. Monteiro et al., *UN Decade of Nutrition, the NOVA food classification and the trouble with ultra-processing*, Public Health Nutr. Jan. 2018.
[332] Erica M. LaFata & Ashley N. Gearhardt, *Ultra-Processed Food Addiction: An Epidemic?*, Psychother Psychosom., Nov. 2022.
[333] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021; Erica M. LaFata, *Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., Jun. 2024.

81

unprecedented".[334] Never in American history have so many children been hooked on an addictive substance.

371. A similar level of U.S. children are now obese, a level that has more than tripled since the 1970's.[335] Obesity disproportionately affects Black and Hispanic children—the exact children the UPF industry disproportionately targets with marketing.[336]

372. For the first time in human history, diseases of older individuals, including but not limited to Type 2 diabetes, have emerged in children and are now common in children and increasing.[337]

373. Childhood Type 2 Diabetes is a commerciogenic disease – a disease which would not exist but for the recklessness of the companies that dominate our commercial food system, including Defendants KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER.

374. Prior to 1985, Type 2 Diabetes was only a disease of older adults.[338] It was alternatively referred to as "adult-onset diabetes" to distinguish between type 1 diabetes, which can present at childhood.

375. But beginning in the late 1980's, doctors began seeing unusual findings in certain minority communities. Children began presenting with all of the clinical features of Type 2 Diabetes.

---

[334] Erica M. LaFata, *Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., Jun. 2024.

[335] Division of Population Health, National Center for Chronic Disease Prevention and Health Promotion, *Obesity*, CDC Healthy Schools, (Last updated Aug. 2022), https://www.cdc.gov/healthyschools/obesity/index.htm.

[336] Id.

[337] Robert H. Lustig, *Ultraprocessed Food: Addictive, Toxic, and Ready for Regulation*, Nutrients., Nov. 2020.

[338] Heather J. Dean & Elizabeth Sellers, *Children have Type 2 Diabetes too, a historical perspective*, Biochem Cell Biol, Oct. 2015.

376. These unfortunate children were canaries in the coal mine—the first harbingers of a public health calamity that continues to convulse through American families.

377. Throughout the early 1990's, as clinicians began to observe more pediatric Type 2 Diabetes cases, the scientific community remained skeptical about how Type 2 Diabetes could even exist in children.[339]

378. However, as rates of childhood obesity and childhood Type 2 Diabetes rose throughout the late 1990's and early 2000's, the notion that it was possible for children to get Type 2 Diabetes gained broad acceptance.[340]

379. Type 2 Diabetes is now one of the fastest growing pediatric chronic diseases worldwide, with rates accelerating rapidly throughout the world.[341] In the U.S., the rates of Childhood Type 2 Diabetes doubled between 2000 and 2017.[342]

380. Notably, a quarter (25%) of children with Type 2 Diabetes are not obese.[343] This indicates that obesity is a possible marker of Type 2 Diabetes in children, but is not the sole cause.

381. The very children targeted by the aggressive marketing of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA AND UNILEVER – have fared the worst. In 2021, the Centers for Disease Control noted that, in particular, the rates of "Type 2 Diabetes

---

[339] Id.

[340] Id.

[341] Id.

[342] Centers for Disease Control and Prevention, *New Research Uncovers Concerning Increases in Youth Living with Diabetes in the U.S.,* (Last updated Aug. 2021).

[343] Milena Cioana et al., *The Prevalence of Obesity Among Children with Type 2 Diabetes, Systematic Review and Meta-Analysis,* JAMA, Dec. 2022.

83

skyrocket[ed] in Black and Hispanic youth".[344] Compared to white children, the rates of Type 2 Diabetes grew 5 times as fast among Hispanic children, and 9 times as fast among Black children.

382. This is an ongoing, and unmitigated, disaster for American children and families. The prevalence of childhood Type 2 Diabetes is currently projected to increase 7-fold by the year 2060 if current trends continue.[345]

383. Notably, obesity existed in children before the misconduct of each Defendant as alleged herein; however, childhood Type 2 Diabetes did not. This makes clear that exposure, rather than individual behavior, is at the root of these epidemics.[346]

384. UPF is the cause of childhood Type 2 Diabetes.[347] The conduct of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – is a direct and substantial cause of childhood Type 2 Diabetes.

385. There are no plausible explanations for childhood Type 2 Diabetes *other* than UPF. Childhood Type 2 Diabetes *cannot* be caused solely by a lack of exercise, genetics, non-UPF, or any combination thereof.

386. The emergence of Childhood Type 2 Diabetes (and increase in other diseases) is the result of profound corruption in the U.S. food system.

387. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – made purposeful decisions to engineer their UPF in ways that make them harmful

---

[344] Centers for Disease Control and Prevention, *New Research Uncovers Concerning Increases in Youth Living with Diabetes in the U.S.,* (Last updated Aug. 2021).
[345] Thaddäus Tonnies et al., *Projections of Diabetes Burden in US Population Aged under 20 years through* 2060, Diabetes Care., 2023.
[346] Id.
[347] Id.

for human consumption, and to inundate children with marketing to increase child consumption of UPF.

388. There was not a massive, population-level failure of personal responsibility beginning in the 1980's. Similarly, the human genome did not undergo a paradigmatic shift beginning in the 1980's.

389. Instead, what happened in the 1980's was that the Tobacco Companies, and each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – took over the U.S. food environment and filled it with UPF.

390. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – targeted children with aggressive and/or excessive marketing. These children now have rising levels of unprecedented diseases that are caused by Defendants' UPF.

391. The ramifications of developing chronic disease during childhood reverberate throughout the rest of that child's life. Children who develop chronic diseases will have diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications.

392. Children with chronic diseases will live the rest of their lives sick, suffering, and getting sicker.

393. It can be expected that children with Type 2 Diabetes will also develop diabetes related micro- and macro-vascular complications, including amputation, blindness, nephropathy

and retinopathy.[348] Additional complications of Type 2 Diabetes include (but are not limited to) diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's disease, and depression.[349]

394. Canadian researchers conducted a fifteen-year follow-up of children diagnosed with Type 2 Diabetes and found an alarming number of these children suffered from blindness, amputation, kidney failure requiring dialysis, pregnancy loss, and death in *young adulthood*.[350]

## VI. Decades of Warnings Ignored: Each Defendant had Every Reason to Know that their Conduct Would Gravely Wound America's Children

### A. *The Risks of Ultra-Processing have long been clear to UPF Manufacturers*

395. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – had every reason to know that their respective actions would create public health crises in America's youth.

396. Indeed, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – had actual knowledge that these consequences would occur.

397. Yet Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and

---

[348] George Alberti et al., *Type 2 Diabetes in the Young: The Evolving Epidemic. Consensus Statement of the International Diabetes Federation Consensus Workshop*, Diabetes Care., Jul. 2004.

[349] American Diabetes Association, *Diabetes Complications What you need to know about diabetes complications*, ABOUT DIABETES, (Last viewed July 2024), https://diabetes.org/about-diabetes/complications; Mayo Clinic Staff, *Diabetes Symptoms and Causes*, Mayo Clinic, (Last updated Mar. 2024), https://www.mayoclinic.org/diseases-conditions/diabetes/symptoms-causes/syc-20371444.

[350] Kelly D. Brownell & Kenneth E. Warner, *The Perils of Ignoring History, Big Tobacco Played Dirty and Millions Died. How Similar is Big Food?*, Milbank Q., Mar. 2009.

UNILEVER – recklessly, and intentionally, sacrificed the health of America's children on the altar of more and more profits.

398. Well before Carlos Monteiro developed the NOVA classification system, Dr. W. Coda Martin expounded a similar philosophy of nutrition to the National Dietary Association in a speech titled "When is Food a Poison?". In that speech, Dr. Martin explained "Man is a living, dynamic organism. He is a three-fold being consisting of body, mind and spirit. He is not a mechanical machine. Therefore, scientists cannot produce food for living organism, plants, animals or humans by methods applicable to that used for dead or inanimate machines".[351]

399. It has long been clear that ultra-processing serves no purpose other than to increase profits of UPF manufacturers.

400. As far back as 1958, an article in *Prevention* explained that added chemicals in food:

> "are there to make greater profit for the food processor. They serve no other purpose. They do not improve the food in any way for the consumer. But the consumer must pay (and how many pay with their lives?) for the extra profit made by using a preservative that prolongs the 'shelf-life' of the product, by using a dye that gives the product brighter color than that of a competitive product, by using a synthetic fat in place of a natural one and thus cutting costs."[352]

401. There have been concerns about ultra-processing since its invention. At the dawn of industrial food processing, reasonable experts expressed grave concern about the public health consequences of introducing laboratory chemicals and novel substances into our food supply. A 1951 report noted that:

> "The number of chemicals entering the food supply of the Nation has increased tremendously in the last decade. The rapidity with which substances heretofore foreign to the body are being introduced in the production, processing, storage, packaging and distribution of food is alarming. Eminent pharmacologists, toxicologists, physiologists, and

[351] W. Coda Martin, *When is a Food a Poison? Philosophy of Nutrition*, National Dietary Association, 1957.
[352] *Cancer and Nutrition*, Prevention, Jan. 1958.

nutritionists expressed fear that many of the chemicals being added to food today have not been tested sufficiently to establish their nontoxicity and suitability for use in food. These scientists are not so much concerned with the acutely toxic compounds whose harmfulness can readily be detected as they are with the small and insidious toxic effects of substances which may produce harmful effects only after being fed for months or years".[353]

402.     Around the same time, an article warned that "hundreds of untested and unproved chemicals, in the hands of irresponsible food manufacturers, are threatening the health, and even the lives, of our families".[354] The article noted that "in general, nutritionists agree that no new chemical should be added, however, unless it is definitely proved safe, serves a useful purpose, and is not a substitution in whole or in part for a natural food element".[355]

403.     A Harvard cancer research scientist concurred, stating "It is simply not in the public interest to expose consumers to the unforeseeable risks of a host of biologically foreign food additives that provide eye appeal and advertising value but offer no nutritive benefit".[356]

404.     Similarly, in 1957, health advocate Gloria Swanson stated:

"It is horrifying to know that 99.9% of our citizens (that includes you but not me—because most of my food is organically grown and unsprayed)—that 99.9% are eating more than 276 chemicals (this was the figure in 1952, no doubt its greater now) which have never been pretested for their chronic effect on human body and mind. You may say you feel fit—but remember most of you like me, have come from healthy stock and were raised on unprocessed and unsprayed foods—so our stamina has saved us. I tremble to think what kinds of minds and bodies my grandchildren's children will have if this continues".[357]

405.     Swanson's warning was prescient. Three generations later, U.S. children are contracting severe chronic illnesses in unprecedented numbers, and growing sicker each year.

---

[353] James J. Delany et al., *Delaney Investigation on the Use of Chemicals in Foods*, Union Calendar, Jan. 1951.
[354] James J. Delaney, *Peril on Your Shelf*, American Magazine, Jul. 1951.
[355] Id.
[356] *Doctor Says we may be Eating Cancer*, Citizens Medical Reference Bureau Inc., 1957
[357] Swanson, Remarks at Big Brother Luncheon, Advertising Club, (November 19, 1957).

406. There are now more than 10,000 chemicals in our food supply—almost none of which have any published safety information.[358]

407. Almost none of these chemicals have undergone long-term safety testing to determine whether they are safe to be chronically consumed, or whether there are "small and insidious toxic effects of substances which may produce harmful effects only after being fed for months or years". Many of these may exhibit toxicities at exceedingly low levels or are suspected endocrine disruptors.[359]

408. These and other components of UPF can contribute to endocrine diseases such as Type 2 Diabetes. For example, a recent large high-quality epidemiological cohort study revealed "direct associations between the risk of Type 2 Diabetes and exposures to various food additives and emulsifiers widely used in industrial foods".[360]

409. There are no requirements for UPF companies to submit safety information or subject chemicals to independent testing and review before introducing them into our food supply.

410. Neither UPF companies nor federal regulators are required to evaluate whether chronic diseases can be caused by a single chemical additive or combinations of multiple chemical additives.[361] There are no testing requirements to demonstrate the effects of low or cumulative exposures that occur in the diet.[362]

---

[358] Maricel V. Maffini et al., *We are what we eat: regulatory gaps in the United States that put our health at risk*, PLoS Biol., Dec. 2017; Olivia Backhaus & Melanie Benesh, *EWG analysis: Almost all new food chemicals greenlighted by industry, not the FDA*, EWG, Apr. 2022.
[359] Maricel V. Maffini et al., *We are what we eat: regulatory gaps in the United States that put our health at risk*, PLoS Biol., Dec. 2017.
[360] Clara Salame et al., *Food Additive Emulsifiers and the Risk of Type 2 Diabetes: Analysis of data from the NutriNet-Sante prospective cohort study*, Lancet Diabetes Endocrinol., May 2024.
[361] Maricel V. Maffini et al., *We are what we eat: regulatory gaps in the United States that put our health at risk*, PLoS Biol., Dec. 2017.
[362] Id.

411. UPF companies can introduce new chemicals, or use chemicals in new ways, without disclosing "the identity of the substance, where it was used, how much of it was used, and if it was safe".[363]

412. Under the voluntary chemical registration system, the FDA does not have authority to limit a chemical's use in edible substances, even if there are safety concerns.[364] A chemical can still be marketed as "generally recognized as safe" ("GRAS") even if there are safety concerns, and no one—neither competitors nor consumers—will know that there might be safety concerns.[365]

413. The paucity of safety and testing information disclosed by UPF manufacturers is astonishing.[366]

414. Nevertheless, most consumers assume that if something is on shelves, and available for purchase at grocery stores and restaurants, it is safe, pure and does not contain hidden health harms.

415. Most consumers assume that anything included in a store bought item has been studied, tested, and guaranteed to be safe—especially given the likelihood that children may ingest these items. After all, who would sell untested, harmful, and potentially addictive items to children?

416. The Tobacco Companies took advantage of consumers' reasonable assumptions and dramatically increased the amount of untested chemicals in our food supply.

417. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and

---

[363] Id.
[364] Id.
[365] Id.
[366] Id.

UNILEVER – who is either a direct descendant of the Tobacco Companies and/or has used similar technologies and strategies as the Tobacco Companies, had every reason to know that creating and selling untested UPF could lead to incurable and life-changing illnesses.

418. Yet, instead of adequately testing the effects of consuming their UPF, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER –actively refused to conduct the appropriate safety testing needed to ensure their UPF could be consumed without harm.

419. Alternatively, the internal testing of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – has revealed safety concerns that they have concealed from consumers, regulators, and the public, and each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – had actual knowledge that their UPF would cause incurable and life-changing illnesses.

420. Defendant KRAFT HEINZ has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

421. Alternatively, Defendant KRAFT HEINZ's internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

422. Defendant MONDELEZ has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

423. Alternatively, Defendant MONDELEZ's internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

424. Defendant POST HOLDINGS has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

425. Alternatively, Defendant POST HOLDINGS' internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

426. Defendant COCA-COLA has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

427. Alternatively, Defendant COCA-COLA's internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

428. Defendant PEPSICO has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

429. Alternatively, Defendant PEPSICO's internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

430. Defendant GENERAL MILLS has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

431. Alternatively, Defendant GENERAL MILLS' internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

432. Defendant NESTLE has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

433. Alternatively, Defendant NESTLE's internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

434. Defendant KELLOGG'S has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

435. Alternatively, Defendant KELLOGG's' internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

436. Defendant MARS has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

437. Alternatively, Defendant MARS' internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

438. Defendant CONAGRA has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

439. Alternatively, Defendant CONAGRA's internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

440. Defendant UNILEVER has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

441.    Alternatively, Defendant UNILEVER's internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

### B.    The Predatory Nature of UPF Marketing Has Been Clear from the Start

442.    The predatory nature of targeting children with UPF advertisements has been clear for decades. As the creator of Sesame Street observed in the 1970s, advertising UPF to children is 'like shooting fish in a barrel…grotesquely unfair'".[367]

443.    Around that time, the President of the Council on Children, Media and Merchandising explained:

> "Advertising to children much resembles a tug of war between 200-pound men and 60-pound youngsters…Any communication that has a $1000-per-commercial scriptwriter, actors, lighting technicians, sound effects specialists, electronic editors, psychological analysts, focus groups and motivational researchers with a $50,000 budget on one end and the 8-year-old mind (curious, spongelike, eager, gullible) with 50 cents on the other inherently represents an unfair contest"[368]

444.    In an extensive 1978 report, the U.S. Federal Trade Commission ("FTC") stated that children are too naïve to "perceive the selling purpose of television advertising or otherwise comprehend or evaluate it and tend…to view commercials simply as a form of informational programming".[369]

445.    A British Parliamentary report at the time stated, "children are inclined to believe that what they are told in a television programme is not only true, but the whole truth…that is why the majority of us believe that children should not be exposed to the blandishments and subtle persuasiveness of advertisements".[370]

---

[367] Ellis M. Ratner et al., *FTC Staff Television Advertising to Children*, Feb. 1978.
[368] Id.
[369] Id.
[370] Id.

446. The FTC report commented on this U.K. Parliamentary finding, noting "That view has widespread support throughout the world".[371]

447. An advertising executive explained that the goal of marketing to kids is to take advantage of their ability to be "very successful naggers", explaining that "When you sell a woman on a product and she goes into the store and finds your brand isn't in stock, she'll probably forget about it. But when you sell a kid on your product, if he can't get it he will throw himself on the floor, stamp his feet and cry. You can't get a reaction like that out of an adult'".[372]

448. Thus, as described by Dr. Frances Horwich, a psychologist and director of children's television programming, "the child is unwittingly turned into an assistant salesman. He sells, he nags, until he breaks down the sales resistance of his parent".[373]

449. The FTC noted that "this takes a toll on the parent-child relationship".[374]

450. The President of the American Academy of Child Psychiatry stated that the Academy is "deeply concerned with the exploitation of children for advertising purposes because it encourages confrontation and alienation on the part of children toward their parents and undermines the parents' child rearing responsibilities".[375]

451. Along the same lines, when asked why parents don't shield their children from televised food advertising, NYU psychology professor Dr. Sherryl Graves said that "the matter is not so simple" and that "the unwillingness of parents to intervene often stems from profound feelings of helplessness, and from fear that if they deny their children so pervasive a childhood experience as children's program, the children will become social outcasts or social isolates".[376]

---

[371] Id.
[372] Id.
[373] Id.
[374] Id.
[375] Id.
[376] Id.

452. The FTC found that "whatever the dynamics of the matter may be, it does appear that there are substantial numbers of parents who object to the advertising being addressed to children on television, but who are unwilling or unable to take the drastic step of shutting that advertising out of the home by forbidding their children to watch".[377]

453. The FTC report warned that television advertising of foods to children does not "impress on them the risks they take by eating the advertised products", and may pose a threat to their health.[378]

454. The American Medical Association characterized "televised food advertising to children" as 'most distressing' and as 'counter-productive to the encouragement of sound [nutritional] habits'".[379]

455. The FTC explained that "a number of prominent nutritionists, educators, other public health professionals, and parents have expressed concern that televised food advertising addressed to children is distorting nutritional habits, negating what little nutrition education takes place in the schools, and undermining the authority of parents in their own homes on matters of nutrition".[380]

456. The FTC concluded that "advertisements for sugared products, like those for cigarettes, involve inducements to children to gamble with their health" and that:

> "such advertising causes substantial injury to children to the extent that it induces them to consume products which pose health risks and interferes with their education on matters of nutrition. It injures the parent-child relationship in that it puts parents in the hard choice of allowing their children to take those health risks or enduring the strife that can accompany denial of requests induced by television advertising".[381]

---

[377] Id.
[378] Id.
[379] Id.
[380] Id.
[381] Id.

457. The FTC further found that "The advertising at issue is deceptive in that it fails to state facts which are material, either in light of the claims made in the advertising, or in light of the customary or recommended use of the advertised products…The material but unrevealed fact is that the products can also pose health risks".[382]

458. All of this was before tobacco companies super-charged child advertising budgets for their food companies in the late 1980s and early 1990s, and set in motion a model that the UPF industry has followed ever since.

459. Despite clear warnings about the harms likely to result from targeting kids for marketing UPF, and the fundamental unfairness of targeting children with UPF marketing, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – purposefully inundated America's children with UPF ads for decades.

460. Defendant KRAFT HEINZ's conduct in this regard directly degraded the health of America's youth.

461. Defendant MONDELEZ's conduct in this regard directly degraded the health of America's youth.

462. Defendant POST HOLDING's conduct in this regard directly degraded the health of America's youth.

463. Defendant COCA-COLA's conduct in this regard directly degraded the health of America's youth.

464. Defendant PEPSICO's conduct in this regard directly degraded the health of America's youth.

---

[382] Id.

97

465. Defendant GENERAL MILLS' conduct in this regard directly degraded the health of America's youth.

466. Defendant NESTLE's conduct in this regard directly degraded the health of America's youth.

467. Defendant KELLOGG'S' conduct in this regard directly degraded the health of America's youth.

468. Defendant MARS' conduct in this regard directly degraded the health of America's youth.

469. Defendant CONAGRA's conduct in this regard directly degraded the health of America's youth.

470. Defendant UNILEVER's conduct in this regard directly degraded the health of America's youth.

471.

472. By 2006, the Institutes of Medicine ("IoM") found that "The dramatic rise in the number of U.S. children and youth who are obese, have Type 2 Diabetes, and are at increased risk for developing obesity and related chronic diseases in adulthood, is a matter of national concern".[383]

473. The IoM found that "the prevailing pattern of food and beverage marketing to children in America represents…a direct threat to the health of the next generation. Dietary patterns that begin in childhood give shape to the health profiles of Americans at all ages".[384]

474. The IoM report noted

---

[383] J. Michael McGinnis et al., *Food Marketing to Children and Youth: Threat or Opportunity*, (2006).
[384] Id.

Case 1:26-cv-00738    Filed 04/27/26    Page 98 of 185    Document 1

"Children and youth represent a primary focus of food and beverage marketing initiatives. Between 1994 and 2004, the rate of increase in the introduction of new food and beverage products targeted to children and youth substantially outpaced the rate for those targeting the total market. An estimated more than $10 billion per year is spent for all types of food and beverage marketing to children and youth in America".[385]

475. Among the IoM's Key Findings were that "food and beverage marketing influences the preferences and purchase requests of children, influences consumption…is a likely contributor to less healthful diets and may contribute to negative diet-related health outcomes and risks among children and youth".[386]

476. Based on their systematic review, the IoM stated "it can be concluded that television advertising influences children to prefer and request high-calorie and low-nutrient foods and beverages".[387] The IoM further found that "food and beverage marketing practices geared to children and youth are out of balance with healthful diets and contribute to an environment that puts their health at risk".[388]

477. While the 2006 IoM Report recommended changes that UPF manufacturers could take to improve their child marketing behaviors, a 2013 follow-up found that only limited progress had been made, and that "there has been a proliferation of new venues and new vehicles, particularly the rise of digital media".[389]

478. UPF industry groups and some Defendants have claimed to take voluntary action to "self-regulate" the ways in which they target children with marketing for UPF. However, regardless of any such pledges to "self-regulate", each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE,

---

[385] Id.
[386] Id.
[387] Id.
[388] Id.
[389] Institute of Medicine at al., *Challenges & Opportunities for Change in Food Marketing to Children & Youth*, (2013).

KELLOGG'S, MARS, CONAGRA and UNILEVER – each continued to engage in unfair marketing to children.

479. In 2013, the IoM found that "Despite the lip service paid to children, actions do not match words…Children are society's most vulnerable population, and those who care the most about them need to be mobilized".[390]

480. Similarly, the FTC found in 2012 that:

"The overall picture of how marketers reach children…did not significantly change. Companies continue to use a wide variety of techniques to reach young people, and marketing campaigns are heavily integrated, combining traditional media, Internet, digital marketing, packaging, and often using cross-promotions with popular movies or TV characters across all of these. Those techniques are highly effective. Consumer research submitted by the reporting companies confirms the "pester power" phenomenon—child-directed marketing and promotional activities drive children's food requests. Children, in turn, play an important role in which products their parents purchase at the store, and which restaurants they frequent".[391]

481. The FTC noted that new media marketing was increasing, and that "viral marketing and word-of-mouth activities were increasingly used by food marketers to reach children and especially teens and were often closely integrated with Internet marketing…Food marketers also used word-of-mouth techniques—recruiting consumers as 'ambassadors' of the brand".[392]

482. Internal company research indicated that the use of athletes and other superstar celebrities produced pronounced effects in children[393] Spokes-characters, including third-party characters from popular TV shows or movies were also revealed to be effective methods of targeting children.[394]

---

[390] Id.
[391] Sarah Botha et al., *A Review of Food Marketing to Children and Adolescents*, U.S. Federal Trade Commission Follow-Up Report, Dec. 2012.
[392] Id.
[393] Id.
[394] Id.

483. The FTC also found that "contests and promotions are another common marketing technique used to target youth".[395]

484. The child targeting efforts used by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – are highly sophisticated, and highly effective. According to FTC:

> "one company's research indicated that a child seeing an ad for a food product or seeing the product on the shelf was a key factor in purchase and that 75% of the purchasers surveyed bought the product for the first time because their child requested it…Another company submitted research showing that in-store advertising programs using child-targeted character-based themes outperformed those using mom-targeted campaigns. Yet another company found that children are most influential in the purchase decisions for snacks. These findings are relevant in light of other research submitted showing that for children, good commercials and websites are the key drivers of food appeal".[396]

485. In 2012, a group of 300 retired U.S. admirals and generals declared that in-school marketing of UPF "is not just a national health issue. It is a national security issue", and jeopardizing our ability to field an adequate military.[397]

486. The group found that UPF marketing in schools was degrading America's armed forces, and that 1 in 4 potential recruits could not meet military fitness standards.[398]

487. UPF was found to cause military challenges even for youth who could join, because they "become too heavy once they are in the military, or have weak muscles or bones from poor nutrition" that can lead to excess sprains or stress fractures.[399]

488. Despite these clear warnings, and knowledge that their conduct represented "a direct threat to the health of the next generation", the conduct of each Defendant – KRAFT HEINZ,

---

[395] Id.
[396] Id.
[397] William Christeson et al., *Still Too Fat to Fight*, Mission: Readiness Report, Sept. 2012.
[398] Id.
[399] Id.

MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – did not improve over the ensuing decade.

489. The numerous examples described herein further bolster these conclusions, and demonstrate that each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – continue to aggressively target children with pervasive and integrated promotional campaigns.

490. The American Heart Association ("AHA") recently declared the UPF industry's attempts at self-regulating to be inadequate, finding "There are still companies that do not participate and many of the foods allowed to be marketed to children under these voluntary standards are still unhealthy".[400]

491. Despite these voluntary standards, the AHA found that children were still "regularly exposed to advertising and marketing through television, the internet, social media, magazines, schools, product placements, video games, cell phones, and other means…Young children are especially vulnerable to these marketing and advertising strategies because they are developmentally less able to comprehend their intent".[401]

492. The AHA found that "Unhealthy food marketing aimed at children and teens is a significant contributor to poor diet quality and diet-related diseases worldwide" and concluded that "the American Heart Association sees no ethical, political, scientific, or social justification for marketing low-nutrient, high-calorie foods to children".[402]

---

[400] American Heart Association, *Unhealthy and Unregulated: Food Advertising and Marketing to Children*, (Last updated Apr. 2019).
[401] Id.
[402] Id.

102

493. A 2019 review by the Center for Science in the Public Interest ("CSPI") found that ads marketing unhealthy UPF at children were growing, and that more and more ads targeting children failed to comply with the UPF industry's voluntary guidelines.[403]

494. Th eCSPI found that UPF marketing "plays a key role" in poor health outcomes in children, and described the environment American children live in:

> "In addition to television advertisements, children are exposed to food and beverage marketing in schools, retail stores, restaurants and movie theaters and through radio, print, websites, mobile devices, contests, events, and sponsorships. The ubiquitous, unavoidable chorus of food messaging shapes social norms, children's food preferences, and, ultimately, their health".[404]

495. CSPI found that UPF ads "undermine parents' ability to guide their children's food and beverage choice, as parents have to counter the sophisticated psychological research and marketing techniques used by food and beverage companies. Marketing aimed at children can strain parent-child relationships as they repeatedly put parents in a position of negotiating over food".[405]

496. A more recent review similarly found that "industry self-regulations contain numerous loopholes and have not demonstrably reduced most types of food marketing directed to children, nor substantially improved the nutrition of marketed products".[406]

497. Despite warning after warning, unfair UPF marketing to children remains widespread.

498. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and

---

[403] Amanda Reat et al., *Changing the Channels: How Big Media Helps Big Food Target Kids (and What to Do about it)*, Center for Science in the Public Interest, Nov. 2019.
[404] Id.
[405] Id.
[406] Jennifer L. Harris et al., *Hooked on Junk: Emerging Evidence on How Food Marketing Affects Adolescents' Diets and Long-Term Health*, Curr. Addict. Rep., Nov. 2020.

UNILEVER – has known for decades that targeting children with unhealthy UPF was fundamentally unfair, "a direct threat to the health" of children, and would lead to disastrous health outcomes. Nevertheless, they continue to inundate American children with unfair and deceptive marketing.

499. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – targets children with UPF marketing for the same reason the Tobacco Companies targeted children with cigarette marketing: UPF companies "view young people as potential lifelong loyal customers. Marketing to hook young people on their products represents a highly profitable investment, while potential regulation of food marketing to adolescents presents a significant business risk".[407]

## VII. The International Consensus: UPF are Uniquely Harmful, Require Warnings, and Should Not be Marketed to Children

500. While the explosion of UPF occurred first in the United States, the UPF industry eventually reached a saturation point that limited the potential for further profit growth within the United States.

501. As such, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – began to use the same playbook described above in country after country throughout the globe.

502. The invariable result: unprecedented increases in noncommunicable diseases including diabetes, fatty liver disease, and numerous others in populations across the world.

---

[407] Id.

503.   An international consensus has emerged that UPF is uniquely harmful, that UPF manufacturers have caused massive increases in chronic diseases and human suffering, that UPF requires warnings, and that marketing UPF to children is inherently unfair.

504.   Public Health Agencies and Governmental Agencies throughout the world have endorsed the appropriateness of the NOVA System, the UPF Categorization, and recognize the massive societal harms caused by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER –, and UPF generally.

505.   For example, the Public Health Association of Australia ("PHAA") found that "Action is needed across all levels of government, food industry, and the public domain to reduce the production, consumption and consequential impact of ultra-processed foods on population and planetary health".[408]

506.   The PHAA explained that:

"Evidence from over 500 studies across more than 14 countries and summarized in 23 systematic reviews published to date, shows consumption of ultra-processed foods is a major contributor to global burden of disease.

Large-scale population and experimental studies demonstrate a direct association between ultra-processed food consumption, poor quality eating patterns and negative health outcomes such as weigh gain, non-communicable diseases (e.g., Type 2 Diabetes, cardiovascular disease, and impaired mental and cognitive health and increased mortality…

Poor health outcomes associated with ultra-processed food consumption result from both: a) nutrient profile of ultra-processed foods which typically include added sugars, salt and industrial fats; and b) non-nutrient mediated mechanisms such as deconstruction of the food matrix of the presence of cosmetic additives and contaminants that may impair endocrine function and gut-satiety signaling".[409]

---

[408] Public Health Association Australia, *Ultra-Processed Foods: Policy Position Statement*, PHAA, Jun. 2019.
[409] Id.

507. The PHAA recommended that restrictions on marketing UPF to children should be enacted, as well as food labeling requirements to identify the level of processing, and "fiscal policies to disincentivize the production and consumption" of UPF.[410]

508. The World Health Organization and the Food and Agriculture Organization of the United Nations issued a joint statement that "A large and growing body of evidence suggests that consumption of highly processed foods described as "ultra-processed" foods (UPF) by the NOVA classification scheme…is associated with negative health outcomes. These include risk of premature mortality, cancer, cardiovascular diseases, overweight, obesity, and type 2 diabetes, as well as impaired mental, respiratory and gastrointestinal health".[411] The joint statement found that the "evidence suggests that the associations with negative health effects go beyond their fat, sodium, and sugar content".[412]

509. The Consumer Federation of America ("CFA") states that "an increasing body of evidence fingers UPFs as a key culprit behind our dietary woes".[413] The CFA explains that UPF "may effectively 'hijack' the brain and override satiety signals that prevent us from overeating less processed foods…certain chemicals in UPFs may affect us in more complex and nefarious ways as well, degrading the gut microbiome, disrupting the endocrine system, and even stymying healthy brain development".[414]

510. The Brazilian Health Ministry counsels people to "avoid ultra-processed foods", explaining that "as a result of their formulation and presentation, they tend to be consumed in

---

[410] Id.

[411] Food & Agriculture Organization of the United Nations and World Health Organization. *What are healthy diets? Joint Statement by the Food and Agriculture Organization of the United Nations and the World Health Organization*, 2024.

[412] Id.

[413] Consumer Federation of America, *Why they Matter and What to Do About It.* CFA, 2024

[414] Id.

106

excess, and displace natural or minimally processed foods. Their means of production, distribution, marketing, and consumption damage culture, social life, and the environment".[415]

511.    The Dietary Guidelines for Brazilians emphasize that UPF:

"are now often reformulated and advertised as if they are healthy, being labelled as for example 'light' or 'diet', or low in fat or sugar, or free from trans fats, or high in fibre or vitamins and minerals. These adjustments may improve the products which however remain ultra-processed and unhealthy".[416]

512.    The Ministry of Health Brazil explains that UPF "disturb mechanisms located in the digestive system and the brain that ensure that the intake and expenditure of dietary energy is balanced. These mechanisms tend to underestimate the energy contained in ultra-processed foods" and lead to "excess consumption".[417]

513.    The Brazilian Health Ministry found that UPF "are promoted and advertised incessantly on television and radio, newspapers and magazines, the internet, social media, at point of sale, and on packaging, and with discounts and giveaways. Much of this propaganda is aimed at children and young people".[418]

514.    According to the Brazilian Health Ministry, UPF advertising "often conveys incorrect or incomplete information about diet and health and mainly affects children and youngsters".[419]

515.    The "Dietary Guidelines for Indians" states that UPFs are "known to increase the risk of non-communicable diseases like diabetes, hypertension, cardiovascular diseases, etc." and

---

[415] Ministry of Health Brazil, *Dietary Guidelines for the Brazilian Population*, Secretariat of Health Care. Primary Health Care Department., 2015.
[416] Id.
[417] Id.
[418] Id.
[419] Id.

that UPFs should be avoided or restricted.[420] The Indian guidelines also emphasize that "enriching and fortifying UPFs with nutrients does not make them wholesome or healthy".[421]

516. France's Public Health Agency recommends "avoiding the consumption of ultra-processed products".[422]

517. The French National Assembly's Parliamentary Office for Scientific and Technological Assessment stated:

> "a number of consistent studies have found a significant association between consumption of ultra-processed foods and the risk of excess weight and obesity, Type 2 Diabetes, cardiovascular disease and associated mortality, hypertension, depression and overall mortality…the accumulation of epidemiological studies with identical results, as well as the plausibility of the biological mechanisms detailed below, provide **strong arguments for causality**".[423] (emp. orig.)

518. Among those biological mechanisms, the French Parliamentary Office explained that the modification of the food matrix, intensified by the use of flavourings "override the homeostatic control of food intake" and alter "our ability to assess the energy content of foods".[424] The Parliamentary Office continued "ultra-processed foods encourage **excessive energy intake** and are even associated with "**food addiction**".[425] (emp. orig.)

519. The French Parliamentary Office further explained,

> "the poor nutritional composition of ultra-processed foods and their possible over-consumption are not sufficient to explain their effect on health. The associations identified by most of the above-mentioned epidemiological studies remain despite statistical adjustments to energy intake and the nutritional quality of the diet. It would therefore seem that other mechanisms are involved, which justifies the relevance and usefulness of this new type of classification.

---

[420] ICMR-NIN Expert Committee, *National Institute of Nutrition: Dietary Guidelines for Indians—2024*, ICMR-National Institute of Nutrition, (Revised May 2024).
[421] Id.
[422] Sante Publique France, *Recommendations Concerning Diet, Physical Activity and Sedentary Behaviour for Adults,* PNNS, Aug. 2019.
[423] Parliamentary Office for Scientific and Technological Assessment, *Briefing 35: Ultra-Processed Foods*, National Assembly of France, Jan. 2023.
[424] Id.
[425] Id.

In addition to the physical impacts on food texture, transformations in the food matrix are likely to affect the digestibility and bioavailability of ingested nutrients and the possible synergies that may exist between different compounds.

Moreover, ultra-processed foods generally contain various additives (emulsifiers, colourings, flavour enhancers, sweeteners, etc.) whose impact on health may be detrimental in the long term. Studies suggest that some additives may disrupt the gut microbiota or the endocrine system, or have carcinogenic or inflammatory effects…

In addition to these additives, which are included in the list of ingredients, other potentially harmful compounds may be food in ultra-processed foods, which may contribute to their harmful nature. During processing, especially intense processing, some molecules may be broken down to form new compounds. Heat treatments are known to generate numerous molecules (acrylamide, acrolein, etc.) with carcinogenic, cardiometabolic and diabetogenic effects. Substances contained in food packaging (such as bisphenol A and phthalates) can also contaminate these foods...These various molecules increase the risk of a cocktail effect, i.e. the effect of the interacting substances is greater than the sum of the individual effects.[426]

520. The French Parliamentary Office concluded that "current knowledge already calls for the implementation of measures to **reduce the consumption** of these foods, an objective set by the National Nutrition and Health Programme".[427] (emp. orig.)

521. The French Parliamentary Office also concluded that "the abolition of commercial advertising during youth programmes broadcast on French public television must be extended to all programmes, as children are exposed to advertising at all hours".[428]

522. The Heart and Stroke Foundation of Canada advises people to "avoid ultra-processed foods".[429]

523. The Israeli Ministry of Health counsels that "it is important to reduce the consumption of ultra-processed foods as much as possible since they come with a substantial

---

[426] Id.
[427] Id.
[428] Id.
[429] JC Moubarac, *Ultra-processed foods in Canada: consumption, impact on diet quality and policy implications*, 2017, Montréal: TRANSNUT, University of Montreal, Dec. 2017.

health cost. In recent years studies have been confirming an association between the degree of food processing and health effects".[430]

524. In the Israeli Nutrition Recommendations, the Israeli Ministry of Health[431] stated that "the health implication of the consumption of ultra-processed food include: an increase in the risk of diabetes, cardiovascular disease, obesity, fatty liver, certain types of cancer, damage to the microbiome, an increase in the risk of mental illness and more".[432]

525. The Israeli Health Ministry explained UPF encourage "subconscious eating" and "as a result of their composition and method of marketing we tend to consume exaggerated amounts of them".[433]

526. The Israeli Health Ministry stated that while chemical additives in UPF undergo an approval process, "the effect of their long term consumption and also the cumulative effect of the consumption together is not known".[434]

527. The Israeli Ministry of Health concluded that UPF's "manufacture, distribution, marketing and consumption are injurious to health, culture, social life and the environment" and that marketing of UPF to children should be restricted.[435]

528. The Peruvian Ministry of Health advises people to "protect your health by avoiding ultra-processed food consumption" and that people should avoid "ultra-processed foods to prevent disease".[436]

---

[430] State of Israel Ministry of Health, *Processed Food*, Ministry of Health, (Last updated 2024).
[431] Israeli Ministry of Health, *Nutritional Recommendations*, Ministry of Health, 2019
[432] Id.
[433] Id.
[434] Id.
[435] Id.
[436] Mirko Luis Lázaro Serrano & César Hugo Domínguez Curi, *Guías alimentarias para la población Peruana*, Ministerio de Salud. Instituto Nacional de Salud, 2019, (translation to English).

110

529. The Uruguayan Ministry of Health explains that "ultra-processed products 'cheat' the mechanisms that regulate appetite. They have certain characteristics that make the brain and digestive system underestimate the calories we eat".[437]

530. Uruguay's Ministry of Health advises people to "avoid the consumption of ultra-processed products".[438]

531. The Malaysian Ministry of Health advises people to "limit intake of ultra-processed foods" and to "be aware that advertising of ultra-processed products dominates commercial advertising of food; it often conveys incorrect or incomplete information about diet and health".[439]

532. The European Association for Study of the Liver ("EASL") found that "alcohol and ultra-processed foods represent key health challenges in the 21st century" and that UPF consumption is a "major driver of liver-related morbidity and mortality".[440]

533. The EASL reported that "many European countries have seen a striking increase in the consumption of ultra-processed foods" and that "children in Europe are regularly exposed to marketing that promotes ultra-processed foods…Such targeting of children and adolescents by food and beverage commercials, in particular those embedded in children's TV programmes, electronic media (e.g., video games and DVDs), and social media, has been shown to drive consumption".[441]

---

[437] Miniterio de Salud de Uruguay, *Guía alimentaria para la población Uruguaya: para una alimentación saludable, compartida y placentera*, Área Progamática de Nutrición, (Last updated 2019), (translation to English).
[438] Id.
[439] Minsitry of Health of Malaysia, *Malaysian dietary guidelines 2020*, NCCFN, 2021.
[440] Tom H. Karlsen et al., *The EASL-Lancet Liver Commission, protecting the next generation against liver disease complications and premature mortality*, The Lancet Commissions, Jan. 2022.
[441] Id.

111

534. As a result, the EASL found that "sugar-sweetened beverage consumption is now one of the leading causes of childhood and adult obesity and associated NAFLD".[442]

535. The EASL concluded that given the harms caused by marketing UPF to children, "we call for attention to unregulated narrowcasting of marketing messages to mobile phones by digital and social media; experience from the tobacco industry has shown that the only effective means to protect children is through a complete ban".[443]

536. The EASL also called for "the implementation of a European-wide, mandatory, government-led, simple, informative, and uniform front-of-pack labelling approach based on the latest scientific research and guidelines" to "help encourage consumers to reduce their intake of ultra-processed foods".[444]

537. The Ecuadorian Ministry of Public Health advises people to "avoid the consumption of ultra-processed foods", noting that many health problems, including obesity, diabetes, hypertension, metabolic syndrome, gastric and colorectal cancer, are related to UPF consumption.[445]

538. In discussing this conclusion, the Ecuadorian Ministry of Public Health reported major increases in the sales of UPF were accompanied by significant increases in body mass, and that "One of the determinants that explain these trends is the aggressive marketing strategy used by the processed foods and sugary drinks industry, which is mainly directed at children and adolescents".[446]

---

[442] Id.
[443] Id.
[444] Id.
[445] Ministerio de Salud del Ecuador & Organización de las Naciones Unidas para la Alimentación y la Agricultura, *Guías alimentarias basadas en alimentos del Ecuador*, GABA, Febr. 2021, (translation to English)
[446] Id.

539. Similarly, the Maldives Ministry of Health recommends people limit the intake of UPF.[447]

540. The Food and Agriculture Organization of the United Nations ("FAO") found that "the significance of food processing, and in particular of ultra-processed food, is now generally recognized".[448] In discussing the scientific evidence of UPF's harms, FAO found that the scientific studies "show plausible, significant and graded associations between the dietary share of ultra-processed foods and the occurrence or incidence of several non-communicable diseases, including obesity and obesity-related outcomes, cardiovascular and metabolic diseases, breast and all cancers, depression, gastrointestinal disorders, frailty in the elderly, and also premature mortality".[449]

541. Francis Collins, director of the United States National Institutes of Health ("NIH") recommended that Americans should "work to eliminate or at least reduce ultra-processed foods in your diet".[450]

542. On December 5, 2024, Dr. Robert Califf, the Commissioner of the United States Food and Drugs Administration, testified that ultra-processed food "is probably addictive".[451] Commissioner Califf explained that "the food industry has figured out that there is a combination of sweet, carbohydrate, and salt that goes to our brains and I think its addictive, that's my opinion. And I think it's the same neural circuits that are involved in opioid addiction and other kinds of addiction that we have. And they've studied this, again, we don't have access to their research data

---

[447] Ministry of Health, Republic of Maldives. Food Based Dietary Guidelines for Maldives, 2019.
[448] Carlos A. Monterio et al., *Ultra-processed foods, diet quality, and health using the NOVA classification system*, Food and Agriculture Organization of the United Nations, 2019.
[449] Id.
[450] Id.
[451] United States Senate Committee on Health, Education, Labor & Pensions. Testimony of FDA Commissioner Dr. Robert Califf, December 5, 2024.

113

like we do in the human medical products arena…There are actually three or four pathways involved here".[452]

## VIII. The Meeting in Minneapolis: Defendants' Conspiracy Against American Children

543.    On April 8, 1999, the CEOs of America's largest food companies met in Minneapolis.[453] Leaders and/or executives from Defendants KRAFT HEINZ, MONDELEZ, POST HOLDINGS, GENERAL MILLS, COCA-COLA, MARS, and/or their predecessors, were in attendance.[454]

544.    James Behnke, then-CTO of Pillsbury (which was subsequently acquired by GENERAL MILLS), and Michael Mudd, VP of Kraft, called the meeting to warn the CEOs that their companies had gone too far in marketing their products, and engineering UPF to maximize their consumption.[455]

545.    In the months prior, they had been engaged with a group of food science experts who were painting an increasingly grim picture of the public's ability to cope with the industry's formulations.[456] The scientific presentations, from the body's fragile controls on overeating to the hidden power of UPF to make people feel hungrier still, convinced Behnke & Mudd that intervention was necessary.[457]

546.    Behnke & Mudd convened the unusual meeting of their competitors' CEOs to address these findings.

---

[452] Id.
[453] Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, at xi, (2013).
[454] Id. at xii.
[455] Id. at xiv-xv.
[456] Id. at xiv.
[457] Id. at xiv-xv.

114

547.    Mudd led the initial presentation by saying:

"I very much appreciate this opportunity to talk to you about childhood obesity and the growing challenge it presents for us all.

Let me say right away at the start, this is not an easy subject. There are no easy answers—for what the public health community must do to bring this problem under control, or for what industry should do as others seek to hold it accountable for what has happened.

But this much is clear: For those of us who've looked hard at this issue, whether they're public health officials or staff specialists in your own companies, we feel sure that the one thing we shouldn't do is nothing.

Each of us who knows the issue might have our own thoughts on timing, or the scope of our response, or the specific tactics. But we all agree that "no action" is ultimately a path to more public health and public relations problems."[458] (emp. orig.)

548.    Mudd then explained, "in a nutshell, the food industry is being portrayed as a major cause of an epidemic of obesity and all its disease-related effects. The proposed remedies are troubling—taxes to control consumption and regulations to restrict marketing and advertising, especially to kids".[459]

549.    The presentation noted that "some of the voices are traditional critics of the food industry", including "industry's old friend, former FDA Commissioner David Kessler", but that:

"more important, we're also hearing sincere concerns about obesity from many of industry's traditional allies, experts whose points of view industry has shared and respected, and who have acted as spokespeople on behalf of industry's own organizations. Among all these voices there is near unanimous agreement—and great frustration, I might add—that obesity is rising to epidemic proportions, with devastating public health consequences".[460]

550.    Among the "devastating public health consequences" were a then doubling in childhood obesity rates, "massive social costs they estimate at anywhere from $40 to $100 billion a year", and an estimated 300,000 deaths a year.[461]

---

[458] Michael Mudd, Remarks for ILSI CEO Dinner, (Draft April 2, 1999).
[459] Id.
[460] Id.
[461] Id.

551. The presentation noted that obesity "changed dramatically in the late 1980s and early 1990s when obesity took a big jump upwards. And this trend appears to be continuing".[462]

552. Mudd then explained that "experts are really worried" about children, noting that "we have the fattest and most unfit generation of children ever and it's hard to imagine that this will not translate into a generation of obese adults", and that these children would be "at a higher risk of developing chronic diseases such as diabetes, heart disease, hypertension and cancer".[463]

553. Mudd explained that "the increase in obesity can't be caused by genetics, because genes just don't change that much in a 10 or 20 year period".

554. Mudd then flashed a slide stating, "What's driving the increase? Ubiquity of inexpensive, good-tasting, super-sized, energy-dense foods" that were manufactured by the companies in attendance.[464]

555. A quote by a public health official followed: "As a culture, we have become upset by the tobacco companies advertising to children, but we sit idly by while the food companies do the very same thing. And we could make a claim that the toll taken on the public health by a poor diet rivals that taken by tobacco".[465]

556. Mudd then asked "With all this, can the trial lawyers be far behind?", predicting a wave of mass litigation against food industries on similar public health grounds to the recent tobacco litigation.[466]

---

[462] Id.
[463] Id.
[464] Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, at xvii-xviii, (2013).
[465] Id. at xviii.
[466] Michael Mudd, Remarks for ILSI CEO Dinner, (Draft April 2, 1999).

557. He continued "If anyone in the food industry ever doubted there was a slippery slope out there, I imagine they are beginning to experience a distinct sliding sensation right now".[467]

558. Mudd warned that the food industry may be approaching the same moment the tobacco industry encountered in 1964 with the release of the 1964 U.S. Surgeon General Report, and implored his fellow executives that "we cannot pretend food isn't part of the obesity problem…if you mapped categories of food advertising, especially advertising to kids, against the Food Guide Pyramid, it would turn the Pyramid on its head".[468]

559. Mudd then urged the companies to create a coalition to implement a national program focused on prevention of obesity, "focused specifically on kids".[469] Mudd concluded his remarks by emphasizing: "we have the luxury of doing something before the problem becomes a crisis for us".[470]

560. The presentation landed with a thud.

561. When Mudd concluded, Stephen Sanger, CEO of GENERAL MILLS, rose to speak, denigrating the fickleness of consumers' health concerns and those of their "ivory tower" advocates.[471]

562. Sanger stated that industry always weathered these squalls, that GENERAL MILLS would not pull back, that he would push his people onward, and that his peers should do the same: "Look we're not going to screw around with the company jewels here and change the formulations because a bunch of guys in white coats are worried".[472]

---

[467] Id.
[468] Id.
[469] Id.
[470] Id.
[471] Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, at xx, (2013).
[472] Id. at xx-xxi.

117

563. No one spoke to counter Sanger's response—it effectively ended the meeting, and the presentation was a failure.[473] All of the UPF companies present spurned the idea.[474] Nothing was done, and the UPF industry continued headlong despite having express knowledge of the consequences of their actions.

564. Despite having actual knowledge of the harm they are inflicting on America's children, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – has not changed their ways.

565. Instead, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – has spent the last 25 years inundating children with targeted marketing for their UPF, while America's kids get sicker and sicker.

566. Instead of improving their respective conduct, "the industry has responded with a ferocious campaign against regulation".[475]

567. UPF companies spent $106 million on political lobbying in the United States in 2023—almost twice as much as the tobacco and alcohol industries combined.[476]

568. Commentors have noted that "there are striking similarities" in the way that the UPF and "tobacco industries have responded to public mistrust, damning scientific evidence, and calls for legal and legislative actions".[477]

---

[473] Id. at xx.
[474] Id. at xxi.
[475] Madeleine Speed et al., *Deny, Denounce, Delay: the battle over the risk of ultra-processed foods*, Financial Times, May 22, 2024.
[476] Id.
[477] Kelly D. Brownell & Kenneth E. Warner, *The Perils of Ignoring History, Big Tobacco Played Dirty and Millions Died. How Similar is Big Food?*, Milbank Q., Mar. 2009.

569. Like the tobacco industry, the UPF industry "seduces children…infiltrates schools, buys loyalty from scientists, and pressures administration officials into accepting weak and ineffective nutrition policies".[478]

570. The UPF industry is "organized and politically powerful".[479] It is "represented by lobbyists, lawyers and trade organizations" employed to protect it from changing its ways.[480]

571. Like the tobacco industry before it, the UPF industry uses the same master playbook to deflect criticism of its actions.[481] Their strategy: "deny, denounce, delay".[482]

572. The UPF industry's tactics include a focus on personal responsibility, vilification of critics, criticizing studies that hurt industry as "junk science", arguing that there are no good or bad foods and that no foods should be targeted for change, and the vast sowing of doubt.[483]

573. The personal responsibility strategy "was first deployed by tobacco companies in 1962 as a reason to keep on smoking".[484] It has been widely used by the UPF industry as well to deflect blame and suggest that people should keep consuming UPF.

574. Another Big Tobacco strategy utilized by the UPF industry is to bias research findings.[485] Research publications sponsored by the UPF industry "showed systemic bias from industry funding".[486] Articles sponsored exclusively by UPF companies are "four-times to eight

---

[478] Id.

[479] Id.

[480] Id.

[481] Id.

[482] Madeleine Speed et al., *Deny, Denounce, Delay: the battle over the risk of ultra-processed foods*, Financial Times, May 22, 2024.

[483] Kelly D. Brownell & Kenneth E. Warner, *The Perils of Ignoring History, Big Tobacco Played Dirty and Millions Died. How Similar is Big Food?*, Milbank Q., Mar. 2009.

[484] Robert H. Lustig, *Ultraprocessed Food: Addictive, Toxic, and Ready for Regulation*, Nutrients., November 2020

[485] Rob Moodie et al., *Profits and Pandemics: Prevention of Harmful Effects of Tobacco, Alcohol, and Ultra-Processed Food and Drink Industries*, Lancet., Feb. 2013.

[486] Id.

times more likely to have conclusions favorable to the financial interests of the sponsoring company than those that were not sponsored" by UPF companies.[487]

575. The UPF industry spends millions of dollars misinforming the public and policymakers by generating outcome driven "research" studies that undermine evidence of harm.

576. The UPF industry also distributes millions of dollars each year to policy makers through direct and indirect contributions and gifts.[488] For example, approximately 2/3 of the members of the U.S. Congress declare funding received from the food industry.[489]

577. Hired industry experts and front groups pressure policy makers across a number of different avenues.[490] These "industry actors market and generate doubt" in efforts to delay any proposed regulations or taxation.[491]

578. The UPF industry also affirmatively sought to rig the legal system in ways that would keep them from having to answer for the harms they were knowingly creating.

579. For example, within a few years of Michael Mudd's presentation in 1999, Defendants KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER utilized a front group named the American Legislative Exchange Council ("ALEC") to lobby Federal and State legislative bodies to pass laws to eliminate the rights of victims to sue UPF companies for their conduct.[492]

---

[487] Id.

[488] Simon Capewell & Ffion Lloyd-Williams, *The Role of the Food Industry in Healthy, Lessons from Tobacco?*, Br. Med Bull., Mar. 2018.

[489] Id.

[490] Id.

[491] Id.

[492] SOURCEWATCH, *ALEC Corporations*, CMD, (Revised Oct. 2023), https://www.sourcewatch.org/index.php?title=ALEC_Corporations; ALEC Board of Directors, *Common Sense Consumption Act*, ALEC, (Revised Sept. 2017), https://alec.org/model-policy/commonsense-consumption-act/.

580. The UPF industry seeks to "co-opt policy makers and health professionals" and to substitute "ineffective interventions such as education or 'individual choice', self-regulation or voluntary agreements".[493]

581. Such voluntary actions are counterfeit progress: their purpose is not to cause effective change but to prevent it. These strategies also have roots "in the tobacco arena when voluntary actions by industry appeared helpful but were not and served to stall government action for many years".[494]

582. Like the tobacco industry, the UPF industry exploits "the concept of inequities to defend themselves against public health policies, such as increasing taxes on harmful products or regulating their marketing. They do this by claiming that such policies would harm the poorest the most".[495]

583. In reality, the UPF industry causes disproportionate harm in poorer communities by inundating these more vulnerable populations with marketing.

584. As the Director-General of the World Health Organization explained, the tactics used by the UPF industry to prevent change are identical to those used by the Tobacco industry:

> "Efforts to prevent noncommunicable diseases go against the business interests of powerful economic operators…It is not just Big Tobacco anymore. Public health must also contend with Big Food, Big Soda, and Big Alcohol. All of these industries fear regulation, and protect themselves using the same tactics.
>
> Research has documented these tactics well. They include front groups, lobbies, promises of self-regulation, lawsuits, and industry funded research that confuses the evidence and keeps the public in doubt.

[493] Rob Moodie et al., *Profits and Pandemics: Prevention of Harmful Effects of Tobacco, Alcohol, and Ultra-Processed Food and Drink Industries*, Lancet., Feb. 2013; Simon Capewell & Ffion Lloyd-Williams, *The Role of the Food Industry in Healthy, Lessons from Tobacco?*, Br. Med Bull., Mar. 2018.

[494] Kelly D. Brownell & Kenneth E. Warner, *The Perils of Ignoring History, Big Tobacco Played Dirty and Millions Died. How Similar is Big Food?*, Milbank Q., Mar. 2009.

[495] WHO Regional Office for Europe, *Commercial Determinants of Noncommunicable Diseases in the WHO European Region*, SNI, Jun. 2024.

121

Tactics also include gifts, grants, and contributions to worthy causes that cast these industries as respectable corporate citizens in the eyes of politicians and the public. They include arguments that place the responsibility for harm to health on individuals, and portray government actions as interference in personal liberties and free choice.

This is a formidable opposition. Market power readily translates into political power. Few governments prioritize health over big business. As we learned from experience with the tobacco industry, a powerful corporation can sell the public just about anything.

Let me remind you. Not one single country has managed to turn around its obesity epidemic in all age groups. This is not a failure of individual will-power. This is a failure of political will to take on big business".[496]

585. The parallel strategies used by the Tobacco and UPF industries, and the tenacity with which they are used, "are unsurprising in view of the flow of people, funds and activities across these industries, which also have histories of joint ownership".[497]

586. Meanwhile, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – callously cause America's children to get sicker and sicker.

587. Several commenters have noted that "the state of the food environment for US consumers bears a striking resemblance to the US environment in the 1950s during the tobacco epidemic, before the US federal government regulated the availability of tobacco products".[498]

588. Kelly Brownell, the Director of the World Food Policy Center noted that "in December 1953, the CEOs of the Major Tobacco companies met secretly in New York City. Their

[496] Margaret Chan, *WHO Director-General addresses health promotion conference: Opening address at the 8th Global Conference on Health Promotion*, WHO, Jun. 10, 2013.
[497] Rob Moodie et al., *Profits and Pandemics: Prevention of Harmful Effects of Tobacco, Alcohol, and Ultra-Processed Food and Drink Industries*, Lancet., Feb. 2013.
[498] Terra L. Fazzino, US Tobacco Companies Selectively Disseminated Hyper-Palatable Foods into the US Food System: Empirical evidence and current implications, Addiction, Sept. 2023.

purpose was to counter the damage from studies linking smoking to lung cancer".[499] What followed "were decades of deceit and actions that cost millions of lives".[500]

589. Brownell compared Big Food to Big Tobacco, explaining that there are "significant similarities in the action that these industries have taken in response to concern that their products cause harm…the world cannot afford a repeat of the tobacco history, in which industry talks about the moral high ground but does not occupy it".[501]

590. Unfortunately, that is exactly what has occurred.

591. Almost 15 years after his failed presentation to major UPF company CEOs, Michael Mudd wrote "I left the industry when I finally had to acknowledge that reform would never come from within. I could no longer accept a business model that puts profits over public health—and no one else should have to, either".[502]

592. Mudd continued:

"as more is revealed about their deliberate indifference, food companies must be made to change their worst practices. After years of foot dragging and hundreds of millions of dollars in lobbying fees, it's obvious the industry won't change on its own. Quite simply, change will have to be forced—by public pressure, media attention, and litigation".[503]

593. Defendants had a momentous opportunity to change their ways in 1999. CEOs from the largest UPF companies met secretly, sat together in the same room, and looked squarely at the consequences of their actions.

---

[499] Kelly D. Brownell & Kenneth E. Warner, *The Perils of Ignoring History, Big Tobacco Played Dirty and Millions Died. How Similar is Big Food?*, Milbank Q., Mar. 2009.
[500] Id.
[501] Id.
[502] Michael Mudd, *How to Force Ethics on the Food Industry*, The New York Times, Mar. 16, 2013.
[503] Id.

123

594. They were told that their conduct was directly causing "devastating public health consequences" to America's children. They knew that their actions had caused "the fattest and most unfit generation of children ever" and were killing hundreds of thousands of Americans.[504]

595. These CEOs understood that their actions were unconscionable, and that they should expect to be sued for their conduct. They were asked rhetorically, "with all this, can the trial lawyers be far behind?"[505]

596. These CEOs knew that they had "the luxury of doing something" before the problem became a crisis.[506]

597. But instead, they turned their back on America's children and spent the next 25 years callously grasping at profits, despite having actual knowledge of the public health crises they were causing.

598. Like the Tobacco industry before them, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – knowingly disregarded unspeakable suffering they were inflicting on millions of Americans, and engaged in decades of deceit.

## IX. Defendants' Tortious Actions caused Plaintiff to Develop Type 2 Diabetes During her Childhood

599. Plaintiff OLIVIA KREIE was diagnosed with Type 2 Diabetes at age 9.

600. This disease did not exist in children prior to the tortious and unlawful conduct of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER.

---

[504] Michael Mudd, Remarks for ILSI CEO Dinner, (Draft April 2, 1999).
[505] Id.
[506] Id.

601. The science supports that Plaintiff is reasonably likely to develop sequalae and other complications of her Type 2 diabetes in the near future.

602. The conduct of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – as set forth herein, is a proximate cause of Plaintiff's injuries.

603. Plaintiff OLIVIA KREIE regularly, frequently, and chronically ingested UPF manufactured, designed, marketed, labeled and sold by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER –, and was diagnosed with Type 2 Diabetes during her childhood as a direct result of ingesting each Defendant's respective UPF.

604. Plaintiff's Type 2 Diabetes is the result of her long-term exposure to the UPF manufactured, designed, marketed, labeled and sold by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER.

605. The consistency of Plaintiff's exposure to the UPF manufactured, designed, marketed, labeled and sold by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – over the course of her lifetime prior to her diagnosis at age 9, led to chronic metabolic dysfunction, a chronic inflammatory state, and increased insulin resistance that substantially contributed to and caused her diagnosis of Type 2 Diabetes.

606. There are no plausible alternative explanations for Plaintiff's injuries. Had Plaintiff not regularly, frequently, and chronically ingested UPF manufactured, designed, marketed, labeled and sold by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA,

PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – over the course of many years, she would not have been diagnosed with Type 2 Diabetes at the age of 15.

607.    Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – targeted children, including Plaintiff, with unfair and deceptive marketing messages regarding their respective UPF.

608.    Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – also failed to warn children, including Plaintiff, that their UPF was harmful and could lead to the injuries suffered by Plaintiff.

609.    Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – did not disclose that they had not tested the safety of chronic exposures to their UPF, that their UPF causes unique health risks independent of macronutrient content, that their UPF are potentially addictive substances, and/or that their UPF are engineered to be overconsumed.

610.    There was no way for Plaintiff OLIVIA KREIE to know that each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER –was deliberately and knowingly engineered the respective UPF she was consuming to drive excess consumption.

611.    There was no way for Plaintiff OLIVIA KREIE to know that any attempts she made to eat more healthfully would be undermined by the hidden toxicities, and risks and dangers

126

inherent to the UPF manufactured and designed by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER.

612. There was also no way for Plaintiff OLIVIA KREIE to know that the toxicities of UPF manufactured, designed, marketed, labeled, and sold by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – would work synergistically over the course of many years to cause chronic health conditions, including but not limited to Type 2 Diabetes, to emerge during her childhood.

## A. **Kraft Heinz**

613. As a result of Defendant KRAFT HEINZ's conduct as set forth herein, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of KRAFT HEINZ's UPF.

614. Prior to her diagnosis of Type 2 Diabetes, Plaintiff OLIVIA KREIE was regularly, frequently, and chronically exposed to the following products manufactured, designed, marketed, labeled and/or sold by Defendant KRAFT HEINZ:

- Capri Sun - approximately four times a year starting in approximately 2008
- Jell-O - approximately three times a week starting in approximately 2012
- Kraft mac and cheese - approximately one time a month starting in approximately 2008
- Lunchables - approximately four times a year starting in approximately 2008
- Velveeta - approximately a few times a year starting in approximately 2015
- Philadelphia - approximately a few times a year starting in approximately 2015
- Jet-Puffed - approximately a few times a year starting in approximately 2018

127

615. All of the aforementioned products are UPF.

616. Defendant KRAFT HEINZ marketed the aforementioned UPF to children, including the Plaintiff, using unfair and deceptive strategies and tactics such as those described herein.

617. Upon information and belief, Defendant KRAFT HEINZ utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize its UPF for overconsumption.

618. Plaintiff consumed the aforementioned UPF in a manner and an amount that was intended and/or reasonably foreseeable to Defendant KRAFT HEINZ.

619. Plaintiff's long-term, chronic, and regular exposure to Defendant KRAFT HEINZ'S UPF has resulted in severe life-changing illness, including Type 2 Diabetes.

620. Defendant KRAFT HEINZ's conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

621. As a result of Defendant KRAFT HEINZ's actions, and Plaintiff's resulting ingestion of KRAFT HEINZ's UPF, Plaintiff suffers from severe chronic illness, including Type 2 Diabetes and its sequelae, and will live the rest of her life sick and suffering.

622. As a further result of Defendant KRAFT HEINZ's actions, and Plaintiff's resulting ingestion of Defendant KRAFT HEINZ's UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's

disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.[507]

### B.     <u>Mondelez</u>

623.    As a result of Defendant MONDELEZ's conduct as set forth herein, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of MONDELEZ's UPF.

624.    Prior to her diagnosis of Type 2 Diabetes, Plaintiff OLIVIA KREIE was regularly, frequently, and chronically exposed to the following products manufactured, designed, marketed, labeled and/or sold by Defendant MONDELEZ:

- Oreo - approximately  one time a week starting in approximately 2015
- Graham Crackers - approximately a few  times a year starting in approximately 2010
- Chips Ahoy (all varieties) - approximately  four times a year starting in approximately 2010
- Ritz Bits - approximately  one time a week starting in approximately 2010

625.    All of the aforementioned products are UPF.

626.    Defendant MONDELEZ marketed the aforementioned UPF to children, including the Plaintiff, using unfair and deceptive strategies and tactics such as those described herein.

627.    Upon information and belief, Defendant MONDELEZ utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize its UPF for overconsumption.

628.    Plaintiff consumed the aforementioned UPF in a manner and an amount that was intended and/or reasonably foreseeable to Defendant MONDELEZ.

---

[507] Cleveland Clinic, *Steatotic (Fatty) Liver Disease*, Cleveland Clinic, (Last reviewed Sept. 2023), https://my.clevelandclinic.org/health/diseases/15831-fatty-liver-disease.

629. Plaintiff's long-term, chronic, and regular exposure to Defendant MONDELEZ'S UPF has resulted in severe life-changing illness, including Type 2 Diabetes.

630. Defendant MONDELEZ's conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

631. As a result of Defendant MONDELEZ's actions, and Plaintiff's resulting ingestion of MONDELEZ's UPF, Plaintiff suffers from severe chronic illness, including Type 2 Diabetes and its sequelae, and will live the rest of her life sick and suffering.

632. As a further result of Defendant MONDELEZ's actions, and Plaintiff's resulting ingestion of Defendant MONDELEZ's UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.[508]

### C. Post Holdings

633. As a result of Defendant POST HOLDINGS' conduct as set forth herein, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of POST HOLDINGS' UPF.

634. Prior to her diagnosis of Type 2 Diabetes, Plaintiff OLIVIA KREIE was regularly, frequently, and chronically exposed to the following products manufactured, designed, marketed, labeled and/or sold by Defendant POST HOLDINGS:

---

[508] Cleveland Clinic, *Steatotic (Fatty) Liver Disease*, Cleveland Clinic, (Last reviewed Sept. 2023), https://my.clevelandclinic.org/health/diseases/15831-fatty-liver-disease.

- Pebbles - approximately two times a week starting in approximately 2015
- Honey Bunches of Oats - approximately one time a week starting in approximately 2015
- Waffle Crisp - approximately a few times a year starting in approximately 2015

635. All of the aforementioned products are UPF.

636. Defendant POST HOLDINGS marketed the aforementioned UPF to children, including the Plaintiff, using unfair and deceptive strategies and tactics such as those described herein.

637. Upon information and belief, Defendant POST HOLDINGS utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize its UPF for overconsumption.

638. Plaintiff consumed the aforementioned UPF in a manner and an amount that was intended and/or reasonably foreseeable to Defendant POST HOLDINGS.

639. Plaintiff's long-term, chronic, and regular exposure to Defendant POST HOLDINGS' UPF has resulted in severe life-changing illness, including Type 2 Diabetes.

640. Defendant POST HOLDINGS' conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

641. As a result of Defendant POST HOLDINGS' actions, and Plaintiff's resulting ingestion of POST HOLDINGS' UPF, Plaintiff suffers from severe chronic illness, including Type 2 Diabetes and its sequelae, and will live the rest of her life sick and suffering.

642. As a further result of Defendant POST HOLDINGS' actions, and Plaintiff's resulting ingestion of Defendant POST HOLDINGS' UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications. These complications may include amputation,

131

blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.[509]

**D.**      <u>**Coca-Cola**</u>

643.      As a result of Defendant COCA-COLA's conduct as set forth herein, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of COCA-COLA's UPF.

644.      Prior to her diagnosis of Type 2 Diabetes, Plaintiff OLIVIA KREIE was regularly, frequently, and chronically exposed to the following products manufactured, designed, marketed, labeled and/or sold by Defendant COCA-COLA:

- Diet Coke - approximately two times a week starting in approximately 2018
- Minute Maid - approximately two times a year starting in approximately 2010

645.      All of the aforementioned products are UPF.

646.      Defendant COCA-COLA marketed the aforementioned UPF to children, including the Plaintiff, using unfair and deceptive strategies and tactics such as those described herein.

647.      Upon information and belief, Defendant COCA-COLA utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize its UPF for overconsumption.

648.      Plaintiff consumed the aforementioned UPF in a manner and an amount that was intended and/or reasonably foreseeable to Defendant COCA-COLA.

---

[509] Cleveland Clinic, *Steatotic (Fatty) Liver Disease*, Cleveland Clinic, (Last reviewed Sept. 2023), https://my.clevelandclinic.org/health/diseases/15831-fatty-liver-disease.

649. Plaintiff's long-term, chronic, and regular exposure to Defendant COCA-COLA's UPF has resulted in severe life-changing illness, including Type 2 Diabetes.

650. Defendant COCA-COLA's conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

651. As a result of Defendant COCA-COLA's actions, and Plaintiff's resulting ingestion of Defendant COCA-COLA's UPF, Plaintiff suffers from severe chronic illness, including Type 2 Diabetes and its sequelae, and will live the rest of her life sick and suffering.

652. As a further result of Defendant COCA-COLA's actions, and Plaintiff's resulting ingestion of Defendant COCA-COLA's UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.[510]

### E. PepsiCo

653. As a result of Defendant PEPSICO's conduct as set forth herein, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of PEPSICO's UPF.

654. Prior to her diagnosis of Type 2 Diabetes, Plaintiff OLIVIA KREIE was regularly, frequently, and chronically exposed to the following products manufactured, designed, marketed, labeled and/or sold by Defendant PEPSICO:

---

[510] Cleveland Clinic, *Steatotic (Fatty) Liver Disease*, Cleveland Clinic, (Last reviewed Sept. 2023), https://my.clevelandclinic.org/health/diseases/15831-fatty-liver-disease.

- Gatorade - approximately four times a week starting in approximately 2010
- Sun Chips - approximately two times a week starting in approximately 2015
- Lays - approximately two times a week starting in approximately 2018
- Ruffles - approximately one time a week starting in approximately 2015
- Propel - approximately two times a week starting in approximately 2008
- Fritos - approximately one time a year starting in approximately 2016

655. All of the aforementioned products are UPF.

656. Defendant PEPSICO marketed the aforementioned UPF to children, including the Plaintiff, using unfair and deceptive strategies and tactics such as those described herein.

657. Upon information and belief, Defendant PEPSICO utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize its UPF for overconsumption.

658. Plaintiff consumed the aforementioned UPF in a manner and an amount that was intended and/or reasonably foreseeable to Defendant PEPSICO.

659. Plaintiff's long-term, chronic, and regular exposure to Defendant PEPSICO's UPF has resulted in severe life-changing illness, including Type 2 Diabetes.

660. Defendant PEPSICO's conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

661. As a result of Defendant PEPSICO's actions, and Plaintiff's resulting ingestion of PEPSICO'S UPF, Plaintiff suffers from severe chronic illness, including Type 2 Diabetes and its sequelae, and will live the rest of her life sick and suffering.

662. As a further result of Defendant PEPSICO's actions, and Plaintiff's resulting ingestion of Defendant PEPSICO's UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and

134

greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.[511]

## F.    **General Mills**

663.    As a result of Defendant GENERAL MILLS's conduct as set forth herein, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of GENERAL MILLS's UPF.

664.    Prior to her diagnosis of Type 2 Diabetes, Plaintiff OLIVIA KREIE was regularly, frequently, and chronically exposed to the following products manufactured, designed, marketed, labeled and/or sold by Defendant GENERAL MILLS:

- Reese's Puffs - approximately  five times a week starting in approximately 2010
- Cinnamon Toast Crunch - approximately  three times a month starting in approximately 2010
- Betty Crocker - approximately  two times a week starting in approximately 2019
- Cheerios - approximately  one time a week starting in approximately 2015
- Haagen-Dazs - approximately  one time a month starting in approximately 2018
- Yoplait - approximately  two times a week starting in approximately 2009
- Chex - approximately  twice a year starting in approximately 2010
- Lucky Charms - approximately  one time a week starting in approximately 2010

665.    All of the aforementioned products are UPF.

---

[511] Cleveland Clinic, *Steatotic (Fatty) Liver Disease*, Cleveland Clinic, (Last reviewed Sept. 2023), https://my.clevelandclinic.org/health/diseases/15831-fatty-liver-disease.

666. Defendant GENERAL MILLS marketed the aforementioned UPF to children, including the Plaintiff, using unfair and deceptive strategies and tactics such as those described herein.

667. Upon information and belief, Defendant GENERAL MILLS utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize its UPF for overconsumption.

668. Plaintiff consumed the aforementioned UPF in a manner and an amount that was intended and/or reasonably foreseeable to Defendant GENERAL MILLS.

669. Plaintiff's long-term, chronic, and regular exposure to Defendant GENERAL MILLS's UPF has resulted in severe life-changing illness, including Type 2 Diabetes.

670. Defendant GENERAL MILLS's conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

671. As a result of Defendant GENERAL MILLS's actions, and Plaintiff's resulting ingestion of GENERAL MILLS'S UPF, Plaintiff suffers from severe chronic illness, including Type 2 Diabetes and its sequelae, and will live the rest of her life sick and suffering.

672. As a further result of Defendant GENERAL MILLS's actions, and Plaintiff's resulting ingestion of Defendant GENERAL MILLS's UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment,

Alzheimer's disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.[512]

### G.    <u>Nestle</u>

673.    As a result of Defendant NESTLE's conduct as set forth herein, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of NESTLE's UPF.

674.    Prior to her diagnosis of Type 2 Diabetes, Plaintiff OLIVIA KREIE was regularly, frequently, and chronically exposed to the following products manufactured, designed, marketed, labeled and/or sold by Defendant NESTLE:

- Hot Pockets - approximately  one time a week starting in approximately 2010
- Kit Kat - approximately a few  times a year starting in approximately 2015
- Stouffer's - approximately a few  times a year starting in approximately 2015
- Toll House - approximately a few  times a year starting in approximately 2015
- Gerber - approximately  three times a day starting in approximately 2006

675.    All of the aforementioned products are UPF.

676.    Defendant NESTLE marketed the aforementioned UPF to children, including the Plaintiff, using unfair and deceptive strategies and tactics such as those described herein.

677.    Upon information and belief, Defendant NESTLE utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize its UPF for overconsumption.

678.    Plaintiff consumed the aforementioned UPF in a manner and an amount that was intended and/or reasonably foreseeable to Defendant NESTLE.

---

[512] Cleveland Clinic, *Steatotic (Fatty) Liver Disease*, Cleveland Clinic, (Last reviewed Sept. 2023), https://my.clevelandclinic.org/health/diseases/15831-fatty-liver-disease.

679. Plaintiff's long-term, chronic, and regular exposure to Defendant NESTLE's UPF has resulted in severe life-changing illness, including Type 2 Diabetes.

680. Defendant NESTLE's conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

681. As a result of Defendant NESTLE's actions, and Plaintiff's resulting ingestion of NESTLE'S UPF, Plaintiff suffers from severe chronic illness, including Type 2 Diabetes and its sequelae, and will live the rest of her life sick and suffering.

682. As a further result of Defendant NESTLE's actions, and Plaintiff's resulting ingestion of Defendant NESTLE's UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.[513]

**H. Kellogg's**

683. As a result of Defendant KELLOGG'S' conduct as set forth herein, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of KELLOGG'S' UPF.

684. Prior to her diagnosis of Type 2 Diabetes, Plaintiff OLIVIA KREIE was regularly, frequently, and chronically exposed to the following products manufactured, designed, marketed, labeled and/or sold by Defendant KELLOGG'S:

---

[513] Cleveland Clinic, *Steatotic (Fatty) Liver Disease*, Cleveland Clinic, (Last reviewed Sept. 2023), https://my.clevelandclinic.org/health/diseases/15831-fatty-liver-disease.

- Pop Tarts - approximately three times a week starting in approximately 2010
- CheezIt - approximately two times a week starting in approximately 2018
- Froot Loops - approximately two times a week starting in approximately 2013
- Frosted Mini Wheats - approximately one time a month starting in approximately 2015
- Kellogg's Waffles - approximately two times a week starting in approximately 2023

685. All of the aforementioned products are UPF.

686. Defendant KELLOGG'S marketed the aforementioned UPF to children, including the Plaintiff, using unfair and deceptive strategies and tactics such as those described herein.

687. Upon information and belief, Defendant KELLOGG'S utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize its UPF for overconsumption.

688. Plaintiff consumed the aforementioned UPF in a manner and an amount that was intended and/or reasonably foreseeable to Defendant KELLOGG'S.

689. Plaintiff's long-term, chronic, and regular exposure to Defendant KELLOGG'S' UPF has resulted in severe life-changing illness, including Type 2 Diabetes.

690. Defendant KELLOGG'S' conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

691. As a result of Defendant KELLOGG'S' actions, and Plaintiff's resulting ingestion of KELLOGG'S' UPF, Plaintiff suffers from severe chronic illness, including Type 2 Diabetes and its sequelae, and will live the rest of her life sick and suffering.

692. As a further result of Defendant KELLOGG'S' actions, and Plaintiff's resulting ingestion of Defendant KELLOGG'S' UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and

139

greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.[514]

## I. **ConAgra**

693. As a result of Defendant CONAGRA's conduct as set forth herein, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of CONAGRA's UPF.

694. Prior to her diagnosis of Type 2 Diabetes, Plaintiff OLIVIA KREIE was regularly, frequently, and chronically exposed to the following products manufactured, designed, marketed, labeled and/or sold by Defendant CONAGRA:

- Orville Redenbacher - approximately four times a week starting in approximately 2015
- Reddi Whip - approximately a few times a year starting in approximately 2015
- Chef Boyardee - approximately a few times a year starting in approximately 2015
- Pam - approximately 7 times a week starting in approximately 2020
- Slim Jim - approximately two times a week starting in approximately 2010
- Banquet Foods - approximately one time a month starting in approximately 2010

695. All of the aforementioned products are UPF.

696. Defendant CONAGRA marketed the aforementioned UPF to children, including the Plaintiff, using unfair and deceptive strategies and tactics such as those described herein.

---

[514] Cleveland Clinic, *Steatotic (Fatty) Liver Disease*, Cleveland Clinic, (Last reviewed Sept. 2023), https://my.clevelandclinic.org/health/diseases/15831-fatty-liver-disease.

697. Upon information and belief, Defendant CONAGRA utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize its UPF for overconsumption.

698. Plaintiff consumed the aforementioned UPF in a manner and an amount that was intended and/or reasonably foreseeable to Defendant CONAGRA.

699. Plaintiff's long-term, chronic, and regular exposure to Defendant CONAGRA's UPF has resulted in severe life-changing illness, including Type 2 Diabetes.

700. Defendant CONAGRA's conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

701. As a result of Defendant CONAGRA's actions, and Plaintiff's resulting ingestion of CONAGRA'S UPF, Plaintiff suffers from severe chronic illness, including Type 2 Diabetes and its sequelae, and will live the rest of her life sick and suffering.

702. As a further result of Defendant CONAGRA's actions, and Plaintiff's resulting ingestion of Defendant CONAGRA's UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.[515]

---

[515] Cleveland Clinic, *Steatotic (Fatty) Liver Disease*, Cleveland Clinic, (Last reviewed Sept. 2023), https://my.clevelandclinic.org/health/diseases/15831-fatty-liver-disease.

141

**J.    Mars**

703.    As a result of Defendant MARS' conduct as set forth herein, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of MARS' UPF.

704.    Prior to her diagnosis of Type 2 Diabetes, Plaintiff OLIVIA KREIE was regularly, frequently, and chronically exposed to the following products manufactured, designed, marketed, labeled and/or sold by Defendant MARS:

- Twix - approximately  two times a month starting in approximately 2018
- Snickers - approximately a few  times a year starting in approximately 2015
- Starburst - approximately a few  times a year starting in approximately 2015
- 

705.    All of the aforementioned products are UPF.

706.    Defendant MARS marketed the aforementioned UPF to children, including the Plaintiff, using unfair and deceptive strategies and tactics such as those described herein.

707.    Upon information and belief, Defendant MARS utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize its UPF for overconsumption.

708.    Plaintiff consumed the aforementioned UPF in a manner and an amount that was intended and/or reasonably foreseeable to Defendant MARS.

709.    Plaintiff's long-term, chronic, and regular exposure to Defendant MARS' UPF has resulted in severe life-changing illness, including Type 2 Diabetes.

710.    Defendant MARS' conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

711.    As a result of Defendant MARS' actions, and Plaintiff's resulting ingestion of MARS' UPF, Plaintiff suffers from severe chronic illness, including Type 2 Diabetes and its sequelae, and will live the rest of her life sick and suffering.

712. As a further result of Defendant MARS' actions, and Plaintiff's resulting ingestion of Defendant MARS' UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.[516]

**K.    Unilever**

713. As a result of Defendant UNILEVER's conduct as set forth herein, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of UNILEVER's UPF.

714. Prior to her diagnosis of Type 2 Diabetes, Plaintiff UNILEVER was regularly, frequently, and chronically exposed to the following products manufactured, designed, marketed, labeled and/or sold by Defendant UNILEVER:

- Hellman's Mayonnaise - approximately  two times a week starting in approximately 2011.

715. The aforementioned product are UPF.

716. Defendant UNILEVER marketed the aforementioned UPF to children, including the Plaintiff, using unfair and deceptive strategies and tactics such as those described herein.

---

[516] Cleveland Clinic, *Steatotic (Fatty) Liver Disease*, Cleveland Clinic, (Last reviewed Sept. 2023), https://my.clevelandclinic.org/health/diseases/15831-fatty-liver-disease.

717.    Upon information and belief, Defendant UNILEVER utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize its UPF for overconsumption.

718.    Plaintiff consumed the aforementioned UPF in a manner and an amount that was intended and/or reasonably foreseeable to Defendant UNILEVER.

719.    Plaintiff's long-term, chronic, and regular exposure to Defendant UNILEVER's UPF has resulted in severe life-changing illness, including Type 2 Diabetes.

720.    Defendant UNILEVER's conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

721.    As a result of Defendant UNILEVER's actions, and Plaintiff's resulting ingestion of UNILEVER'S UPF, Plaintiff suffers from severe chronic illness, including Type 2 Diabetes and its sequelae, and will live the rest of her life sick and suffering.

722.    As a further result of Defendant UNILEVER's actions, and Plaintiff's resulting ingestion of Defendant UNILEVER's UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.[517]

---

[517] Cleveland Clinic, *Steatotic (Fatty) Liver Disease*, Cleveland Clinic, (Last reviewed Sept. 2023), https://my.clevelandclinic.org/health/diseases/15831-fatty-liver-disease.

## FIRST CAUSE OF ACTION
## AS AGAINST THE DEFENDANTS
## (NEGLIGENCE)

723. Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

724. At all relevant times, Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – had a duty to exercise reasonable care in the manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, promoting, advertising, labeling, packaging, selling and/or distribution of their respective UPF products.

725. The duty of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – to exercise reasonable care included a duty to warn Plaintiff and other consumers of the risks and dangers associated with their respective UPF products.

726. The duty of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – to exercise reasonable care included a duty to design their respective UPF products in as safe a manner as an ordinary consumer, such as the Plaintiff, would expect when used as intended or in a reasonably foreseeable manner.

727. The duty of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – to exercise reasonable care included a duty to design their respective UPF products in such a manner where the utility of the products outweighed their risks.

145

728. The duty of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – to exercise reasonable care included a duty to properly and adequately research and/or test their respective UPF products for risks and dangers, including harms to the endocrine and metabolic systems, such as Type 2 Diabetes, before introducing their respective UPF products into the stream of commerce for human consumption.

729. At all relevant times, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – knew or should have known through the exercise of reasonable care of the dangers associated with the normal and/or intended use of their UPF, including the increased risk of harm to the endocrine and metabolic systems, such as Type 2 diabetes, as well as the addictive nature of their UPF.

730. In particular, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – knew or should have known that: (a) their UPF were engineered to be addictive; (b) their UPF were engineered to promote overconsumption; (c) their UPF contained dangerous and unnatural combinations of nutrients; (d) their UPF contained dangerous chemical additives and contaminants; (e) their UPF caused unique health hazards independent of nutrient content; (f) ultra-processing causes human health risks, and (g) UPF significantly increases the risk of metabolic diseases, such as Type 2 Diabetes, and other life changing chronic diseases.

731. At all relevant times, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS,

146

CONAGRA and UNILEVER – knew, or should have known through the exercise of reasonable care, that ordinary consumers such as Plaintiff, who ingested UPF as intended or in a reasonably foreseeable manner, would not realize the potential risks and dangers of their UPF.

732. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – breached their duty to exercise reasonable care by manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, promoting, advertising, labeling, packaging, selling, and/or distributing their UPF negligently, recklessly, and/or with extreme carelessness, and by failing to adequately warn of the risks and dangers of their UPF as described in the allegations above. Such breaches include but are not limited to:

    a.    Failing to warn Plaintiff and other consumers of the risks and dangers associated with the ingestion of their UPF;

    b.    Failing to properly and/or adequately research and/or test their UPF to determine the increased risk of harm to the endocrine and metabolic systems, including Type 2 Diabetes, caused by the normal and/or intended use of their UPF;

    c.    Failing to inform Plaintiff that their UPF are addictive substances;

    d.    Failing to inform Plaintiff that their UPF and are engineered to be overconsumed;

    e.    Failing to inform Plaintiff that their UPF contain dangerous and unnatural combinations of nutrients;

    f.    Failing to inform Plaintiff that their UPF contain dangerous chemical additives and contaminants;

    g.    Failing to inform Plaintiff that their UPF cause unique health risks independent of nutrient content;

    h.    Failing to inform Plaintiff that ultra-processing causes human health risks;

    i.    Failing to warn Plaintiff that their UPF significantly increases the risk of Type 2 Diabetes and other life-changing chronic illnesses;

147

j.  Marketing and labeling their UPF as safe when Defendants knew or should have known their UPF were defective and dangerous;

k.  Failing to design their UPF in as safe a manner as an ordinary consumer, such as the Plaintiff, would expect when used as intended or in a reasonably foreseeable manner;

l.  Failing to design their UPF in such a manner where the utility of the products outweighed their risks; and

m.  Failing to act like a reasonably prudent company under similar circumstances.

733.  Each of these acts and omissions, taken singularly or in combination, were a proximate cause of the injuries and damages sustained by Plaintiff.

734.  Plaintiff consumed and used each Defendants' respective UPF in the manner in which UPF were intended to be used, without any substantial alteration or change in the product from when it left the hands of each Defendant.

735.  Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – knew or should have known that consumers such as Plaintiff would foreseeably suffer injuries as a result of Defendants' failure to exercise ordinary care as described above.

736.  Due to each Defendants' failure to exercise ordinary care or comply with their duties, Plaintiff was not able to discover the dangers of ingesting each Defendants' UPF.

737.  Had Plaintiff known of any of the dangers of the UPF of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER –, including not limited to their addictiveness and increased risk of serious injury, including but not limited to developing Type 2 Diabetes, Plaintiff would not have started ingesting and/or using their UPF.

148

738. The acts and/or omissions of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – constitute gross negligence because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff and other consumers.

739. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff and other consumers. Each Defendants' acts and omissions had a great probability of causing significant harm and, in fact, resulted in such harm to Plaintiff.

740. Based on their knowledge and strategic and intentional promotion, advertising and marketing history, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – reasonably should have foreseen that children, such as the Plaintiff, would ingest their UPF and suffer lifelong chronic illnesses, such as Type 2 Diabetes.

741. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – reasonably should have foreseen the physical and emotional distress this would place on the children, such as the Plaintiff, and their families, such as the Plaintiff's family.

742. Plaintiff was injured as a direct and proximate result of each Defendants' negligence and/or gross negligence.

743. Each Defendants' negligence and/or gross negligence was a direct and proximate cause of the injuries, harm, and economic losses that Plaintiff has suffered, and will continue to suffer.

744. Each Defendants' negligence and/or gross negligence was a substantial factor in causing and/or contributing to Plaintiff's harms.

745. As a direct and proximate result of Plaintiff's reasonably anticipated use of each Defendants' UPF as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – Plaintiff was caused to suffer serious and dangerous side effects including Type 2 Diabetes and its sequelae, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

746. As a direct and proximate result of Plaintiff's reasonably anticipated use of each Defendants' UPF as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – Plaintiff has required and will require more health care and services and did incur medical, health, incidental, and related expenses.

747. Each Defendants' conduct with respect to their design, promotion and sale of their UPF, including their negligent marketing, to Plaintiff and the public, was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages against each Defendant –

150

KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER.

748. By reason of the foregoing, Plaintiff has been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

<u>**SECOND CAUSE OF ACTION**</u>
<u>**AS AGAINST THE DEFENDANTS**</u>
<u>**(STRICT LIABILITY: FAILURE TO WARN)**</u>

749. Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

750. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – was in the business of selling UPF, and each Defendant designed, manufactured, marketed, promoted, advertised, labeled, packaged and/or sold their respective UPF that were ingested by Plaintiff.

751. The respective UPF of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – were in an unsafe, defective, and unreasonably dangerous condition at the time they left each Defendants' possession because they were not accompanied by adequate warnings.

752. In particular, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – knew or should have known that their UPF could cause serious chronic injuries, including but not limited to Type 2 Diabetes, as well as addiction when used in

151

an intended or reasonably foreseeable manner. Nonetheless, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – failed to give appropriate and adequate warning of such risks. In fact, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – continues to this day to market and sell their UPF to consumers without adequate warnings of the risks associated with their use, including but not limited to Type 2 Diabetes and/or addiction.

753. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – was aware that UPF posed risks that were known to each Defendant and knowable to each Defendant in light of scientific and medical knowledge that was generally accepted in the scientific community at the time each Defendant designed, manufactured, distributed and sold their respective UPF.

754. The UPF of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – are defective because, among other reasons described herein, each Defendant failed to warn consumers including Plaintiff, in the labeling, packaging, marketing, promotion, advertising and/or sale of their respective UPF that:

    a.    Their UPF are ultra-processed;

    b.    Ultra-processing causes human health risks that other foods do not;

    c.    Their UPF are potentially addictive substances;

    d.    Their UPF and are engineered to be overconsumed;

e.   Their UPF contain dangerous and unnatural combinations of nutrients;

f.   Their UPF contain dangerous chemical additives and contaminants;

g.   Their UPF cause unique health risks independent of nutrient content; and

h.   Their UPF significantly increases the risk of Type 2 Diabetes, and other life-changing chronic illnesses.

755.   Through aggressive mass marketing campaigns, each Defendant targeted children with UPF marketing. The failure of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – to adequately warn about their defective UPF and to misleadingly advertise through a variety of marketing campaigns created a danger of injuries that were reasonably foreseeable at the time of manufacture, design, promotion, advertising, marketing, distribution and sale of their respective UPF.

756.   Ordinary consumers, such as the Plaintiff, could not and would not have recognized the potential risks of UPF when used in the manner reasonably foreseeable to each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER.

757.   The defective conditions of the respective UPF of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – rendered the products unreasonably dangerous to persons, including Plaintiff.

758.   The defective UPF of each Defendant– KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS,

CONAGRA and UNILEVER – reached Plaintiff without a substantial change in the condition in which it was sold.

759. At all relevant times, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in promotions, marketing, advertising, at point of sale, and on the product labels.

760. If any Defendant– KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – had warned Plaintiff that use of their UPF in an intended or reasonably foreseeable manner would increase their risk of being seriously injured, including but not limited to developing Type 2 Diabetes, Plaintiff would not have started ingesting and/or using their UPF.

761. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – caused their UPF to enter the stream of commerce and to be sold to consumers, including Plaintiff, through a variety of channels, including through grocery stores, convenience stores, other retail locations, drive-through locations, and/or home delivery services.

762. Plaintiff used the UPF of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – for the purposes and in a manner normally intended, recommended, promoted, advertised and marketed by each Defendant.

763. The lack of adequate and sufficient warnings and instructions and/or the inadequate and misleading advertising by each Defendant – KRAFT HEINZ, MONDELEZ, POST

154

HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – was a substantial contributing factor in causing the harm to Plaintiff.

764. As a direct and proximate result of Plaintiff's reasonably anticipated use of each Defendants' UPF as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – Plaintiff was caused to suffer serious and dangerous side effects including type 2 Diabetes and its sequelae, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

765. As a direct and proximate result of Plaintiff's reasonably anticipated use of each Defendants' UPF as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – Plaintiff has required and will require more health care and services and did incur medical, health, incidental, and related expenses.

766. The conduct of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – with respect to their design, promotion and sale of their UPF to Plaintiff and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages against each Defendant – KRAFT HEINZ, MONDELEZ, POST

155

HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER.

767. By reason of the foregoing, Plaintiff has been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

## THIRD CAUSE OF ACTION
## AS AGAINST THE DEFENDANTS
## (STRICT LIABILITY—DEFECTIVE DESIGN)

768. Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

769. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – was in the business of selling UPF, and each Defendant designed, manufactured, marketed, promoted, advertised, labeled, packaged and/or sold their respective UPF that were ingested by Plaintiff.

770. The respective UPF of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – were in an unsafe, defective, and unreasonably dangerous condition at the time they left each Defendants' possession because they were dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchased it, with the ordinary knowledge common to the community as to its characteristics.

771. In particular, the respective UPF of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – when used as intended or in a reasonably

156

foreseeable manner, did not perform as safe as an ordinary consumer would expect because, *inter alia*: (a) they were engineered to be addictive; (b) they were engineered to promote overconsumption; (c) they contained dangerous and unnatural combinations of nutrients; (d) they contained dangerous chemical additives and contaminants; (e) they caused unique health hazards independent of nutrient content; and/or (f) they significantly increase the risk of metabolic diseases, such as Type 2 Diabetes and other life changing chronic diseases.

772.    The respective UPF of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – were in an unsafe, defective, and unreasonably dangerous condition at the time they left each Defendant's respective possession because their risks outweighed their utility.

773.    Specifically, the risks of the respective UPF of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – outweighed their utility because, *inter alia*: (a) they were engineered to be addictive; (b) they were engineered to promote overconsumption; (c) they contained dangerous and unnatural combinations of nutrients; (d) they contained dangerous chemical additives and contaminants; (e) they caused unique health hazards independent of nutrient content; (f) they significantly increase the risk of metabolic diseases, such as Type 2 Diabetes and other life changing chronic diseases; (g) the aforementioned risk (a-f) were not open and obvious and each Defendant concealed and/or failed to warn of these risks of which they were aware or should have been aware; (h) safer alternative products existed which met the same, if not more, needs of consumers, such as the Plaintiff; and/or (i) they were not providing as much utility as one would expect from product designated as "foods".

774. At all relevant times and at the time the UPF left the control of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER, the UPF was unreasonably dangerous in design because there existed a feasible, safer alternative design for UPF that was capable of preventing the Plaintiff injuries and damages – actual food that was not ultra-processed.

775. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – was aware or should have been aware, in light of scientific and medical knowledge that was generally accepted in the scientific community at the time each Defendant designed, manufactured, distributed and sold their respective UPF, that UPF posed risks as outlined above.

776. Ordinary consumers, such as the Plaintiff, could not and would not have recognized the potential risks of UPF when used in the manner reasonably foreseeable to each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER.

777. The defective conditions of the respective UPF of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – rendered the products unreasonably dangerous to persons, including Plaintiff.

778. The defective UPF of each Defendant– KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – reached Plaintiff without a substantial change in the condition in which it was sold.

779. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – caused their UPF to enter the stream of commerce and to be sold to consumers, including Plaintiff, through a variety of channels, including through grocery stores, convenience stores, other retail locations, drive-through locations, and/or home delivery services.

780. Plaintiff used the UPF of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – for the purposes and in a manner normally intended.

781. Had Plaintiff known of any of the dangers of the UPF of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER –  including not limited to their addictiveness and increased risk of serious injury, including but not limited to developing Type 2 Diabetes, Plaintiff would not have started ingesting and/or using their UPF.

782. The defective design by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – of their respective UPF was a substantial contributing factor in causing the harm to Plaintiff.

783. As a direct and proximate result of Plaintiff's reasonably anticipated use of each Defendants' UPF as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – Plaintiff was caused to suffer serious and dangerous side effects including Type 2

Diabetes and its sequelae, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

784.    As a direct and proximate result of Plaintiff's reasonably anticipated use of each Defendants' UPF as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – Plaintiff has required and will require more health care and services and did incur medical, health, incidental, and related expenses.

785.    The conduct of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – with respect to their design, promotion and sale of their UPF to Plaintiff and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages against each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER.

786.    By reason of the foregoing, Plaintiff has been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

**FOURTH CAUSE OF ACTION**
**AS AGAINST THE DEFENDANTS**
**(NEGLIGENT MISREPRESENTATION**

787.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

160

788. At all relevant times, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – had a duty to provide Plaintiff and other consumers with true and accurate information about their UPF, including information about the risks they knew of or should have known of related to the ingestion of their UPF.

789. At all relevant times, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – knew or should have known, based on evolving scientific studies and research, of the safety risks associated with their respective UPF, including but not limited to the following: (a) they were engineered to be addictive; (b) they were engineered to promote overconsumption; (c) they contained dangerous and unnatural combinations of nutrients; (d) they contained dangerous chemical additives and contaminants; (e) they caused unique health hazards independent of nutrient content; and/or (f) they significantly increase the risk of metabolic diseases, such as Type 2 Diabetes and other life changing chronic diseases.

790. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – breached this duty in representing that their UPF were safe to sue for human consumption and have no serious side effects when they knew or should have known that their products did cause serious side effects as described herein.

791. From the time the UPF of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – was first tested, studied, researched, evaluated, endorsed, manufactured, marketed, promoted, advertised, sold and/or distributed, and up to the present, each

161

Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – failed to disclose material facts regarding the health risks of their UPF to Plaintiff or the public, including *inter alia*: (a) they were engineered to be addictive; (b) they were engineered to promote overconsumption; (c) they contained dangerous and unnatural combinations of nutrients; (d) they contained dangerous chemical additives and contaminants; (e) they caused unique health hazards independent of nutrient content; and/or (f) they significantly increase the risk of metabolic diseases, such as Type 2 Diabetes and other life changing chronic diseases.

792. At all relevant times, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – conducted sales and marketing campaigns to promote the sale and ingestion of their UPF and, in so doing, deceived Plaintiff and the general public about the health risks and adverse consequences of their UPF.

793. The misrepresentations of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – were made to Plaintiff in the product packaging and labeling of the UPF at the time she ingested and/or used the UPF as well as in the aggressive marketing campaigns of each Defendant, and they all indicated that their respective UPF were safe for human consumption.

794. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – failed to exercise ordinary care in their representations concerning their UPF by negligently misrepresenting that their respective UPFs were safe for human consumption when in

162

fact their UPF's posed high risks of unreasonable, dangerous and devastating health conditions, including but not limited to Type 2 Diabetes, as well as addictiveness.

795. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – made such representations and failed to disclose such material facts with the intent to induce consumers, including Plaintiff, into purchasing and ingesting their UPF.

796. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – had an economic interest in having Plaintiff purchase and ingest their UPF.

797. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – knew or should have known that their representations about the safety of their UPF were false, and that they had a duty to both learn and disclose the dangers associated with their UPF.

798. Plaintiff and other consumers justifiably relied on each Defendants' respective misrepresentations and nondisclosures to their detriment. Specifically, Plaintiff relied on representations from each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – that their UPF were safe to use as expected, when they were not.

799. In reliance on the misrepresentations by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – Plaintiff was induced to purchase and ingest each Defendants' UPF.

800. Had Plaintiff known the true facts regarding the dangers of UPF, including not limited to their addictiveness and increased risk of serious injury, including but not limited to developing Type 2 Diabetes, that were concealed by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – Plaintiff would not have started ingesting or using each Defendants' UPF.

801. As a direct and proximate result of the foregoing negligent misrepresentations by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – Plaintiff was caused to suffer serious and dangerous side effects including Type 2 Diabetes and its sequelae, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

802. As a direct and proximate result of the foregoing negligent misrepresentations by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – Plaintiff has required and will require more health care and services and did incur medical, health, incidental, and related expenses.

803. The conduct of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – with respect to their design, promotion and sale of their UPF to Plaintiff and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages against each Defendant – KRAFT HEINZ, MONDELEZ, POST

164

HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER.

804. By reason of the foregoing, Plaintiff has been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

**FIFTH CAUSE OF ACTION**
**AS AGAINST THE DEFENDANTS**
**(FRAUDULENT CONCEALMENT)**

805. Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

806. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – owed a duty to Plaintiff and other consumers to fully disclose accurate and complete information regarding their UPF.

807. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – had unique and private access to the ingredients, manufacturing, development, design, production, research and/or testing of its UPF, and thus unique access to material facts regarding the safety of its UPF.

808. At all relevant times, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – knew or should have known, based on evolving scientific studies and research, of the dangers associated with their respective UPF, including but not limited to the following: (a) they were engineered to be addictive; (b) they were engineered to promote

165

overconsumption; (c) they contained dangerous and unnatural combinations of nutrients; (d) they contained dangerous chemical additives and contaminants; (e) they caused unique health hazards independent of nutrient content; and/or (f) they significantly increase the risk of metabolic diseases, such as Type 2 Diabetes and other life changing chronic diseases.

809. Nevertheless, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – willfully deceived Plaintiff by concealing these dangers from her – facts of which Defendants had a duty to disclose.

810. In addition to monitoring the evolving scientific literature, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER –should have been testing their UPF to ensure they were not harmful to Plaintiff when used in their intended manner; however, upon information and belief, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – was not adequately or properly performing such testing, if any.

811. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – fraudulently and deceptively concealed that they had not adequately researched or tested their UPF to assess their safety before placing their UPF on the market and promoting their UPF to children.

812. At all relevant times, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – willfully conducted sales and marketing campaigns to promote the

166

sale and ingestion of their UPF as safe for human consumption, and, in so doing, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – deceived Plaintiff and the general public about the health risks and adverse consequences of their UPF.

813. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – willfully deceived Plaintiff by failing to disclose the dangers associated with their respective UPF on the product packaging and labeling of the UPF.

814. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – willfully deceived Plaintiff by failing to disclose the dangers associated with their respective UPF in their marketing campaigns to Plaintifff.

815. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – concealed and suppressed the true facts concerning their UPF.

816. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – knew that their omissions were material, and that they were false, incomplete, misleading, deceptive and/or deceitful when they were made.

817. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – willfully concealed the dangers of their UPF from the Plaintiff and the public for

167

the purpose of having them act and rely on such concealments and, thus, ingest and/or use their UPF.

818. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – committed a continuing fraud in obfuscating and failing to disclose such material facts, in whole or in part, to induce consumers, including Plaintiff, to ingest and/or use their UPF.

819. Plaintiff relied, with reasonable justification, on the concealments of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – which induced her to ingest and/or use each Defendants' UPF on a regular and continuing basis.

820. Plaintiff did not know about these dangers and safety concerns associated with UPF when she ingested and/or used the UPF of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – and Plaintiff could not have discovered the true facts with reasonable diligence because of the willful concealment by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER.

821. Had Plaintiff known the true facts regarding the dangers of UPF, including not limited to their addictiveness and increased risk of serious injury, including but not limited to developing Type 2 Diabetes, that were concealed by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – Plaintiff would not have started ingesting or using each Defendants' UPF.

822. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – knew or should have known that its concealments and/or omissions were material, and that the failure to disclose this material safety information made its representations regarding its respective UPF false, incomplete, misleading, deceptive, and deceitful when they were made.

823. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – knew or should have known that its failure to disclose this material safety information was done with such reckless disregard for the truth that knowledge of the falsity can be imputed to them.

824. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – profited significantly from their unlawful conduct that fraudulently induced Plaintiff and other consumers to purchase dangerous and defective UPF.

825. Consumers, including Plaintiff, required, and should have been provided with, truthful, accurate, and correct information concerning the safety of each Defendants' UPF.

826. The willful concealments by each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing her injury and damages.

827. As a direct and proximate result of the fraudulent concealment of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – Plaintiff was caused to

169

suffer serious and dangerous side effects including Type 2 Diabetes and its sequelae, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

828. As a direct and proximate result of the fraudulent concealment of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – Plaintiff has required and will require more health care and services and did incur medical, health, incidental, and related expenses.

829. Each Defendants' conduct with respect to their design, promotion and sale of their UPF to Plaintiff and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages against each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER.

830. By reason of the foregoing, Plaintiff has been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

<u>**SIXTH CAUSE OF ACTION**</u>
<u>**AS AGAINS TTHE DEFENDANTS**</u>
<u>**(VIOLATION OF CONSUMER PROTECTION LAW)**</u>

831. Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

170

832. The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA" or the "Statute") prohibits any "assertion, representation or statement of fact which is untrue, deceptive or misleading" in public advertisements or sales announcements. Wis. Stat. § 100.18(1).

833. Plaintiff and/or Defendants are "persons" under the Statute.

834. Plaintiff is a consumer who purchased UPF for personal, family, and/or household purposes.

835. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – is the creator, designer, investigator, researcher, supplier, manufacturer, advertiser, and/or seller of their respective UPF, subject to liability under the Statute for fraudulent, unfair, deceptive, and unconscionable consumer sales practices.

836. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed their respective UPF into the stream of commerce, and therefore owed not only a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiff, but also separate and independent statutory duties to be truthful, fair, accurate, and to not mislead or deceive consumers in connection with the sale of their UPF.

837. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER: (1) packaged, labeled, marketed, advertised, promoted, and/or sold their respective UPF to consumers in the state of Wisconsin and/or to residents of Wisconsin, such as the Plaintiff;

(2) shipped their UPF to Wisconsin; and (3) otherwise engaged in in trade or commerce, or conducted business, related to UPF in Wisconsin. Thus, the conduct of each Defendant described herein significantly affected Wisconsin consumers.

838. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – engaged in unfair competition or unfair, deceptive, misleading, false, fraudulent, or unconscionable acts or practices in violation of the Statute by, among other things:

    a. Misleading consumers regarding the safety risks associated with use of their UPF, including but not limited to Type 2 Diabetes as well as their addictive nature, of which they were aware or should have been aware;

    b. Excessively advertising, marketing and overpromoting their UPF, particularly to children; and

    c. Failing to disclose the safety risks associated with their UPF, including but not limited to Type 2 Diabetes as well as their addictive nature, of which they were aware or should have been aware;

839. At all relevant times, Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – knew or should have known, based on evolving scientific studies and research, of the safety risks associated with their respective UPF, including but not limited to the following: (a) they were engineered to be addictive; (b) they were engineered to promote overconsumption; (c) they contained dangerous and unnatural combinations of nutrients; (d) they contained dangerous chemical additives and contaminants; (e) they caused unique health hazards independent of nutrient content; and/or (f) they significantly increase the risk of metabolic diseases, such as Type 2 Diabetes and other life changing chronic diseases.

840. Despite this knowledge, Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS,

CONAGRA and UNILEVER – continued to mislead consumers by omitting, understating, or downplaying risks associated with use of their UPF.

841. The information referenced above that each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – concealed and did not disclose, was material.

842. A reasonable person, including Plaintiff, would find that information, which was related to their health and well-being, such as the serious adverse health risks associated with the consumption of UPF, such as Type 2 Diabetes, to be important when deciding whether to purchase and/or use UPF.

843. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – intentionally concealed the foregoing material information from consumers, including Plaintiff, because to do otherwise would have resulted in fewer purchases of their UPF.

844. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – violated the Statute by failing to disclose the material health and safety information regarding UPF, discussed above, to consumers, including the Plaintiff, in any of their respective marketing and promotional materials, advertising, packaging, labeling, websites, and/or any other public communications.

845. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – knew or should have known that the omissions and concealment of material safety

173

information in the UPF packaging, labels, advertisements, promotional materials, websites, and other communications and disclosures rendered them false, deceptive, inadequate, and misleading.

846. In violation of the Statute, through a pervasive pattern of false and misleading omissions to consumers, including the Plaintiff, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – engaged in unlawful intentional conduct by omitting or downplaying the risks of their respective UPF.

847. In violation of the Statute, the conduct of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – described herein constitutes the knowing and willful act, use, or employment of deception, false promise, misrepresentation, and unfair practices, and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of goods, merchandise and/or consumer merchandise, in trade or commerce, and was done with the intention that consumers, such as Plaintiff, would rely upon such conduct in purchasing or using the UPF.

848. The conduct of Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – was fraudulent and/or deceptive because the material misrepresentations and omissions had the capacity or tendency to deceive and, in fact, did deceive reasonable consumers, including Plaintiff.

849. Plaintiff justifiably relied on the misrepresentations and omissions of Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – and if

174

Plaintiff had known the information that each Defendant withheld and concealed, Plaintiff would not have purchased and/or used UPF.

850. As a result of such deceptive packaging, labels, advertisements, promotional, materials, websites, and other communications and disclosures, Plaintiff purchased and/or used UPF in justifiable and reasonable reliance on the misrepresentations and omissions of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER.

851. Defendants expected or should have expected reasonable consumers to rely on these misrepresentation and omissions, in part, because the omitted information directly relates to consumers' health and well-being.

852. Plaintiff at all times acted as a reasonable consumer in relying upon the misrepresentations and omissions of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – concerning their respective UPF in choosing to use and/or ingest the UPF.

853. As alleged above, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – had actual or constructive knowledge of the defective and dangerous condition of UPF and failed to take any action to cure those conditions.

854. As a direct and proximate result of the misconduct of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – Plaintiff was caused to suffer serious and dangerous side effects including Type 2 Diabetes and its sequelae, as well as other

175

severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

855. As a direct and proximate result of the misconduct of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – Plaintiff has required and will require more health care and services and did incur medical, health, incidental, and related expenses.

856. Each Defendant's conduct with respect to their design, promotion and sale of their UPF to Plaintiff and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages against each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER.

857. By reason of the foregoing, Plaintiff has been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

**SEVENTH CAUSE OF ACTON**
**AS AGAINST DEFENDANTS KRAFT HEINZ, MONDELEZ, POST HOLDINGS,**
**GENERAL MILLS, COCA-COLA, and MARS**
**(CIVIL CONSPIRACY/CONCERTED ACTION)**

858. Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

176

859. This claim is brought by Plaintiff against Defendants KRAFT HEINZ, MONDELEZ, POST HOLDINGS, GENERAL MILLS, COCA-COLA, and MARS ("the Conspiracy Defendants").

860. The Conspiracy Defendants entered into an agreement and/or combined to advance their financial interests by injuring Plaintiff. Specifically, the Conspiracy Defendants worked in concert to maintain and expand the UPF market and to ensure a steady and growing customer base. This included protecting and expanding their massive, ill-gotten share of the food market.

861. The Conspiracy Defendants acted in concert to accomplish an unlawful objective that harmed Plaintiff, including by unlawfully agreeing to conceal and/or omit, and did in fact conceal and/or omit to Plaintiff's detriment, information regarding the dangers of UPF, including but not limited to the risk of Type 2 Diabetes as well as their addictive nature, with the intention that consumers and the public would believe that UPF were safe for human consumption.

862. The Conspiracy Defendants further conspired with one another by setting out to entice and lure children to consume increasing amounts of UPF as a wrongful, unlawful and tortious means to make a profit.

863. Plaintiff's ingestion of UPF was a primary objective of the Conspiracy.

864. The Conspiracy Defendants orchestrated efforts with a unity of purpose to drive UPF into children by way of unlawful conduct in creating, designing, marketing, promoting, advertising, labelling and selling UPF that substantially contributed to the Plaintiff's injuries as alleged herein.

865. Despite having actual and constructive knowledge that their conduct was causing severe and incurable injuries in children, the Conspiracy Defendants engaged in this Conspiracy with callous disregard for the health, safety and livelihood of Plaintiff and other children.

866. Despite actual and constructive knowledge that each of the Conspiracy Defendants' actions were causing severe and incurable injuries in children, each Conspiracy Defendant withheld the truth about the consequences of their and their co-conspirators' actions, and concealed the harms caused by their and their co-conspirators' UPF.

867. Instead, the Conspiracy Defendants established an ongoing relationship to actively conceal and obfuscate the truth about their and their co-conspirators' actions by, among other things: (a) denying and denouncing scientific and public concern about the harms of their UPF; (b) delaying appropriate regulatory action to reduce the harms of their UPF; (c) blaming their victims for the harms of their UPF; (d) otherwise deflecting blame for the harms of their UPF; (e) polluting the scientific literature with biased research to confuse the public about the harms of their UPF; (f) utilizing biased experts and industry front groups to generate doubt about the harms of their UPF; (g) seeking to enact laws shielding themselves and their co-conspirators from legal liability for the harms of their UPF; and (h) attempting to fraudulently assuage concerns about their conduct by entering into illusory "self-regulation" or similar arrangements.

868. These and the Conspiracy Defendants' other actions constitute a collaborative scheme to defraud and injure. As described above, the Conspiracy Defendants shared and acted on a common purpose of maintaining and expanding the amount of their UPF consumed by children in order to ensure a steady and growing customer base, including by maintaining and expanding Conspiracy Defendants' massive and ill-gotten share of the food market.

869. This conspiracy has been in existence for at least 25 years and continues to operate to this day.

870. During this time period, each Conspiracy Defendant transmitted deceptive, false and misleading marketing, promotions, and advertising to children through numerous channels.

178

871. Despite having knowledge about deceptive, false and misleading nature of their and their co-conspirators' communications, and the harms caused by their UPF and their co-conspirator's UPF, each Conspiracy Defendant concealed these truths.

872. The Conspiracy Defendants devised and knowingly carried out material schemes and/or artifices to defraud the public, including Plaintiff, and regulators

873. The Conspiracy Defendants intended that the public and regulators rely on these false transmissions and this scheme was therefore reasonably calculated to deceive individuals and deprive them of ordinary prudence and comprehension.

874. Plaintiff was injured by the conspiracy, in that she was caused to suffer from Type 2 Diabetes, and her injury would not have occurred but for the predicate acts of the Conspiracy Defendants.

875. The combined effect of the Conspiracy Defendants' fraudulent acts included inducing Plaintiff to purchase and ingest UPF that she would not have started ingesting or using had she known that these UPF were addictive and toxic.

876. The Conspiracy Defendants' conduct was unlawful and was a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of the Conspiracy Defendants' unlawful conspiracy.

877. Defendants' conduct with respect to their design, promotion and sale of their UPF to Plaintiff and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages.

878. As a direct and proximate result of the Conspiracy Defendants' conspiracy, Plaintiff was caused to suffer serious and dangerous side effects, including Type 2 Diabetes and its sequelae,

as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

879. As a direct and proximate result of the Conspiracy Defendants' conspiracy, Plaintiff has required and will require more health care and services and did incur medical, health, incidental, and related expenses.

880. By reason of the foregoing, Plaintiff has been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

**EIGHTH CAUSE OF ACTON**
**AS AGAINST DEFENDANTS KRAFT HEINZ, MONDELEZ, POST HOLDINGS,**
**GENERAL MILLS, COCA-COLA, and MARS**
**(AIDING AND ABETTING WRONGFUL CONDUCT)**

881. Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

882. The Conspiracy Defendants had actual and constructive knowledge that each co-conspirator's actions were unlawful, and violated the rights of children, including Plaintiff.

883. The Conspiracy Defendants had actual and constructive knowledge that their conduct was causing severe and incurable injuries in children.

884. Nevertheless, each Conspiracy Defendant acted in concert with each other and aided and abetted each other pursuant to a common design to conceal the truth about their and their co-conspirators' actions, and to conceal the harms caused by their and their co-conspirators' UPF.

885. Additionally, each Conspiracy Defendant gave substantial assistance and encouragement to each other co-conspirator's unlawful conduct by, among other things: (a) denying and denouncing scientific and public concern about the harms of their UPF; (b) delaying

appropriate regulatory action to reduce the harms of their UPF; (c) blaming their victims for the harms of their UPF; (d) otherwise deflecting blame for the harms of their UPF; (e) polluting the scientific literature with biased research to confuse the public about the harms of their UPF; (f) utilizing biased experts and industry front groups to generate doubt about the harms of their UPF; (g) seeking to enact laws shielding themselves and their co-conspirators from legal liability for the harms of their UPF; and (h) attempting to fraudulently assuage concerns about their conduct by entering into illusory "self-regulation" or similar arrangements.

886. In so doing, the Conspiracy Defendants each gave substantial assistance to each other Conspiracy Defendant in order to increase sales and ingestion of UPF by children.

887. The Conspiracy Defendants did this despite having actual and constructive knowledge that such sales and exposures would cause serious and incurable injuries to children, including Plaintiff.

888. Plaintiff was injured by these actions of the Conspiracy Defendants, and her injury, Type 2 Diabetes, would not have occurred but for the predicate acts of the Conspiracy Defendants.

889. The combined effect of the Conspiracy Defendants' fraudulent acts included inducing Plaintiff to ingest and/or use UPF that she would not have ingested and/or used had she known that UPF were addictive and toxic.

890. The Conspiracy Defendants' concerted conduct was unlawful and was a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of Defendants' unlawful concerted action.

891. As a direct and proximate result of the Conspiracy Defendants' unlawful concerted action, Plaintiff was caused to suffer serious and dangerous side effects, including Type 2 Diabetes

and its sequelae, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

892. As a direct and proximate result of the Conspiracy Defendants' unlawful concerted action, Plaintiff has required and will require more health care and services and did incur medical, health, incidental, and related expenses.

893. Defendants' conduct with respect to their design, promotion and sale of their UPF to Plaintiff and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages.

894. By reason of the foregoing, Plaintiff has been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

## ALLEGATIONS PERTAINING TO PUNITIVE DAMAGES

895. Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

896. The acts and omissions of each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – as alleged throughout this Complaint were willful, wanton and malicious. Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – committed these acts with a conscious disregard for the rights, health and safety of Plaintiff and other consumers/users of Defendants' UPF, for the primary purpose of increasing Defendants' profits from the sale and distribution of their UPF.

897. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS, CONAGRA and UNILEVER – in an amount appropriate to punish and make an example of each Defendant Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, MARS, CONAGRA and UNILEVER.

898. Each Defendant's willful, wanton, malicious, and/or reckless acts include the foregoing allegations, including but not limited to:

a. Failing to disclose, or warn of, concealing, and/or suppressing material facts regarding the dangers and serious safety concerns of UPF to Plaintiff, consumers, and the public;

b. Making false and deceptive representations that UPF could be used safely for their ordinary and intended purposes, including frequent and chronic ingestion by children, for the purpose of deceiving and lulling Plaintiff and other consumers into purchasing and ingesting their UPF without knowledge of their risks;

c. Falsely representing the qualities and characteristics of their UPF and their safety to Plaintiff, other consumers, and the public;

d. Knowingly subjecting Plaintiff and all users of their UPF to a substantial and unreasonable risk of serious lifelong illness, for the purpose of enhancing their respective profits; and

e. Intentionally targeting children with deceptive, unfair, and fraudulent promotion and marketing campaigns to induce them to purchase and ingest their UPF without warning of their dangers.

899. By reason of the foregoing, Plaintiff has been damaged as against the Defendants in the sum of ONE BILLION DOLLARS ($1,000,000,000.00).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against each Defendant on each of the above-referenced claims and Causes of Action and as follows:

A.      Awarding compensatory damages, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

B.      Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings, lost earning capacity and other economic damages in an amount to be determined at trial of this action;

C.      Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and Plaintiff in an amount sufficient to punish Defendants and deter similar conduct;

D.      Statutory damages including treble damages;

E.      Pre-judgement interest;

F.      Post judgement interest;

G.      Awarding Plaintiff reasonable attorney's fees;

H.      Awarding Plaintiff the costs of these proceedings; and

I.      Such other and further relief as this Court deems just and proper.

Dated: April 27, 2026

By:         KRAVIT, HOVEL & KRAWCZYK s.c.

*s/ Christopher J. Krawczyk*
Christopher J. Krawczyk
State Bar No. 1033982
*Attorneys for Plaintiff*

184

Kravit, Hovel & Krawczyk s.c.
825 North Jefferson Street, Suite 500
Milwaukee, Wisconsin 53202
(414) 271-7100 (phone)
(414) 271-8135 (facsimile)
cjk@kravitlaw.com

MICHAEL A. LONDON (ML-7510)
GARY J. DOUGLAS
One State St, 35th Floor
New York, NY 10004
Ph: (212) 566-7500
Fax: (212) 566-7501
Email: mlondon@douglasandlondon.com
        gdouglas@douglasandlondon.com
*To be admitted pro hac vice*

VIRGINIA E. ANELLO (VA-8197)
935 Gravier St, Suite 2120
New Orleans, LA 70112
Ph: (212) 566-7500
Fax: (212) 566-7501
Email: vanello@douglasandlondon.com
*To be admitted pro hac vice*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all Counts and as to all issues.

Dated: April 27, 2026

By:    KRAVIT, HOVEL & KRAWCZYK s.c.

*s/ Christopher J. Krawczyk*
Christopher J. Krawczyk
  State Bar No. 1033982
*Attorneys for Plaintiff*
Kravit, Hovel & Krawczyk s.c.
825 North Jefferson Street, Suite 500
Milwaukee, Wisconsin 53202
(414) 271-7100 (phone)
(414) 271-8135 (facsimile)
cjk@kravitlaw.com

185